IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

MARION WILSON, JR.,            :
                                 :
          Petitioner        :
                                 :
          vs.                :       CIVIL ACTION NO: 5:10-CV-489 (MTT)
                                 :
CARL HUMPHREY, Warden,    :
                                 :
          Respondent     :

## ORDER

Pending before the Court is Petitioner Marion Wilson, Jr.'s Motion for Leave to Conduct Discovery and Authorization and Payment of Necessary Expert Services.

## I.    BACKGROUND

## A.    Facts

According to the Georgia Supreme Court, the evidence at Wilson's trial established the following facts:

> [O]n the night of March 28, 1996, the victim, Donovan Corey Parks, entered a local Wal-Mart to purchase cat food, leaving his 1992 Acura Vigor parked in the fire lane directly in front of the store. Witnesses observed Wilson and Robert Earl Butts standing behind Parks in one of the store's checkout lines and, shortly thereafter, speaking with Parks beside his automobile. A witness overheard Butts ask Parks for a ride, and several witnesses observed Wilson and Butts entering Parks's automobile, Butts in the front passenger seat and Wilson in the back seat. Minutes later, Parks's body was discovered lying face down on a residential street. Nearby residents testified to hearing a loud noise they had assumed to be a backfiring engine and to seeing the headlights of a vehicle driving from the scene. On the night of the murder, law enforcement officers took

inventory of the vehicles in the Wal-Mart parking lot. Butts's automobile was among the vehicles remaining in the lot overnight. Based upon the statements of witnesses at the Wal-Mart, Wilson was arrested. A search of Wilson's residence yielded a sawed-off shotgun loaded with the type of ammunition used to kill Parks, three notebooks of handwritten gang "creeds," secret alphabets, symbols, and lexicons, and a photo of a young man displaying a gang hand sign.

Wilson gave several statements to law enforcement officers and rode in an automobile with officers indicating stops he and Butts had made in the victim's automobile after the murder. According to Wilson's statements, Butts had pulled out a sawed-off shotgun, had ordered Parks to drive to and then stop on Felton Drive, had ordered Parks to exit the automobile and lie on the ground, and had shot Parks once in the back of the head. Wilson and Butts then drove the victim's automobile to Gray where they stopped to purchase gasoline. Wilson, who was wearing gloves, was observed by witnesses and videotaped by a security camera inside the service station. Wilson and Butts then drove to Atlanta where they contacted Wilson's cousin in an unsuccessful effort to locate a "chop shop" for disposal of the victim's automobile. Wilson and Butts purchased two gasoline cans at a convenience store in Atlanta and drove to Macon where the victim's automobile was set on fire. Butts then called his uncle and arranged a ride back to the Milledgeville Wal-Mart where Butts and Wilson retrieved Butts's automobile.

*Wilson v. State*, 271 Ga. 811, 812-13, 525 S.E.2d 339, 343 (1999), *overruled in part by*

*O'Kelley v. State*, 284 Ga. 758, 670 S.E.2d 388 (2008).[1]

---

[1] In his direct appeal, Wilson claimed that "the trial court erred by failing to provide for opening statements at the beginning of the sentencing phase." *Wilson*, 271 Ga. at 818, 525 S.E.2d at 347. The Georgia Supreme Court rejected this claim, holding that "[a]llowing opening statements at the beginning of the sentencing phase is the better practice, but it is not required." *Id.* However, in *O'Kelley v. State*, 284 Ga. 758, 670 S.E.2d 388 (2008), the Court overruled *Wilson's* holding that the trial judge had discretion to determine whether a defendant could make an opening statement in the sentencing phase of a trial; rather "a death penalty defendant is entitled to make an opening statement in the sentencing phase." *O'Kelley*, 284 Ga. at 768, 670 S.E.2d at 398.

**B.     Procedural History**

On May 29, 1996, a Baldwin County Grand Jury indicted Wilson for malice murder, felony murder, armed robbery, hijacking a motor vehicle, possession of a firearm during the commission of a crime, and possession of a sawed-off shotgun. *Id.* at 812 n.1, 525 S.E.2d at 343 n.1.  A jury found him guilty of all charges, and on November 7, 1997, the jury recommended the death sentence for malice murder.  *Id.*

Wilson moved for a new trial on December 3, 1997, and the trial court denied the motion, as amended, on December 18, 1997.  *Id.*

Wilson filed a notice of appeal, and the Georgia Supreme Court affirmed his conviction and sentence on November 1, 1999.  *Id.* at 811-24, 525 S.E.2d at 342-51. The Georgia Supreme Court denied Wilson's motion for reconsideration on December 20, 1999. (Doc. 1, at 3).  Wilson filed a petition for writ of certiorari in the United States Supreme Court, which was denied on October 2, 2000. (Doc. 1, at 3).

Wilson filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts County, Georgia on January 19, 2001.  (Doc. 1, at 3).  After an evidentiary hearing, the court entered its order denying the petition in its entirety on December 1, 2008.  (Doc. 1, at 3).

On January 30, 2009, Wilson filed an Application for a Certificate of Probable Cause to Appeal from the denial of habeas corpus relief.  (Doc. 1, at 3).  The Georgia Supreme Court denied this application on May 3, 2010.  (Doc. 1, at 3).

On September 30, 2010, Wilson filed a Petition for Writ of Certiorari in the United States Supreme Court, which the Court denied on December 6, 2010. (Doc. 1, at 3).

On December 17, 2010, Wilson filed his Petition for Writ of Habeas Corpus by a Person in State Custody in this Court.

## II.  STANDARDS GOVERNING DISCOVERY AND APPOINTMENT OF EXPERTS IN 28 U.S.C. § 2254 ACTIONS

### A.  Requests for Discovery

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  Rule 6 of the Rules Governing Section 2254 Cases ("Rule 6") provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery."  28 U.S.C. § 2254 Rule 6.  Additionally, "[a] party requesting discovery must provide reasons for the request." *Id.*  "Rule 6 is meant to be 'consistent' with" *Harris v. Nelson*, 394 U.S. 286 (1969). *Bracy*, 520 U.S. at 909; *see also* Habeas Corpus R. 6 advisory committee's note.  In *Harris*, the Supreme Court held that a petitioner establishes good cause for discovery if "specific allegations before the court show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief." *Harris*, 394 U.S. at 300.  However, "good cause for discovery cannot arise from mere speculation" and "discovery cannot be ordered on the basis of pure hypothesis." *Arthur v. Allen*, 459 F.3d 1310, 1311 (11th Cir. 2006).

In *Isaacs v. Head*, 300 F.3d 1232 (11th Cir. 2002), the Eleventh Circuit held that with the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "Congress modified the discretion afforded to the district court and erected additional barriers limiting a habeas petitioner's right to discovery or an evidentiary hearing." *Id.* at 1248-49. The Court found that Isaacs had not been "reasonably diligent in trying to develop the factual record while in state court," and that the district court, therefore, correctly denied his requests for both discovery and an evidentiary hearing. *Id.* at 1249. Specifically in relation to Isaacs' request for discovery, the court held that Isaacs

> does not explain why the discovery that he seeks now is any different from the discovery that was available to him in state courts. Under these circumstances, we conclude that the district court properly denied Isaacs' request to conduct additional discovery . . . because he neither exercised sufficient diligence to satisfy the requirements of § 2254 (e)(2) nor showed "good cause" as required by Rule 6(a).

*Id.* at 1250.

In *Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002), the Eleventh Circuit again addressed the issue of whether a habeas petitioner should be granted leave to conduct discovery. During state habeas proceedings, Crawford had obtained a Georgia Bureau of Investigation ("GBI") report that included information about various stains on a mattress, blankets, and clothing. One day before the evidentiary hearing in the state habeas corpus court, Crawford moved for independent serological testing on these items. The state court denied the motion as untimely. *Id.* at 1328-29.

In his federal habeas action, Crawford asked the district court to order serological testing. The Eleventh Circuit held that the district court correctly denied discovery

because "Crawford failed to exercise sufficient diligence in seeking testing of items mentioned in the GBI report while in state court." *Id.* at 1329. The Court held that "in light of both § 2254(e)(2) and Rule 6(a), we conclude that Crawford was not entitled to have the items from the GBI report tested after bringing his case in the federal courts." *Id.*

Thus, a habeas petitioner is entitled to discovery upon a showing of good cause *and* of diligence in pursing the claim for which discovery is sought.[2] Moreover, the Supreme Court's recent decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), likely places additional restrictions on discovery in § 2254 cases. In *Pinholster,* the Court made clear that, "[a]lthough state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." *Id.* at 1401. The Court addressed "whether review under § 2254(d)(1) permits consideration of evidence introduced in an evidentiary hearing before the federal habeas court." *Id.* at 1398. The Court held that when the state court has decided an issue on the merits, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* Likewise, based on the plain language in the statute itself, review under § 2254(d)(2) is limited to "evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *Pinholster*, 131 S. Ct. at 1400 n.7.

---

[2] If the petitioner has not been diligent in developing the factual basis of his claim in the state courts, he can still obtain discovery if he meets the stringent requirements of § 2254(e)(2)(A) and (B). Wilson does not maintain that he can meet these requirements.

While *Pinholster* addressed evidentiary hearings in the district courts, courts have found that "its linkage to . . . discovery . . . is unquestionably present." *Coddington v. Cullen*, No. CIV S-01-1290 KJM GGH DP, 2011 WL 2118855, at *1 (E.D. Cal. May 27, 2011) (explaining that "the extent of permissible discovery in a habeas corpus action, seemingly once settled, has been upset by the AEDPA ruling of . . . *Pinholster*"). After *Pinholster*, if a state court decides a particular claim on the merits, district courts are not authorized to hold an evidentiary hearing in which new evidence is introduced to support that claim. It logically follows that conducting discovery on that claim would be futile, and this has been the holding of at least one district:

> [A]ny new evidence unearthed during discovery in federal court and "later introduced in federal court is irrelevant to § 2254(d)(1) [and (2)] review." In other words, if the state trial court adjudicated . . . Petitioner's [claim] on the merits, such that Petitioner must satisfy the terms of § 2254(d), "good cause" does not exist for the discovery Petitioner seeks . . . because this Court may look only to the state court record in applying § 2254(d).

*Hurst v. Branker*, No. 1:10 CV 725, 2011 WL 2149470, at *8 (M.D.N.C. June 1, 2011) (quoting *Pinholster*, 131 S. Ct. at 1400)).

The Eleventh Circuit has not yet addressed the effect of *Pinholster* on § 2254 discovery claims, and the parties did not address *Pinholster* in their briefs. As discussed below, Wilson has not met Rule 6's good cause and diligence standard, and he therefore is not entitled to conduct discovery. Accordingly, the Court need not reach the issue of whether *Pinholster* further limits discovery in § 2254 proceedings.

**B.     Requests for financial assistance**

To the extent that Wilson is seeking financial assistance for investigators or experts, his requests are governed by 18 U.S.C. § 3599(f), which provides:

> Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor under subsection (g).

Wilson has not cited, and the Court has not found, any Eleventh Circuit cases directly interpreting this statute.  However, other circuits have held that habeas corpus petitioners are entitled to experts and investigators "only upon a showing of reasonable necessity." *Rojem v. Gibson*, 245 F.3d 1130, 1139 (10th Cir. 2001).  Of course, if a petitioner has not shown good cause for the discovery he requests, he would not be entitled to an investigator to conduct the discovery or any experts to interpret the results of the discovery.

## III.  WILSON'S SPECIFIC DISCOVERY REQUESTS

### A.  Discovery related to Jon Philip Carr's character and crimes as well as funds for an investigator to conduct such an investigation

Wilson was represented by Tom O'Donnell and Jon Phillip Carr during his trial.[3] (Resp't Ex. 90, at 11; Doc. 18-4).  O'Donnell was lead counsel and Carr's "role was to assist him."  (Resp't Ex. 54, at 206, 232; Doc. 12-6).  O'Donnell remained lead counsel throughout the trial, but on direct appeal, O'Donnell withdrew because he took a position as Special Assistant Attorney General working with the Department of Family and Children Services.  (Rep't Ex. 54, at 229-30; Doc. 12-6).  Carr and John Bradley represented Wilson during his direct appeal.  (Resp't Ex. 54, at 230; Doc. 12-6).

---

[3] James M. Setters was originally appointed to assist O'Donnell.  However, he withdrew for health reasons and Carr was appointed on May 27, 1997. (Resp't Ex. 54, at 232; Doc. 12-6; Resp't Ex. 55, at 441-42; Doc. 12-8).

In his state habeas corpus petition, Wilson raised "numerous claims of ineffective assistance of trial and appellate counsel." (Resp't Ex. 90, at 10; Doc. 18-4). The Butts County Superior Court adjudicated these claims on the merits and ruled against Wilson in an order entered December 1, 2008. (Resp't Ex. 90, at 10-40; Doc. 18-4).

Wilson now alleges that "[t]he Georgia Supreme Court's denial of Mr. Wilson's ineffective assistance claims relies on the word of one man now known to be a child molester and rapist."[4] (Doc. 25-1, at 7). According to Wilson, Carr was arrested on June 25, 2006, and accused of indecent sexual activity with a thirteen year old girl and a fourteen year old girl who had escaped from a halfway house for troubled youth in Baldwin County. (Doc. 25-2, 25-3). In March, 2007, Carr was sentenced to serve twenty-five years in prison for four counts of child molestation. (Doc. 25-5).

Wilson maintains that the state court gave Carr's "testimony a great deal of weight, [and] rel[ied] on Carr's testimony to find that trial counsel fell within the reasonable range of effective assistance." (Doc. 25-1, at 7). According to Wilson, "post-2005 events reveal this was unreasonable; Carr's word is of little to no value." (Doc 25-1, at 7). Wilson argues that "[b]ecause an investigation may prove that the Georgia Supreme Court's findings of fact and law[5] are unreasonable and contrary to

---

[4] The Georgia Supreme Court did not directly address this issue. The Butts County Superior Court held an evidentiary hearing, reviewed post-hearing briefs, and ruled on the merits regarding the various claims of ineffective assistance of counsel. (Resp't Ex. 90, at 10-40; Doc. 18-4). The Georgia Supreme Court subsequently denied Petitioner's Application for a Certificate of Probable Cause to appeal the denial of habeas corpus. (Resp't Ex. 95; Doc. 18-9).

[5] Again, the Georgia Supreme Court made no findings of fact and law on the issue of ineffective assistance of counsel.

clear Court precedent, [he should be granted] leave to conduct discovery related to Carr's character and crimes, including funding to hire an investigator in furtherance thereof." (Doc. 25-1, at 12).

Although Wilson does not quite come out and say it, his point is that Carr's credibility can now be impeached with his criminal misconduct. Putting aside the question of whether Carr's convictions will be admissible in any proceeding in this Court, it is apparent that Wilson has not established good cause to conduct discovery regarding Carr's crimes. Wilson has already documented that Carr is a convicted child molester, and the Georgia Department of Corrections website confirms that he is serving a twenty-five year sentence for four counts of child molestation. (Doc. 25-5). Respondent does not contest this, and the Court can take judicial notice of these facts. *See generally* Fed. R. Evid. 201. The Court also notes that Carr's license to practice law was suspended June 4, 2007, "pending the termination of the appeal of his criminal convictions." *In re Carr*, 282 Ga. 138, 646 S.E.2d 252, 253 (2007). Give that there is no indication of any pending appeal by Carr, the Court is willing to assume that Carr will, at some point, be disbarred. In short, and in the vernacular, Wilson has all the dirt on Carr he reasonably could expect to use. There is no good cause to find more.

Additionally, Wilson has not "explain[ed] why the discovery that he seeks now is any different from the discovery that was available to him in state courts." *Isaacs*, 300 F.3d at 1250. Wilson's state habeas action was still pending in the Butts County Superior Court when Carr was arrested and charged with child molestation in June 2006 and when he was convicted in March 2007. Although the evidentiary hearing was

held in February 2005, the superior court did not enter its Order denying Wilson's

Petition for Writ of Habeas Corpus until December 1, 2008.  (Resp't Ex. 54-55, at 90;

Doc. 12-5, 12-6, 12.-7, 12-8, 18-4).  Thus, Wilson had nearly three years after Carr's

arrest and over eighteen months after Carr's conviction, to raise the issue of Carr's

credibility with the court considering whether Carr's representation was ineffective.  Yet,

he never  informed the Court of Carr's arrest[6] or conviction, and never sought the

discovery that he now requests.   Although Wilson now claims that he requires

discovery "to determine the truth of what Carr did (or more likely, did not do) during his

purported 'mitigation investigation,'" he should have requested that discovery while his

action was pending in the state habeas court.

Because Petitioner was not "reasonably diligent in trying to develop the factual

record while in state court" and because he has not established good cause, the Court

denies his motion to conduct this discovery now.  *Isaacs*, 300 F.3d at 1249.[7]

**B.      Expert discovery regarding the proportionality of Wilson's death sentence**

O.C.G.A. §17-10-35(c)(3) requires the Georgia Supreme Court to determine

"[w]hether the sentence of death is excessive or disproportionate to the penalty imposed

in similar cases, considering both the crime and the defendant."  Wilson contends that

the Georgia Supreme Court conducted only a cursory review when it found that

---

[6] Two days after Carr's arrest, Wilson submitted a Notice of Supplemental Authority in which he brought to the court's attention a recently-decided Supreme Court case that he maintained supported his ineffectiveness claim.  (Resp't Ex. 89; Doc. 18-3).  Wilson made no mention of Carr's arrest in this document.

[7] For these same reasons, the Court finds that investigative services are not reasonably necessary. 18 U.S.C. § 3599(f).

"considering both the crime and defendant, . . . the sentence of death was neither excessive nor disproportionate to the penalties imposed in similar cases." *Wilson*, 271 Ga. at 823-24, 525 S.E.2d at 351. Wilson claims this finding is "based on unreasonable determinations of fact, is itself an unreasonable determination of fact and is contrary to and/or an unreasonable application of U.S. Supreme Court precedent." (Doc 25-1, at 14).

To support his argument, Wilson seeks "permission to hire an investigator to gather Georgia death penalty case data for cases decided both before and after the Georgia Supreme Court's decision on direct appeal, and to hire Professor Raymond Paternoster to conduct a statistical analysis of this data." (Doc. 25-1, at 15-16). Wilson also seeks authorization to retain David Fassler M.D., a University of Vermont Clinical Professor who is Board Certified in child and adolescent psychiatry, to "provide evidence regarding developments in the field of developmental psychiatry since the state habeas proceedings in 2005." (Doc. 25-1, at 17). Wilson argues that "[t]his evidence will be used to support [his] claim that the state court's determination regarding proportionality was an unreasonable determination of fact and was contrary to and an unreasonable application of" Supreme Court precedent. (Doc. 25-1, at 17).

However, in *Pulley v. Harris*, 465 U.S. 37 (1984), the United States Supreme Court held that the Constitution does not require a proportionality review in any form and made clear that its decision in *Gregg* v. Georgia, 428 U.S. 153 (1976) should not be read to require such a review. *Pulley,* 465 U.S. at 46. The Court explained that while *Gregg* "emphasiz[ed] the importance of mandatory appellate review under the Georgia

statute, [it] did not hold that without comparative proportionality review the statute would

be unconstitutional." *Id.* at 50 (*citing Zant v. Stephens*, 462 U.S. 862 (1983)). Indeed,

while the Court explained that "[p]roportionality review [is] considered to be an additional

safeguard against arbitrarily imposed death sentences," it also noted that "comparative

review [has never been] constitutionally required." *Id*; s*ee also McClesky v. Kemp*, 481

U.S. 279, 306-307 (1987) (holding that "absent a showing that the Georgia capital

punishment system operates in an arbitrary and capricious manner, [the petitioner]

could not prove a constitutional violation by demonstrating that other defendants who

may be similarly situated did *not* receive the death penalty").

The Eleventh Circuit has also addressed the role of state requirements of

proportionality in federal habeas proceedings:

> A federal habeas court should not undertake a review of the state
> supreme court's proportionality review and, in effect, "get out the record"
> to see if the state court's finding of fact, their conclusion based on a review
> of similar cases, was supported by the "evidence" in the similar cases. To
> do so would thrust the federal judicia into the substantive policy making
> area of the state. It is the state's responsibility to determine the procedure
> to be used, if any, in sentencing a criminal to death.

*Moore v. Balkcom*, 716 F.2d 1511, 1518 (11th Cir. 1983). Moreover, the Eleventh

Circuit has specifically rejected the argument that federal law requires state courts to

"make an explicit, detailed account of their comparison." *Lindsey v. Smith*, 820 F.2d

1137, 1154 (11th Cir. 1987). The Eleventh Circuit could not have been any clearer:

> The Constitution does not require a proportionality review. And we refuse
> to mandate as a matter of federal constitutional law that where, as here,
> state law requires such review, courts must make an explicit, detailed
> account of their comparisons. Based on their own past experience in

reviewing capital punishment cases, state appellate courts "can rationally distinguish between those individuals for whom the death penalty is an appropriate sanction and those for whom it is not," without listing in their opinions the facts that did or did not justify the imposition of the death penalty in the prior cases.

*Id.* (internal citations omitted).

Given that proportionality review is not required by the Constitution or any other federal law, and because Eleventh Circuit precedent forbids a case-by-case comparison of the review undertaken by the Georgia Supreme Court, Wilson's request for discovery on this issue is denied.

While not necessary to the Court's decision regarding discovery on this issue, the Court also notes that Wilson seeks to discover and present evidence regarding Georgia cases decided **after** the Georgia Supreme Court issued its opinion in this case. Additionally, he wants his expert to provide evidence regarding new (post- 2005) developments in the field of developmental psychiatry. As discussed above, the Supreme Court made clear in *Pinholster* that the record which the district court can review under 28 U.S.C. § 2254(d)(1) and (2) is limited to the record that was before the state court. Thus, developments in both case law and developmental psychiatry that occurred after the state courts' decisions would be irrelevant.

**C.  Investigation and discovery regarding Georgia's supply of sodium thiopental**

Wilson argues that his execution is barred by the Eighth Amendment because of Georgia's use of suspect sodium thiopental.[8]  Wilson claims that Hospira, Inc., the only "legitimate supplier" of sodium thiopental, stopped manufacturing the drug in January 2011.  (Doc. 25-1, at 19; Doc. 25-8).  The Georgia Department of Corrections then acquired sodium thiopental from Dream Pharma Ltd. of London, England, a company that is not authorized to export this drug into the United States.  (Doc. 25-1, at 20; Doc. 25-8).  There is evidence that this supply of sodium thiopental was actually manufactured in 2006 by a now-defunct Austrian company, Link Pharmaceuticals.  (Doc. 25-1, at 21).  Wilson claims that this drug may be expired, mislabeled, contaminated, or otherwise adulterated and that he has "good cause to believe there is a serious risk that during his execution he will be conscious and suffer the agonizing pain of, first, asphyxiation triggered by the paralytic agent, and second, caustic burning caused by the Potassium Chloride, in violation of the Eighth Amendment."  (Doc. 25-1, at 23).

To support this claim, Wilson seeks leave to conduct discovery and to hire an investigator to determine:  (1) when and where Georgia obtained its supply of sodium thiopental; (2) who manufactured the sodium thiopental, as well as how, when, and

---

[8] Since 2001, Georgia has used a three-step, lethal injection process for executions.  *See Base v. Rees,* 553 U.S. 35, 42 n.1, 44 (2008).  Until recently, the Department of Corrections first administered sodium thiopental to prisoners in order to "induce a deep, comalike unconsciousness."  *Id.*  Thereafter, a second drug was injected to paralyze the inmate, followed by a third drug that induced cardiac arrest.  *Id.*  "The proper administration of the first drug ensure[d] that the prisoner [did] not experience any pain associated with the paralysis and cardiac arrest caused by the second and third drugs."  *Id.*

where it was manufactured; (3) the procedures followed for the importation of the sodium thiopental; (4) the composition of the sodium thiopental labeled as Dream Pharma and/or Link Pharmaceutical; (5) information regarding any inmate injected with Dream Pharma or Link Pharmaceuticals' sodium thiopental; and (6) the effectiveness of the sodium thiopental labeled as Dream Pharma and/or Link Pharmaceuticals.   (Doc. 25-1, at 17-23).

The problem with Wilson's argument is that it attacks a moot point.  On May 20, 2011, the Georgia Department of Corrections announced that it was substituting sodium thiopental for the pentobarbital in its lethal injection protocol.  Bill Rankin, *Georgia's Death Row; New Drug OK'd for executions*, The Atlanta Journal-Constitution, May 21, 2011, at 1B.  Thus the allegedly tainted Dream Pharma sodium thiopental will not be used to execute Wilson.  In his reply brief, Wilson argues this does not obviate his need for discovery.  He now wants to discover "precisely what . . . Georgia intend[s] to inject into" him. (Doc. 27 at p. 17).  As a practical matter, that question can likely be answered without discovery.  Because Wilson's execution is not imminent, and given the developments regarding Georgia's lethal injection protocol in the last few months, it is likely that nobody knows with reasonable certainty what will happen if and when Wilson is executed.  Thus, it is unlikely that Wilson could establish good cause to conduct discovery today on what may or may not happen at some indeterminate time in the future.

However, Wilson's request to conduct discovery suffers from a more fundamental defect.  A habeas action is not the appropriate vehicle for attacking Georgia's lethal

injection procedures; rather, that challenge must be mounted in a 42 U.S.C. § 1983

action. *Tompkins v. Sec'y Dep't Corr.*, 557 F.3d 1257, 1261 (11th Cir. 2009); see *Hill v.*

*McDonough*, 547 U.S. 573, 579-83 (2006); *Thomas v. McDonough,* 228 F. App'x 931,

932 (11th Cir. 2007) (holding that "§ 1983 and § 2254 are mutually exclusive," and that

if a claim can be brought under § 1983, it "cannot be brought under § 2254").

The Court recognizes that the Eleventh Circuit's recent decision in *Powell v.*

*Thomas*, ___ F.3d ___, No. 11-12613, 2011 WL 2437498 (11th Cir.), potentially creates

a dilemma for § 1983 claims attacking lethal injection procedures. In *Powell*, the

Eleventh Circuit rejected a § 1983 challenge to Alabama's decision to substitute

pentobarbital for sodium thiopental in its lethal injection protocol. The Court held that

even though Alabama made the decision to use pentobarbital in 2011, the statute of

limitations for Powell's § 1983 claim started running when Alabama changed its method

of execution from electrocution to lethal injection in 2001. The Eleventh Circuit held that

a new statute of limitations commences only when there has been "a significant

alteration" in a State's execution protocol. *See Id.* at *4. The switch from sodium

thiopental to pentobarbital was not, the Eleventh Circuit held, a significant alteration.

Therefore, the Eleventh Circuit affirmed the district court's dismissal of Powell's § 1983

claim.

Thus, Wilson should bring his challenge to Georgia's lethal injection procedures

in a § 1983 action. However, Georgia, like Alabama, adopted lethal injection for

executions in 2001 and, pursuant to *Powell*, a § 1983 claim based on Georgia's switch

to pentobarbital may well be barred by the statute of limitations. See *Alderman v.*

*Donald,* 293 F. App'x 693, 694 (11th Cir. 2008).  Whether Wilson will face that dilemma remains to be seen.  However, it is clear that he is not entitled to conduct discovery on Georgia's lethal injection procedures in this habeas proceeding.

## IV.    CONCLUSION

Based on the above, the Court **DENIES** Wilson's Motion for Leave to Conduct Discovery and Authorization of Necessary Expert Services and instructs the parties to comply with the March 4, 2011 scheduling Order for future motions and briefs.

**SO ORDERED**, this 12th day of July, 2011.


S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT