IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

MARION WILSON, JR.,                    :
                                       :
            Petitioner,                :
                                       :
     vs.                               :
                                       :     CIVIL ACTION NO. 5:10-CV-489 (MTT)
CARL HUMPHREY, Warden,                 :
                                       :
            Respondent.                :
                                       :
_____:

## ORDER

**MARION WILSON, JR.** was sentenced to death for the murder of Donovan Corey

Parks.   He petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Although he alleges numerous errors on the part of the state courts that considered his

various claims, his principal contention is that he would not have been sentenced to die if

his trial attorneys had competently investigated his background and used the information

gained from that background investigation to present an effective mitigation defense.

Specifically, he argues that if the jury had heard from various teachers, social workers,

and other background witnesses and if his attorneys had armed their mental health

experts with this background information, the jury likely would not have found that he

should be executed.   This Court agrees that the conduct of Wilson's trial attorneys with

regard to their investigation and presentation of mitigation evidence is difficult to defend.

But even assuming his lawyers' performance was deficient, it is clear to this Court that

Wilson cannot prove he was prejudiced.   That is because the Court is satisfied that there

is not a reasonable probability that, but for his lawyers' errors, the result of his trial would

have been different.

For this and many other reasons discussed in detail below, Wilson's petition is

**DENIED.**

## I.  BACKGROUND AND PROCEDURAL HISTORY

### A. Facts

The Georgia Supreme Court summarized the facts of this case in Wilson's direct

appeal:

> [O]n the night of March 28, 1996, the victim, Donovan Corey Parks, entered a local Wal-Mart to purchase cat food, leaving his 1992 Acura Vigor parked in the fire lane directly in front of the store.   Witnesses observed Wilson and Robert Earl Butts standing behind Parks in one of the store's checkout lines and, shortly thereafter, speaking with Parks beside his automobile.   A witness overheard Butts ask Parks for a ride, and several witnesses observed Wilson and Butts entering Parks's automobile, Butts in the front passenger seat and Wilson in the back seat.   Minutes later, Parks's body was discovered lying face down on a residential street.   Nearby residents testified to hearing a loud noise they had assumed to be a backfiring engine and to seeing the headlights of a vehicle driving from the scene.   On the night of the murder, law enforcement officers took inventory of the vehicles in the Wal-Mart parking lot.   Butts's automobile was among the vehicles remaining in the lot overnight.   Based upon the statements of witnesses at the Wal-Mart, Wilson was arrested.   A search of Wilson's residence yielded a sawed-off shotgun loaded with the type of ammunition used to kill Parks, three notebooks of handwritten gang "creeds," secret alphabets, symbols, and lexicons, and a photo of a young man displaying a gang hand sign.
>
> Wilson gave several statements to law enforcement officers and rode in an automobile with officers indicating stops he and Butts had made in the victim's automobile after the murder.   According to Wilson's statements, Butts had pulled out a sawed-off shotgun, had ordered Parks to drive to and then stop on Felton Drive, had ordered Parks to exit the automobile and lie on the ground, and had shot Parks once in the back of the head.   Wilson and Butts then drove the victim's automobile to Gray where they stopped to purchase gasoline.   Wilson, who was wearing gloves, was observed by witnesses and videotaped by a security camera inside the service station. Wilson and Butts then drove to Atlanta where they contacted Wilson's cousin in an unsuccessful effort to locate a "chop shop" for disposal of the victim's automobile.   Wilson and Butts purchased two gasoline cans at a convenience store in Atlanta and drove to Macon where the victim's automobile was set on fire.   Butts then called his uncle and arranged a ride

back to the Milledgeville Wal-Mart where Butts and Wilson retrieved Butts's automobile.

*Wilson v. State*, 271 Ga. 811, 812-13, 525 S.E.2d 339, 343 (1999), *overruled in part by O'Kelley v. State*, 284 Ga. 758, 670 S.E.2d 388 (2008).

### B. Procedural history

On November 5, 1997, a jury found Wilson guilty of malice murder, felony murder, armed robbery, hijacking a motor vehicle, possession of a firearm during the commission of a crime, and possession of a sawed-off shotgun.   (Doc. 8-9 at 90).[1]   He was sentenced to death for the crime of malice murder, and the Georgia Supreme Court affirmed his conviction and sentence on November 1, 1999.   (Doc. 8-9 at 88); *Wilson,* 271 Ga. at 812, 525 S.E.2d at 343.

Wilson filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts County, Georgia on January 19, 2001.   (Doc. 11-4).   After conducting an evidentiary hearing, the state habeas court denied relief in an order dated November 25, 2008. (Docs. 12-5 to12-8; 18-4).

On December 17, 2010, Wilson filed a Petition for Writ of Habeas Corpus by a Person in State Custody in this Court.   (Doc. 1).   The Respondent filed his answer, and the Court denied Wilson's motions for discovery, a stay, and an evidentiary hearing. (Docs. 7, 28, 37, 39).   Both parties have now briefed the issues.   (Docs. 43, 44, 47).

---

[1]  Because all documents have been electronically filed, this Order cites to the record by using the document number and electronic screen page number shown at the top of each page by the Court's CM/ECF software.

## II.   STANDARD OF REVIEW

### A.  Exhaustion and procedural default

Procedural default bars federal habeas relief when a habeas petitioner has failed to exhaust state remedies that are no longer available or when the state court rejects the habeas petitioner's claim on independent state procedural grounds.   *Frazier v. Bouchard,* 661 F.3d 519, 524 n.7 (11th Cir. 2011); *Ward v. Hall,* 592 F.3d 1144, 1156-57 (11th Cir. 2010).

There are two exceptions to procedural default.   If the habeas respondent establishes that a default has occurred, the petitioner bears the burden of establishing "cause for the failure to properly present the claim and actual prejudice, or that the failure to consider the claim would result in a fundamental miscarriage of justice."   *Conner v. Hall*, 645 F.3d 1277, 1287 (11th Cir. 2011) (citing *Wainwright v. Sykes*, 433 U.S. 72, 81-88 (1977); *Marek v. Singletary*, 62 F.3d 1295, 1301-02 (11th Cir. 1995)).   A petitioner establishes cause by demonstrating that some objective factor external to the defense impeded his efforts to raise the claim properly in the state courts.   *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1180 (11th Cir. 2010) (quoting *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003)).   A petitioner establishes prejudice by showing that there is a reasonable probability that the result of the proceedings would have been different.   *Id*.   To the extent the state court's cause and prejudice findings are based upon determinations of fact, those factual findings are presumed to be correct and can be rebutted only by clear and convincing evidence.   28 U.S.C. § 2254(e)(1).   Regarding what is necessary for a petitioner to establish a fundamental miscarriage of justice, the Eleventh Circuit has stated:

> To excuse a default of a guilt-phase claim under [the fundamental miscarriage of justice] standard, a petitioner must prove "a constitutional violation [that] has probably resulted in the conviction of one who is actually innocent."   To gain review of a sentencing-phase claim based on [a fundamental miscarriage of justice], a petitioner must show that "but for constitutional error at his sentencing hearing, no reasonable juror could have found him eligible for the death penalty under [state] law."

*Hill v. Jones*, 81 F.3d 1015, 1023 (11th Cir. 1996) (citations omitted).

### B. Claims that were adjudicated on the merits in the state courts

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides the standard of review.[2]   This Court may not grant habeas relief with respect to any claim that has been adjudicated on the merits in state court unless the state court's decision was (1) contrary to clearly established Federal law; (2) involved an unreasonable application of clearly established Federal law; or (3) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)-(2); *see also Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). The phrase "clearly established Federal law" refers to the holdings of the United States Supreme Court that were in existence at the time of the relevant state court decision. *Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"The 'contrary to' and 'unreasonable application' clauses of § 2254(d)(1) are separate bases for reviewing a state court's decisions."   *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001) (citing *Williams*, 529 U.S. at 404-05).

---

[2]  Wilson complains that the state habeas court "adopt[ed] nearly verbatim the State's proposed findings of fact and conclusions of law."   (Doc. 43 at 19).   Wilson does not allege that AEDPA deference should not apply to the state habeas court's order and both Supreme Court and Eleventh Circuit precedent provide that deference is still required.   *Anderson v. Bessemer City*, 470 U.S. 564, 572 (1985) (citing *United States v. Marine Bancorporation*, 418 U.S. 602, 615 n.13 (1974); *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656-57 (1964)); *Rhode v. Hall*, 582 F.3d 1273, 1281 (11th Cir. 2009); *Brownlee v. Haley*, 306 F.3d 1043, 1067 n.19 (11th Cir. 2002).

> Under § 2254(d)(1), "[a] state court's decision is 'contrary to'... clearly established law if it 'applies a rule that contradicts the governing law set forth in [the United States Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the United States Supreme] Court and nevertheless arrives at a [different] result….'"

*Michael v. Crosby,* 430 F.3d 1310, 1319 (11th Cir. 2005) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003)).

A state court's decision involves an "unreasonable application" of federal law when "'the state court identifies the correct governing legal rule but unreasonably applies it to the facts of the particular state prisoner's case, or when it unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context.'" *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1286 (11th Cir. 2012) (quoting *Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011)).   An "unreasonable application" and an "incorrect application" are not the same:

> We have explained that an *unreasonable* application of federal law is different from an *incorrect* application of federal law.   Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.   Rather, that application must be objectively unreasonable.   This distinction creates a substantially higher threshold for obtaining relief than *de novo* review. AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.

*Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations and quotation marks omitted).

Pursuant to 28 U.S.C. § 2254(d)(2), district courts can "grant habeas relief to a petitioner challenging a state court's factual findings only in those cases where the state court's decision 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Price v. Allen*, 679 F.3d 1315, 1320 (11th Cir. 2012) (quoting 28 U.S.C. § 2254(d)(2)).   A state court's determination of a

factual issue is "presumed to be correct," and this presumption can only be rebutted by "clear and convincing evidence."   28 U.S.C. § 2254(e)(1).

## III.   WILSON'S CLAIMS[3]

### A.  Claims that are procedurally defaulted

1.  <u>Trial counsel's conflict of interest</u>

Wilson claims that his defense suffered because his lead trial counsel, Thomas O'Donnell,[4] continued to represent him after O'Donnell accepted a job as a Special Assistant Attorney General to handle Department of Family and Children Services ("DFCS") cases.   (Doc. 12-8 at 57).   When he accepted the job in the summer of 1996, O'Donnell informed the Attorney General's office that he could not begin work until Wilson's trial was over.   (Doc. 12-8 at 57).   Although O'Donnell testified that he thought his acceptance of this job offer was common knowledge, the record does not reveal when he first disclosed this information to Wilson or to the trial court.

During the December 15, 1998 hearing on Wilson's motion for new trial, O'Donnell advised the trial court:

> [T]his should complete my – my time with Mr. Wilson.   As I pointed out to the Court before I started the trial in the Death Penalty case having to do with Mr. Wilson, because I was appointed Special Attorney General.   I am

---

[3]  Wilson initially submitted a brief consisting of 266 pages and later filed a reply brief consisting of 98 pages.   (Docs. 43, 47).   He states that he "does not abandon any of his other claims not ... addressed [in his briefs], but relies instead on factual and legal arguments contained in the petition itself and in briefing before the state courts …"   (Doc. 43 at 10).   This Court addresses in detail only those claims that Wilson addresses in his two briefs.   "[M]ere recitation in a petition, unaccompanied by argument, in effect forces a judge to research and thus develop supporting arguments—hence *litigate*—on a petitioner's behalf. Federal judges cannot litigate on behalf of the parties before them, and it is for this reason that any claims in [Wilson's] petition that were not argued in his brief are abandoned."  *Blankenship v. Terry*, 2007 WL 4404972 at *40 (S.D. Ga.), *aff'd*, 542 F.3d 1253 (11th Cir. 2008) (citations omitted).

[4]  O'Donnell testified that he started working on Wilson's case on April 9, 1996.   (Doc. 12-8 at 29).   On May 27, 1997, J. Phillip Carr replaced a lawyer who was removed from the defense team for health reasons. (Doc. 8-1 at 41).   Carr is now a felon.   In March 2007, he was sentenced to serve 25 years in prison for four counts of child molestation.   (Doc. 25-5).   Carr's license to practice law was suspended on June 4, 2007.   *In re Carr*, 282 Ga. 138, 646 S.E.2d 252 (2007).

not comfortable, but the Court can instruct me about the fact that since I am
a Special Attorney General, I actually when I file this appeal, it will be
directly against the Attorney General's Office....[T]here is disagreement
between the parties about whether I am actually disqualified or not.... I want
some guidance from the Court.

(Doc. 10-10 at 73).   The trial court asked Wilson if he wanted O'Donnell to continue

representing him, and Wilson, with some equivocation, said he did.   (Doc. 10-10 at 74).

O'Donnell then asked the Office of the Attorney General whether he could

represent, at trial or on appeal, a defendant facing the death penalty.   In a letter dated

December 17, 1998, the Attorney General's office made clear that O'Donnell's

representation of Wilson presented a problem.

Our office has consistently advised Special Assistants that they were not to
handle such cases due to the potential for a conflict of interest and the
appearance of impropriety that would arise.   We are concerned about the
trial of the proceedings because the trial attorney may very well be a
witness in a habeas corpus proceeding which our office will handle and that
would put that attorney in a position potentially adverse to our office.   The
appellate process presents an equally difficult situation because our office
files briefs in all murder appeals and would therefore be filing a brief in
opposition to someone who is a Special Assistant employed by this office.
Thus, when we retain Special Assistants, it is with the understanding that
they will not handle these types of cases.   While a court might not find a
legal conflict in a given case, the potential for a conflict is too much risk to
take in a death penalty action.

(Doc. 16-13 at 56).   On February 8, 1999, the trial court removed O'Donnell as counsel

"due to a conflict with the Attorney General's office."   (Doc. 10-11 at 4).   Carr continued

to represent Wilson on appeal, and John H. Bradley was appointed co-counsel.   (Doc.

10-11 at 4).

Wilson first raised this conflict-of-interest claim in the state habeas action.   That

court found the claim procedurally defaulted:

As Mr. O'Donnell withdrew from Petitioner's case after trial, did not
represent Petitioner on direct appeal and as appellate counsel was aware

of Mr. O'Donnell's acceptance of the position of a [Special Assistant Attorney General] at the time of the direct appeal, Petitioner could have raised this claim of conflict of interest on direct appeal.

This Court further finds that Petitioner has failed to establish cause or any prejudice to overcome his default of this claim as Petitioner failed to allege, much less prove, that there was an actual conflict…or that he was adversely impacted by Mr. O'Donnell's impending employment.

(Doc. 18-4 at 11) (citations omitted).

Because the state habeas court found the claim was procedurally barred, this Court cannot review the claim on the merits unless Wilson can establish cause and prejudice or a fundamental miscarriage of justice.   Wilson has not pointed to any factor external to the defense that prevented him from raising this claim on direct appeal.   *See Spencer,* 609 F.3d at 1180.   Nor has he provided evidence that the state habeas court's finding of no prejudice is incorrect.   *See Greene*, 644 F.3d at 1154 (explaining that when a state court finds insufficient evidence to establish cause and prejudice, this court presumes the state court's findings are correct unless rebutted by clear and convincing evidence).   Finally, Wilson has not shown that failure to review the claim would result in a fundamental miscarriage of justice.   Thus, Wilson's claim that his defense suffered because of O'Donnell's alleged conflict of interest is procedurally defaulted.

2. Prosecutorial misconduct

Wilson states that he is entitled to a new sentencing hearing because the prosecutor unconstitutionally and unethically switched its theory of who actually shot Parks in his and Butts's trials to impose death sentences on each of them.   (Doc. 43 at 234).   Wilson first raised this issue in his state habeas petition.   The state habeas court held:

[A]s to Petitioner's prosecutorial misconduct claim, that the District Attorney changed theories of who was the triggerman in the trial of Petitioner and

Co-Defendant Butts, this Court finds that Petitioner has failed to establish the requisite cause and prejudice to overcome his default of this claim.   In fact, this Court notes that the record establishes that the District Attorney conceded that either Petitioner or Co-Defendant Butts was the triggerman during Petitioner's trial.

Further, this Court finds that Petitioner failed to establish his ineffective assistance of counsel allegation to support "cause" to overcome his default of this claim or any prejudice resulting from counsel's representation as trial counsel at the sentencing phase of trial: counsel introduced evidence from various witnesses that Co-Defendant Butts had claimed to be the triggerman, called Co-Defendant Butts to testify, who invoked his Fifth Amendment right to silence, and, in the sentencing phase of the closing argument, repeatedly argued that Co-Defendant Butts was the person that had actually shot Donovan Parks.   Trial counsel also argued to the jury that the District Attorney had conceded the point that Petitioner may not have pulled the trigger, and that the Sheriff had stated, on the tape recorded statement that the jury had heard, that Co-Defendant Butts shot Donovan Parks.

Further, as to Petitioner's claim of prosecutorial misconduct regarding the prosecutor's arguments at sentencing, this Court finds that Petitioner has failed to establish cause and prejudice to overcome his default of his claim as the prosecutor's arguments during the sentencing phase that Petitioner had killed Donovan Parks, after Petitioner had been found guilty of malice murder, were legally correct.   Further, even if the prosecutor's argument had been misleading, this Court determines that, in light of the District Attorney's numerous concessions during his arguments at the guilt phase of Petitioner's trial as to who was the triggerman and in light of the evidence introduced as to Petitioner's guilt and in aggravation, Petitioner would be unable to show cause and prejudice to overcome his default of this claim.

(Doc. 18-4 at 10-11) (record citations omitted).

Wilson contests the finding of procedural default and argues that it would have been impossible for him to raise the prosecutorial misconduct claim in the trial court because he was convicted approximately one year prior to Butts's trial.   (Doc. 43 at 237). Respondent concedes that the issue could not have been raised at trial, but maintains it should have been raised in Wilson's direct appeal.   (Doc. 44 at 142).   Wilson was convicted and sentenced in November 1997; his motion for new trial was filed on

December 3, 1997 and supplemented on December 10, 1998; a hearing on the motion for new trial was held on December 15, 1998; the trial court denied the motion on December 18, 1998; and Wilson's direct appeal to the Georgia Supreme Court was docketed on February 3, 1999.   (Docs. 8-9 at 88-90, 94, 104-06, 108; 10-10 at 1-76); *Wilson*, 271 Ga. at 812 n.1, 525 S.E.2d at 343 n.1.   Butts was convicted on November 20, 1998 and sentenced on November 21, 1998.   *Butts v. State*, 273 Ga. 760, 761 n.1, 546 S.E.2d 472, 477 n.1 (2001).   Thus, Wilson could have raised the issue of prosecutorial misconduct in his direct appeal.[5]

Wilson argues that the default should be set aside because he can show either cause and prejudice or that there has been a fundamental miscarriage of justice.   (Doc. 43 at 237 n.115).   Wilson claims the ineffective assistance of his appellate counsel establishes cause.   The state habeas court found that Wilson had not shown cause and prejudice.   To determine if this finding was based on a reasonable determination of the facts, the Court looks at the record that appellate counsel had at the time of Wilson's appeal.   *See Dell v. United States*, 710 F.3d 1267, 1274 (11th Cir. 2013).

Transcripts from Wilson's trial reveal that the prosecutor, in his opening statement before the guilt/innocence phase, told the jury that they would "hear evidence in this case that Butts could have pulled the trigger on that shotgun and you will also hear some evidence from which you can conclude that it was this defendant … who pulled the trigger.   (Doc. 9-14 at 36).   Also during the guilt/innocence phase, the State introduced Wilson's confession in which Wilson said Butts had the gun and Butts shot Parks.   (Doc. 9-17 at 117-21).   Wilson maintained he did not get out of the car and had no idea that

---

[5] Respondent does not maintain that Wilson could have raised the issue in his motion for new trial. However, Butts's trial had ended before Wilson filed the supplement to his motion for new trial on December 10, 1998.

Butts was going to shoot Parks.   (Doc. 9-17 at 120).

In his closing argument during the guilt/innocence phase of Wilson's trial, the

prosecutor argued:

> I told you in my opening statement – I wanted to be candid with you – the
> State cannot prove who pulled the trigger in this case.   I'll tell you that point
> blank.   I wasn't there.   We weren't there.   The defendant was there; his
> co-defendant was there and the victim was there and the victim obviously
> cannot speak.   But we don't know.   When I say we don't – we know this.
> We know that one of these two … defendants brutally assaulted and killed
> Donovan Corey Parks, and one them had to pull the trigger.   But could it
> have been Butts?   Yeah.   I'm not conceding that point, I want that crystal
> clear.   Could it have been Wilson, this defendant?   Yeah.…   It was one of
> these two, but it could have been either one.   Okay?

(Doc. 10-1 at 5-6).

Also during closing, the prosecutor explained the charge of malice murder:

> You'll hear about the deliberate intention, unlawfully, to take away the life of
> another human being.   And that's what happened here.   Whether he
> pulled it or his co-defendant, they helped each other.
> >                                         …
> [W]hen the … muzzle of this gun was aimed at the head of Donovan Corey
> Parks, that is the malice of which the law speaks and he is guilty of malice
> murder whether he pulled the trigger or whether the other man pulled the
> trigger.
> >                                         …
> And, one of the two had to have that sawed-off shotgun in their arms.
> Could have been Butts.   Very well could have been Butts.   Might have
> been Wilson, but let's assume it was Butts.

(Doc. 10-1 at 20-22, 26).

During the sentencing phase, Chief Deputy Howard Sills testified he did not know

whether Butts or Wilson shot Parks.   (Doc. 10-4 at 103).   But Sills also said three

inmates told him Butts confessed to being the triggerman.   (Doc. 10-4 at 104, 106).

Trial counsel introduced Butts's recorded statement, and the jury heard Sheriff Bill

Massee tell Butts that he thought Butts was the triggerman.   (Doc. 10-5 at 34, 38).   Trial

counsel also called Officer Russell Blenk and their investigator, William Thrasher, who both testified inmates told them that Butts confessed he was the shooter.   (Doc. 10-5 at 73-78, 83-89).

During his sentencing phase closing argument, the prosecutor explained that Wilson was released from the I. W. Davis Detention Center just three weeks before "he and his buddy robbed … Parks of his car and killed him and blew his brains out to leave him on the side of the road…."   (Doc. 10-6 at 11).   He asked the jury to show Wilson the "same amount of mercy that he granted … Parks when he blew his brains out on the side of the road."   (Doc. 10-6 at 12).   Showing the jury Parks's bloody shirt, the prosecutor said:

> Parks … did nothing … more than … give that man there a ride – a ride. And for what?   And for that, he loses his life.   For that, that man right there took that shotgun and fired it and into the night … it sent 50 pellets … that flash of light screaming out of this cartridge, aimed right in the back of that man's head, 50 of them.   So first, a hole, not just a wound, a hole in the back of his head, to leave him there on the ground with his brains … splattered on the ground.…   That's what he did.   That's what I want you to picture him doing.   Not just sitting there like he has the whole trial.

(Doc. 10-6 at 19).

In their closing, trial counsel repeatedly stated that Butts was the triggerman:

> [Y]ou shouldn't kill [Wilson] and the reason you shouldn't kill him is because he didn't pull the trigger.   He didn't get out of the car.   Mr. Butts did that. His partner in crime.   He did it.…   [Wilson] was there; you found him there. You convicted him of malice murder.   For that, he should be punished. But he didn't pull the trigger.   Mr. Bright told us at the beginning of his opening statement that he wasn't sure....   He wasn't going to concede the point.   That's what he said....   Butts shot him.   Even your sheriff on that tape said Butts shot him.   And that's why you should spare [Wilson's] life. … He didn't pick up the shotgun, as Mr. Bright pointed out to you, and point it and kill him.

(Doc. 10-6 at 35-36).

In the prosecutor's opening statement during Butts's trial, the prosecutor stated

that both Butts and Wilson participated in the murder and that it did not matter who pulled

the trigger, although there would be evidence suggesting Butts was the triggerman.

(Doc. 43-1 at 3).   Wilson's girlfriend, Angela Johnson, testified that Butts brought the

sawed-off shotgun into the home she shared with Wilson and told Wilson to keep it.

(Doc. 43-1 at 6-7).   Two inmates testified that Butts said he was the triggerman.[6]   (Doc.

43-1 at 9, 20).

For attorney error to constitute cause to excuse a procedural default, it must rise to

the level of a constitutional violation of the right to counsel.   *Murray v. Carrier*, 477 U.S.

478, 488 (1986).   *Strickland*[7] applies to appellate counsel.   *Heath v. Jones*, 941 F.2d

1126, 1130 (11th Cir. 1991).   Like trial counsel, appellate counsel are presumed to be

effective and they are not required to raise every non-frivolous issue on appeal.   *Id.* at

1130-31.   Instead, "effective advocates 'winnow out' weaker arguments" even if the

argument has some merit.   *Id.* at 1131 (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52

(1983)).   In Wilson's case, appellate counsel were not deficient for failing to raise

---

[6] Wilson includes excerpts from Butts's trial in an "Appendix" to his brief.   (Doc. 43-1).   Respondent
argues that the Appendix was not part of the record before the state habeas court and, therefore, should not
be considered by this Court.   Respondent also points out that by submitting select portions of Butts's trial
transcript, Wilson has omitted the portions that tend to show his guilt; e.g., testimony that Wilson had a large
green bag with a long object in it the day of the murder and testimony that, just a few weeks prior to the
murder, Wilson asked for a hacksaw to saw off a shotgun.   (Doc. 44 at 154 n.37).   Wilson claims that the
Appendix is properly before this Court because he previously cited to, and quoted from, these exact pages
in his 2005 post-hearing briefs submitted to the state habeas court.   (Docs. 47 at 86-87 n.86; 17-9 at 2, 8;
17-10 at 150).   The Court sees no harm in considering the Appendix because much, if not all, of the
information contained in it is also shown in the Georgia Supreme Court's opinion in Butts's direct appeal.
That opinion shows that "a witness testified that Butts had given the weapon to Wilson to hold temporarily"
and that "[t]wo of Butts's former jail mates testified that he had admitted to being the triggerman in the
murder."   *Butts*, 273 Ga. at 762, 546 S.E.2d at 478.   Furthermore, the Georgia Supreme Court stated that
"Butts then fired one fatal shot to the back of Parks's head with the shotgun."   *Id.* at 761, 546 S.E.2d at 477.
Given that finding, the Court does not need to see the attached Appendix to conclude that the prosecutor
presented evidence and argument to show that Butts was, or might have been, the triggerman.

[7] *Strickland v. Washington*, 466 U.S. 668 (1984).

Wilson's prosecutorial misconduct claim on appeal.   Wilson's argument that the prosecutor misled the jury and used "wholly inconsistent arguments to sentence two men to die" is weak at best.   (Doc. 43 at 246).

Furthermore, even if appellate counsel performed deficiently when they failed to raise the issue on appeal, Wilson was not prejudiced.   Appellate counsel's performance is prejudicial only if the neglected claim would have a reasonable probability of success on appeal.   *Heath*, 941 F.2d at 1132.   The Court sees no reasonable chance this claim would have prevailed on appeal; certainly the state habeas court's lack of prejudice determination was not based on any unreasonable determinations of the facts.   The jury was well aware from the beginning of Wilson's trial that either Wilson or Butts could have fired the shot that killed Parks.[8]   The prosecutor readily acknowledged this at the outset and he acknowledged the same in Butts's trial.   Contrary to Wilson's assertion, this is not a "flip-flopping" theory of the crime or "irreconcilable theories of the crimes."   (Docs. 43 at 240; 47 at 83).

Also, Wilson has not shown that the Court's failure to consider this claim would result in a fundamental miscarriage of justice.   This is not an "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent."   *Murray,* 477 U.S. at 496.   Nor has Wilson shown by clear and convincing evidence that but for constitutional error, no reasonable juror would have found him

---

[8]  Respondent submitted to the state habeas court notes from July 1998 "interviews" with the jurors.   These affidavits show several jurors believed Butts to be the shooter, or thought that Butts might have been the shooter, and reveal the jury discussed the issue of who actually shot Parks during deliberations.   These jurors stated they determined it did not matter who the triggerman was because Wilson was guilty of malice murder and deserved the death penalty due to his participation in the crime.   (Docs. 14-11 at 63-64, 73, 80, 84, 94, 99; 14-12 at 2).   Under former Georgia law, the affidavits of jurors were admissible "to sustain but not impeach their verdict."   O.C.G.A. § 17-9-41 (repealed 2001).

eligible for the death penalty under Georgia law.   *Sawyer v. Whitley*, 505 U.S. 333, 348 (1992).

### B.  Claims that were reviewed on the merits

#### 1.  Ineffective assistance of trial counsel

*Strickland* is "the touchstone for all ineffective assistance of counsel claims." *Blankenship v. Hall*, 542 F.3d 1253, 1272 (11th Cir. 2008).   "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.   First, the defendant must show that counsel's performance was deficient.…   Second, the defendant must show that the deficient performance prejudiced the defense."   *Strickland*, 466 U.S. at 687.   Wilson "must meet both the deficient performance and prejudice prongs of *Strickland*" to obtain relief.   *Wong v. Belmontes,* 558 U.S. 15, 16 (2009).   To establish deficient performance, Wilson must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.   The Court must apply a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 689).   "To overcome that presumption, [Wilson] must show that counsel failed to act 'reasonabl[y] considering all the circumstances.'"   *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 688).   To establish prejudice, Wilson must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Strickland*, 466 U.S. at 694.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome."   *Id.*   When determining if prejudice exists, "it is necessary to consider *all* the relevant evidence that the jury would

have had before it if [Wilson's counsel] had pursued the different path–not just the mitigation evidence [Wilson's counsel] could have presented, but also the [aggravating evidence] that almost certainly would have come in with it."   *Wong,* 558 U.S. at 20; *see also Porter v. McCollum*, 558 U.S. 30, 40-41 (2009).

Federal courts must "take a 'highly deferential' look at counsel's performance through the 'deferential lens of § 2254(d).'"   *Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 689; *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2 (2009)). Wilson must do more than satisfy the *Strickland* standard.   "He must also show that in rejecting his ineffective assistance of counsel claim the state court 'applied *Strickland* to the facts of his case in an objectively unreasonable manner.'"   *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (quoting *Bell v. Cone*, 535 U.S. 685, 699 (2002)).   That is, "[t]he question is not whether counsel's actions were reasonable [but] whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."   *Richter*, 131 S. Ct. at 788.

> a.   Trial counsel's allegedly deficient performance due to lack of death penalty experience

Wilson claims trial counsel's deficient performance was the result of several factors that will be discussed in greater detail below.   As a preliminary matter, however, the Court will first address Wilson's contention his trial counsel were inexperienced in handling death penalty cases because it is central to their overall performance and any alleged prejudice.   The state habeas court rejected this claim.

> Petitioner was represented at trial by Tom O'Donnell and Phillip Carr, both of whom had extensive criminal experience prior to Petitioner's trial. Although Mr. O'Donnell, at the time of Petitioner's trial, had never been lead counsel through the entirety of a death penalty trial, he had worked with a very experienced death penalty attorney in fully preparing a death penalty

case for trial, in which the defendant pled guilty immediately prior to trial. Although Petitioner argues that these two men were not qualified to represent him at trial according to certain guidelines, this Court finds that, regardless of counsel's experience, Petitioner has the burden of establishing that counsel were deficient and that their deficient representation prejudiced Petitioner.   This Court finds that Petitioner has failed to carry that burden.

(Doc. 18-4 at 13-14) (record citations omitted).[9]

The state habeas court reasonably found that both O'Donnell and Carr had significant criminal experience.   O'Donnell, who started practicing law in 1987, had handled ten or eleven murder cases.   (Doc. 12-8 at 29, 76).   Carr, who also had been practicing since 1987, had handled as many as a thousand criminal cases and had tried approximately 25, including four or five murder trials.   (Doc. 12-6 at 66-68).

Wilson argues neither had sufficient experience in death penalty cases and suggests O'Donnell misled the trial court in that regard.

THE COURT: And I can't say I—you know—one of the things about appointed counsel, even in death penalty cases, we tried to pick you the best that we have in the circuit and Mr. O'Donnell has tried a number of death penalty cases I know of.   Not in this circuit, but –in this circuit?

MR. O'DONNELL: The Middle Circuit, ma'am.

(Doc. 8-12 at 6).   In fact, neither O'Donnell nor Carr had tried a death penalty case. (Docs. 12-6 at 95-97; 12-8 at 31-35).   O'Donnell had served as second-chair in one death penalty case that settled prior to trial.[10]   (Doc. 12-8 at 31).   O'Donnell said he

---

[9]  Wilson first argues that "[o]ther than noting counsel's 'extensive criminal experience' and Mr. O'Donnell's experience as co-counsel on a capital case prior to a plea being reached, the court gave no reasoning for its determination."   (Doc. 43 at 106) (quoting Doc. 18-4 at 13).   State courts are not required to provide reasoning for their decisions.   As long as a state court decides an issue on the merits, with or without further explanation, this Court defers to that decision.   *See, e.g.*, *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1329-30 (11th Cir. 2013); *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1213 (11th Cir. 2013).

[10]  The state habeas court found that the defendant in this death penalty case "pled guilty immediately prior to trial."   (Doc. 18-4 at 13).   The record is unclear regarding exactly when the defendant pled guilty. However, this factual finding is reasonable because the record establishes that "the case was prepared" but did not go to trial.   (Doc. 12-8 at 35).

agreed with the trial court's statement about his experience because he thought the court "was referring to the murder cases [he had] tried, also capital cases, not death penalty cases." (Doc. 12-8 at 33).

Wilson also notes trial counsel had no specialized training in the defense of death penalty cases which, according to Wilson, violates ABA Guidelines and the Georgia Unified Appeal rules. (Docs. 43 at 13, 70; 12-6 at 95-97; 12-8 at 31-35).[11]   But there is no clearly established Supreme Court precedent holding that a lawyer lacking death penalty trial experience or specialized training is *per se* ineffective.   Rather, experience is only one factor a court should consider when determining whether an attorney's particular strategic choices are reasonable.   *See Gates v. Zant*, 863 F.2d 1492, 1498 (11th Cir. 1989); *Strickland*, 466 U.S. at 681.

Given that O'Donnell and Carr had significant criminal experience, the state habeas court's assessment of their experience and its effect on their performance was not contrary to clearly established federal law, did not involve an unreasonable application of federal law, and was not based on any unreasonable determinations of fact.

      b.  <u>Trial counsel's allegedly deficient performance in the development and presentation of mitigation evidence in the sentencing phase</u>

Wilson argues his trial counsel were deficient in the development and presentation of mitigation evidence for several reasons.   It is appropriate to note first the temporal context in which counsel's investigation and trial preparation took place.   O'Donnell knew

---

[11]   *See* Guidelines 5.1(1)(A)(vi) and 5.1(1)(B)(ii)(d) of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (1989); *see also* Rules II(A)(1)(a)(5) and II(A)(1)(b)(3) of the Georgia Unified Appeal Procedure.   The ABA Guidelines and similar local or state rules provide "evidence of what reasonably diligent attorneys would do" but are not "inexorable commands with which all capital defense counsel must fully comply." *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (internal citations and quotation marks omitted).   Such guidelines or rules do not provide the definition of reasonableness.   "'[T]he Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices.'"   *Id.* at 9 (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000)).

as early as July 22, 1996 that the State would seek the death penalty.   (Docs. 8-1 at

23-24; 8-10 at 6-7).   He further knew that background investigation was important in a

death penalty case.   (Doc. 12-8 at 42).   Even so, Wilson's lawyers spent only 50 hours

between April 9, 1996 and April 11, 1997 preparing for his trial.[12]   (Docs. 8-11 at 10; 12-8

at 49; 14-12 at 75-84).

> i)   Trial counsel's confusion about who was supposed to investigate
>        Wilson's background

As discussed in more detail below, state habeas counsel developed what Wilson

says is evidence of his pervasive and prolonged abuse and neglect, primarily while

growing up in Glynn County, Georgia.   He claims trial counsel did not discover this

mitigation evidence because neither O'Donnell nor Carr took responsibility for

investigating and preparing a mitigation case.   The state habeas court rejected this

claim.

> Philip Carr … stated he and his co-counsel (O'Donnell) "split duties" in
> preparing for trial.   He further stated "I did some work on the issue of
> mitigation…." and "there were phases I was involved in more so than
> others.   I was not involved in as much of the mitigation stage…."   When
> asked who was responsible for the mitigation evidence, Carr stated: "Mr.
> O'Donnell.   And then he would give me assignments that I would take."
> When O'Donnell was asked who was responsible for going out and
> investigating Petitioner's background, he stated "that is what I had Mr.
> Thrasher and Mr. Carr do.   His testimony was that Carr was to do "both
> the investigation in Glynn County and everything else."

[12] At an April 11, 1997 *ex parte* pretrial conference, O'Donnell provided the trial court with "a copy of exactly
what [they've] done so far."   (Docs. 8-11 at 10; 14-12 at 75-84 ).   This showed they had worked 50 hours
between April 9, 1996 and April 11, 1997.   (Doc. 12-8 at 49, 51).   When questioned whether 50 hours was
correct, O'Donnell stated that "would be about right."   (Doc. 12-8 at 49).   Trial counsel had filed their first
pretrial motions the same day.   They petitioned the court for expert and investigative assistance and
funding for psychiatric and sociological evaluations.   (Doc. 8-1 at 31-33, 36-40).   At the hearing, O'Donnell
told the trial court he wanted to hire psychiatrist Dr. Renee Kohanski, but he had not asked her how much
she would charge because he anticipated Wilson would plead guilty.   (Doc. 8-11 at 4-5).   The trial court
authorized funds to hire an investigator, Thrasher, but denied funding for Kohanski until trial counsel knew
what her charges would be.   The court deferred ruling on the request for funds for a sociologist.   Trial
counsel eventually retained Kohanski on August 1, 1997; they made no further request for a sociologist.
(Docs. 12-8 at 43-44; 14-11 at 29; 8-11 at 6).

On the surface, it appears there was confusion between counsel as to who was responsible for investigating and preparing mitigation evidence, specifically Petitioner's family background.   The question raised by this apparent confusion is whether the result was a failure to investigate because of miscommunication and inattention, and whether this rendered counsel's performance constitutionally deficient.   When considering [counsel's] testimony in context, however, the Court finds no such deficiency.   As lead counsel, O'Donnell had Carr and the investigator report to him.   He received daily reports from them while they were in Glynn County, and monitored their progress.   Counsel spoke with Petitioner's mother, father, and girlfriend.   They also interviewed, or attempted to interview, a number of other witnesses.   There is no indication of a haphazard investigation, nor of a lack of sharing of information between counsel.   Any miscommunication which may have occurred did not result in a lack of preparation of mitigating evidence.   Counsel made a reasonable investigation into Petitioner's family background, and reasonable decisions as to what evidence to prepare and present, consistent with their defense strategy.   The Court finds no deficiency in counsel's performance in this regard, nor was Petitioner prejudiced in any way, given the particular facts and circumstances of the case.

(Doc. 18-4 at 18-20) (record citations omitted).

Trial counsel's confusion extended far beneath the "surface."   At a June 26, 1997 pretrial hearing, four months before the start of trial, the trial court asked about their mitigation investigation.

THE COURT: Now, I want to remind the attorneys that they need to be prepared not only to present evidence in the guilt and innocence phase, but they also are to present evidence in the sentencing phase in mitigation on behalf of the defendant, Mr. Wilson.   Understand?

MR. O'DONNELL: Yes, ma'am.

THE COURT: Are you all going to divide that up or have you made that decision yet?

MR. O'DONNELL: We haven't made a decision on that, your Honor.

(Doc.8-13 at 25-26).

This confusion, or indecision, continued when trial counsel finally began their investigation.   O'Donnell, in his investigation of background information to use in mitigation, talked only with Wilson, Wilson's mother (Mildred Charlene Cox), Wilson's girlfriend (Johnson), Kohanski, and Dr. James Maish, a psychologist trial counsel ultimately decided not to use.   (Doc. 12-8 at 44-45, 63-64).   He did not interview anyone else because, he testified, Carr and Thrasher were tasked to "go and find friends and family members and teachers and so forth."   (Doc. 12-8 at 44-45, 63-64, 78-79, 94).

Carr, on the other hand, testified at the state habeas court hearing that he did not get too involved with the mitigation case because O'Donnell was responsible for gathering the mitigation evidence.   (Doc. 12-6 at 115).   Like O'Donnell, he only spoke with Wilson, Cox, Johnson, Kohanski, and Maish.   (Doc. 12-6 at 72-73, 78-80).

Thrasher testified that, although he knew Wilson had a troubled upbringing, he did not have the time or resources to identify and locate witnesses who could "flesh out this story."   (Doc. 12-11 at 27).   He claimed that he was "[a]t no time . . . directed to conduct investigation into Mr. Wilson's life history for mitigating information, such as by locating and interviewing family members, teachers or social workers."   (Doc. 16-13 at 73).

It is not entirely clear whether the state habeas court found that there was no confusion, other than on the surface, as to who was responsible for developing background information to use in mitigation or simply found there was an adequate investigation notwithstanding any confusion.   The state habeas court's finding that "O'Donnell had Carr and the investigator report to him" while they were in Glynn County and provide daily reports so he could monitor their progress seems to be a finding that there was no confusion.   (Doc. 18-4 at 19).   However, it is not clear how this monitoring

relates to Wilson's contention that trial counsel were confused about who was doing the background investigation.   Carr and Thrasher went to Glynn County to interview aggravation witnesses identified by the State and to review records of offenses identified by the State in its notice of aggravating circumstances.[13]   (Docs. 8-5 at 54-57; 12-6 at 86, 114).   While in Glynn County, neither Carr nor Wilson interviewed Wilson's family, friends, former teachers, or any social workers who might be familiar with Wilson's background.[14]   (Docs. 12-6 at 114; 16-13 at 73).   Given that Carr and Thrasher were not in Glynn County to develop mitigation evidence, the state habeas court's finding that O'Donnell monitored their progress does not support a conclusion that trial counsel were not confused about who was to investigate Wilson's "family background."   (Doc. 18-4 at 19).

Next, the state habeas court found that, notwithstanding any confusion or miscommunication, trial counsel "made a reasonable investigation into [Wilson's] family background, and reasonable decisions as to what evidence to prepare and present, consistent with their defense strategy."   (Doc. 18-4 at 19).   In this finding, the state habeas court clearly did not address whether counsel was confused, but rather moved to the question of whether their investigation was deficient.   That finding is more appropriately addressed in this Court's discussion of that issue.   But with regard to Wilson's contention that counsel were confused about who was to investigate Wilson's

---

[13] From these filings, trial counsel learned that the State could potentially present 39 witnesses to testify about 27 aggravating circumstances during the sentencing phase of Wilson's trial.   (Doc. 8-5 at 54-57). These aggravating circumstances included crimes Wilson committed as an adult while living in Baldwin County and his membership/leadership in a gang.   (Doc. 8-5 at 54-57).   Also included were numerous crimes Wilson committed, or was accused of committing, when he was a juvenile living with his mother in Glynn and McIntosh Counties.   (Doc. 8-5 at 54-57).   The number of witnesses in aggravation ultimately increased to 72 and the number of aggravating circumstances rose to 29.   (Doc. 8-9 at 26, 52).

[14] Thrasher stated that such an investigation would have taken a least a month and he did not have the necessary time or resources.   (Doc. 12-11 at 27).

background, the facts are undisputed.   O'Donnell and Carr each claimed the other was responsible for interviewing background witnesses.   Not surprisingly, those witnesses were never interviewed.[15]   Thus, to the extent the state habeas court found that trial counsel were not confused about who was to interview background witnesses or that background witnesses were interviewed notwithstanding any confusion, those findings are unreasonable.   Whether trial counsel's confusion prejudiced Wilson is discussed below.

> ii)   Trial counsel's allegedly deficient investigation of Wilson's background

Wilson contends that trial counsel's failure to investigate his background prevented them from presenting a constitutionally adequate case of mitigation during the penalty phase of his trial.   "It is unquestioned that under the prevailing professional norms at the time of [Wilson's] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'"   *Porter*, 558 U.S. at 39 (quoting *Williams*, 529 U.S. at 396).   "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."   *Strickland,* 466 U.S. at 691.   Thus, the "question under *Strickland* is … whether [trial counsel] conducted an adequate background investigation or reasonably decided to end the background investigation when he did."   *Johnson v. Sec'y*, *DOC*, 643 F.3d 907, 931 (11th Cir. 2011) (citing *Ferrell v. Hall*, 640 F.3d 1199, 1226 (11th Cir. 2011)).   To answer these questions, the court must consider whether the information counsel learned from the few sources they contacted or the records they obtained would have caused reasonable counsel to

---

[15]  As discussed below, most, and perhaps all, of the information Wilson says trial counsel would have learned from these witnesses is found in the records trial counsel gathered and provided to Kohanski to use in her trial testimony.

ask more questions or seek information from additional sources.   *Wiggins v. Smith*, 539

U.S. 510, 527 (2003).

In addressing the overarching question of whether trial counsel's "pretrial

investigation into Petitioner's background" was deficient, the state habeas court made

several determinations.   The state habeas court first found

> that Petitioner's defense counsel conducted a reasonable investigation of
> Petitioner's background by interviewing and speaking with Petitioner, and
> interviewing Petitioner's mother to obtain a social history of Petitioner.
> However, Petitioner's mother was uncooperative and did not want to testify
> at trial, and despite counsel's numerous interviews with Petitioner himself,
> Petitioner did not provide counsel with the names of any of his family
> members.   In fact, Petitioner told trial counsel, when asked about family
> members to contact, that he had no contact at all with his father's side of the
> family.   "That they never wanted him anyway and nobody would even just
> acknowledge he existed."

(Doc. 18-4 at 20) (record citations omitted).

Wilson contends his mother was cooperative, but trial counsel never interviewed

her to get a "social history."   In an affidavit submitted to the state habeas court, Cox said

trial counsel only "asked [her] about [Wilson's] father, Marion, Sr., and didn't ask [her]

anything about any of the other men [she]'d lived with or about [Wilson's] schooling and

so forth."   (Doc. 12-10 at 69).   Wilson argues that had trial counsel just asked the right

questions, Cox would have provided the names of many valuable mitigation witnesses

and she would have told them of her drug abuse during pregnancy, the physical abuse

Wilson suffered at the hands of her father and boyfriends, the drug use to which Wilson

was exposed, Wilson's problems in school, and the deplorable conditions in which they

lived.   (Docs. 43 at 96-98; 12-10 at 65-66).

Carr testified that he and O'Donnell met with Cox several times and that, although

she was generally cooperative, "she was pretty defensive about … bringing out whether

or not she was a bad mother … [a]nd it kind of, in one respect, was hampering our ability to find mitigation."   (Doc. 12-6 at 80-81).   O'Donnell, in brief testimony on the subject, said he talked with Cox because he "wanted to get a social history."   (Doc. 12-8 at 63).   The state habeas court credited their recollection of events over the affidavit testimony of Cox.   Because the state habeas court's factual findings are presumed correct absent clear and convincing evidence to the contrary, this Court will not revisit its credibility determinations.

       Moreover, there is evidence that Cox was less than cooperative and might have impeded trial counsel's ability to gather mitigation evidence.   Helen McCloud Watkins, a person with whom Wilson lived for a time during his youth, testified that someone telephoned her once prior to Wilson's trial.[16]   When Cox learned of the phone call, she told Watkins that she had no right to speak with trial counsel about Wilson.   (Doc. 12-7 at 51, 60-62).   Also, a note in trial counsel's file, which was apparently written by trial counsel and passed to Wilson either during or after Kohanski's testimony at sentencing, read: "When I talked with your mother, she essentially denies this.   She probably would be a weak witness and would try to defend her action.   This would contradict Dr's testimony.   Do you want me to call her?"   (Doc. 14-12 at 29).   Thus, the state habeas court's factual findings that trial counsel spoke with Cox to get a social history and that she was uncooperative were reasonable.

       The state habeas court also reasonably found that Wilson was unable to provide information about his father's side of the family and that he failed to "provide counsel with

---

[16] It is unclear who called Watkins and what she was asked.   O'Donnell and Carr both testified that they never spoke with Watkins.   (Docs. 12-6 at 114-15; 12-8 at 46-47).   Watkins testified that trial counsel or "whoever it was" asked "a few questions" but she could not remember the questions and she only spoke with the caller for a few minutes.   (Doc. 12-7 at 51, 61-62).

the names of any of his family members."[17]   (Doc 18-4 at 20).   But Wilson's inability to provide trial counsel with names of witnesses did not relieve trial counsel of their obligation to investigate.   *See Porter*, 558 U.S. at 40 (finding defendant's lack of cooperation did not "obviate the need for defense counsel to conduct *some* sort of mitigation investigation").   Trial counsel knew that Wilson had a troubled past.   (Doc. 8-1 at 39).   Yet their efforts to interview witnesses with knowledge of that past were limited to talking with Wilson, the uncooperative Cox, and Johnson, who did not meet Wilson until 1995.   (Doc. 12-11 at 9).   As discussed below, dozens of potential witnesses were named in the records trial counsel received, and Wilson never tried to prevent trial counsel from speaking with them.

The state habeas court next found that, notwithstanding Cox's lack of cooperation and Wilson's failure to provide names of potential witnesses, trial counsel nevertheless interviewed or attempted to interview witnesses.   (Doc. 18-4 at 21).   Further, according to the state habeas court, trial counsel testified that they "spoke with Petitioner's father, Marion Wilson, Sr., and another man[,]" and they "attempted to talk to someone at [the Department of Juvenile Justice ("DJJ")] and at the college Petitioner had attended." (Doc. 18-4 at 21) (record citations omitted).

The state habeas court's order lists a total of 16 record citations to support the finding that trial counsel interviewed witnesses and attempted to contact potential witnesses.   (Doc. 18-4 at 21).   Eleven of these citations are to the testimony of State witnesses in the guilt phase of the trial.   Wilson understandably complains that these citations do not support the finding that trial counsel interviewed or attempted to interview

---

[17]  As Wilson notes, however, he did give trial counsel the names of several friends and the name of his Godmother.   (Doc. 14-12 at 64).

anyone.   Respondent responds that "[t]he string citation by the state habeas court includes the witnesses that testified at trial that trial counsel interviewed or attempted to interview."   (Doc. 44 at 27 n.4).   But they all were witnesses who saw Wilson, Parks, Butts, or Parks's burning car on the night of the murder.   None provided, or could have provided, background information about Wilson.   Thus, even if trial counsel did interview these witnesses, that does not at all tend to establish that trial counsel reasonably investigated Wilson's background.

Contrary to the state habeas court's finding that Wilson's father was interviewed, O'Donnell, Carr, and Thrasher all testified they never talked with Marion Wilson, Sr. (Docs. 12-8 at 46; 12-6 at 114; 16-13 at 73-74).   In an affidavit filed with the state habeas court, Marion Wilson, Sr. confirmed that no one representing Wilson contacted him until the state habeas proceedings.[18]   (Doc. 12-10 at 89).

Regarding "someone" at the DJJ or Georgia Military College ("GMC"), O'Donnell said they attempted to talk to a GMC teacher, Melanie Moye,[19] but "[t]hat's about it." (Doc. 12-8 at 63).   He stated that there may have been "one other woman in Glynn County," but he simply could not remember.[20]   (Doc. 12-8 at 64).   O'Donnell knew Wilson had a history with the DJJ, but he did not interview anyone there or any social

---

[18]   When rejecting Wilson's claim that trial counsel were confused about who was to investigate Wilson's background, the state habeas court also found that trial counsel interviewed Wilson's father.   (Doc. 18-4 at 19).   The basis for this finding is a mystery.

[19]   It bears mentioning that trial counsel never actually spoke with Moye.   In an affidavit, Moye testified that she never spoke with trial counsel and "wondered why no one on his defense team had ever contacted" her. (Doc. 12-9 at 21).

[20]   It is possible this "one other woman" may have been Watkins.   As noted, she testified that trial counsel called her on one occasion, asked a few questions, and never contacted her again.   However, both O'Donnell and Carr stated that they never spoke with Watkins.   (Docs. 12-6 at 114-15; 12-8 at 46). Regardless, Watkins provided no information about Wilson's background during this brief conversation. (Doc. 12-7 at 51, 61-62).

worker assigned to Wilson.   (Doc. 12-8 at 63).   However, O'Donnell thought someone might have spoken with the DJJ in Glynn County.   (Doc. 12-8 at 63).   It is not clear whether Carr or Thrasher spoke with anyone at the DJJ while they were in Glynn County. However, as discussed, it is clear that they went to Glynn County to investigate Wilson's juvenile criminal history rather than to develop mitigation evidence.   (Docs. 12-6 at 86, 114; 16-13 at 73; 12-11 at 26-27).

Nevertheless, the state habeas court concluded counsel attempted "to locate and talk to witnesses," but "the witnesses trial counsel were able to find were more devastating than helpful to Petitioner's case."   (Doc. 18-4 at 21).   To appreciate this point, it is necessary to discern exactly what trial counsel's mitigation strategy was and how the witnesses they supposedly interviewed harmed Wilson's "case."

Respondent describes counsel's strategy as a "multi-faceted mitigation theory of residual doubt, mental health and dysfunctional upbringing and background."   (Doc. 44 at 42).   The residual doubt argument was that "Butts was actually the guy that pulled the trigger … Wilson was a bystander or played very little role in it."   (Doc. 12-6 at 113).

The balance of their mitigation theory was summarized in trial counsel's "List of Mitigating Circumstances" filed with the state trial court:

1. At a very early age, Defendant exhibited signs of mental or emotional disturbance that went untreated;

2. Defendant's mental and/or emotional disturbances were caused in part[] by the emotional instability of his family members during his early developmental stages;

      …

4. Defendant suffered neglect and deprivation in his childhood years as a result of family violence, turmoil, his father's abandonment, alcoholism within his home, his bi-racial status within the community, the neglect by certain family members, and other factors;

5.  During his early school years, his family was forced to move often because of violence and turmoil in his family;

6.  Defendant was unable to learn properly in school because of his lack of aptitude, family turmoil, and lack of academic assistance from his parents;

7.  Defendant was abused by his step-father.[21]

(Doc. 8-9 at 62).   Clearly, the witnesses[22] who would develop this mitigation theory were the background witnesses trial counsel never interviewed.   Nevertheless, Carr said he made the "judgment call" not to call witnesses who could testify about Wilson's background.[23]   (Doc. 12-6 at 113).   Carr said Wilson's "past was horrible" and bringing in Wilson's "past could have very well worked against [them] .... And, more likely ... it would basically convince the jury that [Wilson] probably was the trigger man."   (Doc. 12-6 at 91, 112).

This rationale for not presenting background evidence in mitigation is suspect at best.   Trial counsel unquestionably knew the jury was going to hear the worst of Wilson's past regardless of who trial counsel put on the stand.   They had notice of the State's 29 aggravating circumstances from Wilson's past, ranging from aggravated assault and first degree arson to reckless conduct and cruelty to animals.   (Docs. 8-5 at 54-57; 8-9 at 26, 52).   More importantly, as Carr acknowledged, to make an informed judgment regarding which background witnesses to call, trial counsel first had to find out who the witnesses

---

[21]  There were a total of 13 mitigating circumstances; only those relating to Wilson's background are listed.

[22]  As opposed to records containing information about Wilson's background.   Those records are discussed below.

[23]  Trial counsel's list of mitigating witnesses, who presumably were to testify about the mitigating circumstances, contained the same names as the State's List of Witnesses in Aggravation.   (Doc. 14-3 at 7-16).   Apparently, trial counsel simply added Kohanski and Thrasher to the State's list.   As Wilson points out, trial counsel even erroneously labeled their list of mitigation witnesses as a "List of Witnesses in Aggravation."   (Doc. 14-3 at 11).

were and what they would say.   (Doc. 12-6 at 113-14).

The only basis for the state habeas court's finding that background witnesses were

"more devastating than helpful" was Carr's testimony:

> Q.   Okay.   Did [Wilson] provide you any sort of list of names, people maybe to contact to assist in mitigation?

> A.   He didn't provide me any names.   Mr. O'Donnell, I don't know.   I do know I had talked to him about people he had tried to contact.   And some he could not find, some he did find.   And upon interviews, I don't think we wanted them.   They would have been more devastating than good.   But these were discussions with Mr. O'Donnell.

(Doc. 12-6 at 85-86).   Thus, Carr claimed O'Donnell talked with the "devastating"

witnesses.   (Doc. 12-6 at 86).   But, again, O'Donnell said he only spoke with Wilson,

Cox, and Johnson in his efforts to obtain information about Wilson's background:

> Q.   How about someone to go out and investigate his background?

> A.   That is what I had Mr. Thrasher and Mr. Carr do.

> Q.   You had Mr. Thrasher and Mr. Carr investigate Marion Wilson's background?

> A.   His background, yes, sir.

> Q.   And their job was to go and find friends and family members and teachers and so forth?

> A.   That was their job, yes, sir.

> Q.   That is interesting because Mr. Carr sat in the exact same chair you are sitting in 24 hours ago, and he said it was your job to go out and investigate Mr. Wilson's family background?

> A.   I can't speak for Mr. Carr, but, no, it wasn't my job.   But I did talk to Mr. Wilson, I did talk to his mother, I did talk to his girlfriend.   I did talk to –who else was down in Glynn County?   I didn't go to Glynn County.   [Carr] and [Thrasher] went to Glynn County.

(Doc. 12-8 at 44-45).   Given trial counsel's admission that they never spoke with background witnesses, the state habeas court's finding that the potential background witnesses to whom trial counsel spoke "were more devastating than helpful" is unreasonable.

In further support of its conclusion that trial counsel's pretrial background investigation was not deficient, the state habeas court found trial counsel requested numerous files from various agencies, schools, and medical facilities and that counsel "received many of these requested files."   (Doc. 18-4 at 21-22).   The record clearly supports this finding.[24]   Of course, simply requesting and sometimes receiving records does not automatically render trial counsel's investigation reasonable.   *See Pinholster*, 131 S. Ct. at 1406 (explaining there are no specific guidelines for determining reasonableness).   Rather, the Court must consider what trial counsel learned from the records and ask if it was reasonable for them to abandon their investigation when they did, especially in light of the fact that trial counsel knew of Wilson's deprived childhood and intended, initially at least, to present mitigating life history evidence.   *Alderman v. Terry*, 468 F.3d 775, 792 (11th Cir. 2006) (explaining that when evaluating the

---

[24]  In letters dated June 3, 1996 trial counsel sought: Baldwin County Sheriff's Department investigation and conviction records for Wilson and Butts; Baldwin County Sheriff's Department jail records for Wilson; Milledgeville Police Department investigation and conviction records for Wilson and Butts; Milledgeville Police Department jail records for Wilson; Wilson's employment records from Cheely's Lawn Care and Restaurant Management Services; Division of Youth Services records for Wilson; Georgia Department of Corrections records for Wilson; Fulton County jail records for Wilson; Fulton County Sheriff's Department investigation and conviction records for Wilson; GMC school records for Wilson; Wilson's medical records from the Georgia Regional Hospital at Savannah ("Georgia Regional Hospital") and Southeast Georgia Regional Medical Center in Brunswick; Wilson's birth certificate from the Georgia Vital Records Service; Wilson's school records from the Boards of Education in Wayne, Glynn, and McIntosh Counties in Georgia and Oklahoma City in Oklahoma; Glynn County jail records for Wilson; Glynn County Police Department investigation and conviction records for Wilson; Glynn County Sheriff's Department investigation and conviction records for Wilson; McIntosh County jail records for Wilson; and McIntosh County Sheriff's Department investigation and conviction records for Wilson.   (Docs. 14-8 at 103-09; 14-9 at 1-16).

reasonableness of an investigation, the court must consider whether the known evidence would prompt a reasonable attorney to investigate further).

Trial counsel should have learned much from the records they received.   Marion Wilson, Sr. left Cox when she was two months pregnant.   (Doc. 13-15 at 44).[25]   Cox was then "married by common [l]aw[] to Arthur Kimp," but "Cox left Arthur after Marion walked into a room and saw Arthur holding a gun to his mother's head."   (Docs. 13-15 at 44, 63; 13-13 at 11-12, 20).   Next, Cox lived with Wilson's "stepfather Reginald" or a "man named Reginald."[26]   (Docs. 13-12 at 103; 13-15 at 44).   Trial counsel never contacted these men.

Records from Georgia Regional Hospital revealed that Cox "had numerous liaisons and is at the present time [1992] involved with Lindel Sullivan," whose "drinking and verbal and physical abuse is such that [Wilson] feels uncomfortable in his own home."   (Doc. 13-14 at 11).   The hospital records also refer to DFCS's involvement: "It was the court service worker[']s[27] impression that Ms. Cox values the relationship of her boyfriend over that of her son.   The situation has been referred to DFCS."   (Doc. 13-14 at 4-5, 11, 19).[28]   Wilson's dysfunctional home life was documented: "The mother's present boyfriend is the reason that the patient says he has problems"; "There appears to be much friction in the home, lack of adequate parenting"; "Pt. comes from bad home

---

[25] These record cites are to Kohanski's file, which was an exhibit at the state habeas evidentiary hearing. (Doc. 13-12 at 73 to Doc. 13-16 at 21).   The records in her file were given to her by trial counsel.   (Doc. 10-5 at 100).   Thus, trial counsel had these records prior to trial.

[26] According to Georgia Regional Hospital records, Reginald's last name was McLeod or McCloud.   (Doc. 13-14 at 11).

[27] The records identify the court service worker as Marie Aldridge.   (Doc. 13-14 at 4-5, 19).

[28] DFCS's involvement during this time is confirmed by other records obtained by trial counsel.   The Order for Detention dated December 20, 1991 shows that "McIntosh County [DFCS] is ordered to complete a child protective services assessment and have home evaluation with report to the court."   (Doc. 12-18 at 30).

situation"; "Examiner feels parenting has been lacking and has taken its toll on his development"; "Marion has been known to go to school without adequate clothing"; "There is said to be some turmoil within the home situation"; and "Court worker indicates mother is uncooperative."   (Docs. 13-13 at 23-24, 37; 13-14 at 2, 7, 10-11).

The records reveal that Wilson wanted his social worker to have him placed in foster care or a "contract home" so that he could "[t]ry to straighten up" and "go to school." (Doc. 13-13 at 31).   The psychologist at Georgia Regional Hospital who examined Wilson recommended a group home or contract home setting because Wilson needed "a more structured environment that is capable of providing the level of security that he seems to need while also provid[ing] consistency [and] positive parenting."   (Doc. 13-14 at 13).

In sum, the records trial counsel received contained a wealth of information about Wilson's troubled past, yet trial counsel did not get Wilson's DFCS records, they did not interview DFCS workers, and they did not interview any other social worker who had been in contact with Wilson.   Nor did they contact teachers, counselors, or the school psychologist mentioned in the records.   (Docs. 13-12 at 103; 13-13 at 1, 18, 20).

Finally, in support of its conclusion that trial counsel's background investigation was not deficient, the state habeas court noted that counsel hired two mental health experts, Maish and Kohanski.   Actually, the Parties' briefs and the state habeas court's order appear to address three issues regarding Maish and Kohanski: whether Maish's and Kohanski's work, whatever it was, supports the conclusion that trial counsel properly investigated Wilson's background; whether trial counsel properly prepared Kohanski for trial; and whether Maish or Kohanski requested psychological testing, and if so, whether

trial counsel were deficient when they failed to make arrangements for the testing. Because all three issues relate to the investigation and development of mitigation evidence, it is appropriate to address the issues together.

In a section of its order headed "Trial Counsel's Pretrial Investigation into Petitioner's Background," the state habeas court first addressed the hiring of Maish.

> Trial counsel also hired Dr. James Maish to conduct a psychological evaluation, to present Petitioner's background, and to act as a "substitute for a sociologist."   However, after Dr. Maish had evaluated Petitioner … trial counsel made the reasonable strategic decision not to call Dr. Maish to testify. … Trial counsel testified that … Dr. Maish said he did not want to testify "because if he testified, … he would have to say that [Wilson] was a sociopath."

(Doc. 18-4 at 22) (record citations omitted).

Maish did not investigate Wilson's background.   Rather, trial counsel asked him to perform a psychological evaluation on Wilson and "talk to [Wilson] … about the background, his mother, and things."   (Doc. 12-8 at 43-44).   Thus, while Maish may have been hired to "present [Wilson's] background," his role in the case does not directly address Wilson's contention that trial counsel failed to conduct an appropriate investigation to uncover facts from Wilson's background essential to an effective mitigation defense.   Still, counsel's plan for Maish to evaluate Wilson and present his background provides some support for the state habeas court's conclusion that counsel "were not deficient by [their] investigation of Petitioner's background."   (Doc. 18-4 at 23).

As it turned out, Maish's involvement was very brief.   Trial counsel first met Maish on August 17, 1997.   They told him "what [they] knew about some of [Wilson's] past," the facts of the case, and their defense theory that Butts, not Wilson, was the actual shooter. (Docs. 16-1 at 54-55; 16-10 at 89).   Trial counsel asked Maish to evaluate Wilson, but not to do a written report until after he spoke with them.   (Doc. 12-8 at 97).

On August 28, Maish met with Wilson for approximately two to two-and-one-half hours.  (Docs. 12-10 at 17; 16-10 at 84, 89).   He administered no neuropsychological tests during this "get-acquainted session."   (Doc. 16-10 at 87).   Maish, whose deposition testimony was submitted to the state habeas court, said he told O'Donnell after his meeting with Wilson that Wilson was competent to stand trial, and although he had "a history consistent with antisocial behavior" or sociopathic tendencies, Maish did not form a diagnosis.   (Doc. 16-10 at 91-92, 97-98).   Rather, Maish said he told O'Donnell he could not reach a diagnosis because he had seen Wilson only once for just a few hours. (Doc. 16-10 at 97).   Maish said he explained to O'Donnell that they had a long way to go and asked O'Donnell for "school and medical records and more information about [Wilson's] background and upbringing," all of which he said were necessary to conduct a thorough evaluation and provide a reliable assessment of Wilson.   (Docs. 12-10 at 17-18; 16-10 at 88).

Maish said he told trial counsel that a neuropsychological evaluation was needed because Wilson had suffered a head injury at an early age.   (Doc. 16-10 at 91, 93). Maish told O'Donnell that he could not help unless he was provided the necessary records and background information and was allowed to perform the necessary tests. (Doc. 16-10 at 92-93).   According to Maish, O'Donnell told him there were "no funds available to get the information [he] was asking for or to pay for what [he] needed to do." (Doc. 16-10 at 92).   None of the requested records were provided to Maish, and he had no further contact with either Wilson or trial counsel.   (Doc. 12-10 at 18).

O'Donnell told a much different story.   He testified Maish told him "he did not want to testify because ... he would have to say that [Wilson] was a sociopath" who would kill

again.   (Doc. 12-8 at 97).   While Carr could not recall Maish asking for Wilson's records, he did recall O'Donnell telling him that Maish wanted Wilson to undergo "testing."   (Doc. 16-1 at 57, 59).   O'Donnell testified he was concerned that, regardless of what any testing or additional materials might reveal, Maish might still tell the jury his initial impression was that Wilson was a sociopath.   (Doc. 12-8 at 98-99).

On this point, the state habeas court credited O'Donnell's recollection of events over Maish's and found that because Maish "would have to say that [Wilson] was a sociopath," trial counsel made the "reasonable strategic decision" not to call him.   (Doc. 18-4 at 22).   Given the deference this Court must afford the state habeas court's credibility determinations and factual findings, this Court cannot find this determination unreasonable.   That, however, does not address Wilson's contention that trial counsel's background investigation was deficient.   Again, Maish did not conduct such an investigation.

Also, the section of its order headed "Trial Counsel's Pretrial Investigation into Petitioner's Background," the state habeas court next addressed Kohanski, who, unlike Maish, played a significant role at trial.

> Trial counsel also retained Dr. Renee Kohanski, a forensic psychiatrist. Dr. Kohanski examined Petitioner twice, consulted with trial counsel, reviewed records, and consulted with a "psychologist/attorney."   Trial counsel "discussed anything that could be mitigating" with Dr. Kohanski, interviewed her and explained Petitioner's history to her.   Dr. Kohanski testified that she also reviewed records ….   Further, Dr. Kohanski's testimony from trial establishes that she conducted review of Petitioner's background ….   Dr. Kohanski ultimately testified at trial and provided information to the jury regarding Petitioner's background for mitigation purposes, including his neglectful home life, lack of supervision as a child, and Petitioner having no adult authority figure.   This Court finds that trial counsel were not deficient by trial counsel's investigation of Petitioner's background.

(Doc 18-4 at 22-23) (record citations omitted).[29]

The state habeas court returned to Kohanski later in its order in a section headed "Preparation of Dr. Kohanski."

> Counsel felt that Dr. Kohanski had experience in dealing with "these kind of cases" as an expert.   They interviewed Dr. Kohanski, discussed possible mitigation in the event of conviction, informed her of Petitioner's history, gave her documents and records for review and asked for advice and "discussed anything that could be mitigating." … This Court further finds that as Dr. Kohanski never informed trial counsel that further information was needed to complete her evaluation but, instead, informed trial counsel that they had "truly provided an excellent defense; exploring every single option available to you," trial counsel's preparation of Dr. Kohanski was not deficient and Petitioner was not prejudiced.

(Doc. 18-4 at 26) (record citations omitted).[30]

Kohanski's testimony at the state habeas hearing paints a different picture.   She said O'Donnell wanted a social history, but she told him she would be able to obtain only a "cursory history" and a social worker was needed for a "good social history."   (Doc. 16-7 at 23).   Instead, as the state habeas court found, Kohanski relied on trial counsel to provide her with as much background information as possible.   (Doc. 16-13 at 72). While she looked at records they gave her and interviewed Wilson,[31] she "never took it upon [herself] to search out, locate and interview mitigation witnesses, such as teachers, other family members, social workers, and the like."   (Doc. 16-13 at 72).

_____

[29] The "psychiatrist/attorney" may have been Maish.   Maish testified that he spoke with Kohanski in September 1997, but he was "not very helpful to her in terms of her evaluation because [he] didn't have anything to go on" and there were no funds available to have the neuropsychological testing that he needed in order to evaluate Wilson.   (Doc. 16-10 at 92-93).

[30] Kohanski's statement is from a November 11, 1997 post-trial letter to O'Donnell in which she stated: "I enjoyed working with you on the Marion Wilson case and truly appreciate what a difficult ordeal this was. You represented your profession with honor and integrity and truly provided an excellent defense; exploring every single option available to you.   Unfortunately your client chose not to heed your advise [sic].   Since this was not secondary to a lack of competence on his part, there was nothing else you could do."   (Doc. 14-11 at 34).

[31] Kohanski thought she may have had some discussions with Cox as well.   (Doc. 16-13 at 72).

While Kohanski acknowledged she may not have asked trial counsel for any particular records, she claimed she did ask that Wilson undergo a physical examination and psychological testing.   (Doc. 16-6 at 65).   O'Donnell testified he recalled Kohanski thought Wilson might have brain damage, and she "wanted a complete mental and physical makeup which includes the MRIs and all that kind of stuff."   (Doc. 16-11 at 47). Similarly, Carr testified Kohanski "expressed some concerns about further testing" and "expressed a need for further evaluation[,]" but they "didn't have the money for it."   (Doc. 16-1 at 96-97).   Thus, Kohanski, like Maish, requested psychological testing.   However, trial counsel never requested funds for testing, and none was done.[32]

As far as this Court can determine, the state habeas court made no findings directly addressing Maish and Kohanski's recommendations for psychological testing.   If its finding that "Kohanski never informed trial counsel that further information was needed to complete her evaluation" was intended to suggest Kohanski did not request testing, that finding is clearly unreasonable.   (Doc. 18-4 at 26).   It is undisputed both Maish and Kohanski requested testing.

However, in a section of its order headed "Investigative Support," the state habeas court did address, without mentioning Maish's and Kohanski's recommendations, the failure to request funds for "additional testing."   (Doc. 18-4 at 39).   The court found trial counsel were not deficient when they did not request funding for testing because Wilson never gave them reason to believe the testing was necessary.   (Doc. 18-4 at 38-39). Wilson had obtained his GED, had attended college and earned above-average grades,

---

[32]  As noted, the state habeas court found trial counsel's preparation of Kohanski reasonable because trial counsel interviewed Kohanski, told her of Wilson's past, discussed possible mitigation, and provided her with Wilson's records.   It found that Kohanski examined Wilson, consulted with trial counsel, and consulted with Maish.   All of these are reasonable findings.

was able to assist counsel with his defense, knew right from wrong, had average intelligence, and had no history of organic brain damage.   (Doc 18-4 at 39).

Looking only at those facts, the state habeas court's conclusion that trial counsel reasonably chose not to request funds for testing is both factually reasonable and legally supportable.   *See Holladay v. Haley,* 209 F.3d 1243, 1250 (11th Cir. 2000) (counsel not required to seek independent evaluation when defendant does not display strong evidence of mental illness).   But viewing those facts in isolation distorts reality. Notwithstanding trial counsel's lay observations of Wilson, it hardly seems reasonable that, without explanation, they would reject the recommendations of their mental health experts.

In sum, the state habeas court's ultimate conclusion that trial counsel were not deficient in the development and presentation of mitigation evidence in the sentencing phase was based on both reasonable and unreasonable determinations of fact.   When trial counsel finally began their trial preparation in earnest, they each somehow thought the other was investigating Wilson's background.   Contrary to the state habeas court's findings, they did not interview Wilson's father, and they did not make a strategic decision not to call "devastating" background witnesses.   They could not have; they never interviewed background witnesses.   On the other hand, they hired mental health experts (although they ignored their recommendations for testing), and perhaps most importantly, they gathered considerable documentary evidence of Wilson's troubled background. Yet they ignored the many red flags in these records and did not expand their investigation beyond the records.   However, they gave the records to Kohanski and, through her testimony, presented much of that background evidence to the jury.

As the Court noted at the outset, the conduct of trial counsel in the development of mitigation evidence is difficult to defend.   But, rather than deciding whether Wilson has established his trial counsel's performance was deficient, the Court turns to the state habeas court's prejudice determination.

        c.  <u>The alleged prejudice resulting from trial counsel's allegedly deficient performance in investigation and presentation of mitigation evidence</u>

The Court will first review the evidence trial counsel presented at the sentencing phase and then the evidence Wilson says they should have presented.   The Court will then review the state habeas court's conclusion that there was no reasonable probability the new evidence would have changed the outcome.

        i)  <u>The evidence at the sentencing phase</u>

The State's 22 witnesses in the sentencing phase of Wilson's trial testified regarding Wilson's lengthy criminal history and gang affiliation.   The jury heard Wilson started committing serious felonies when he was twelve and since then was "either out committing crimes or ... incarcerated somewhere."   (Doc. 10-6 at 9).

On January 31, 1989, twelve-year-old Wilson and two other boys started a fire in a vacant duplex apartment in Glynn County.   (Doc. 10-2 at 94-96, 98).   The residents of the attached unit were home at the time.   (Doc. 10-2 at 99).   All three boys were charged with first degree arson and criminal trespass.   (Doc. 10-2 at 96).

John J. Schrier testified he and his mother lived next door to Wilson in Glynn County in 1989.   (Doc. 10-2 at 115).   After Schrier's mother, an elderly heart patient, complained that Wilson was harassing her and her dogs, Schrier asked Wilson to leave his mother and her dogs alone.   (Doc. 10-2 at 115).   Wilson responded, "I'll blow you and that old bitch's head off."   (Docs. 10-2 at 115; 10-6 at 4).

Former McIntosh County Sheriff's Deputy Robert Wayne Hoyt testified that on December 16, 1991, fifteen-year-old Wilson shot Jose Luis Valle, a Mexican migrant worker.   (Docs. 10-2 at 101-05; 10-6 at 4).   Brian Keith Glover testified he and his two cousins were with Wilson the night he shot Valle.   According to Glover, they were standing in the parking lot of a convenience store when Valle, a stranger to them all, walked past and into the store.   Wilson announced he was going to rob Valle and that he "wanted to see what it felt like to shoot somebody."   (Doc. 10-2 at 127).   Wilson, who had a pistol, approached Valle as he left the store.   When Valle raised his arms in the air and turned to run, Wilson shot him in the buttocks.   (Doc. 10-2 at 123-25).   Glover testified that approximately one week after the incident, Wilson, who was again carrying a gun, threatened him because of the statement Glover gave law enforcement about Valle's shooting.   (Doc. 10-2 at 144).[33]   Glover's cousin, Oscar Woods, corroborated Glover's story.[34]   (Doc. 10-2 at 151; 10-3 at 4-6).   The charges against Wilson were dead-docketed because the authorities were unable to locate Valle after he was discharged from the hospital.   (Doc. 10-3 at 29).

After Wilson was charged with shooting Valle, he was incarcerated at the Claxton Regional Youth Development Center ("Claxton RYDC"), where he attacked Steve Nesmith, a youth development worker.   Nesmith testified Wilson assaulted him, kneed him in the groin, grabbed his legs, and shoved him into a steel door.   (Docs. 10-3 at 46-47; 10-6 at 5).   After a struggle, another worker and a detainee helped Nesmith

---

[33] Trial counsel attempted, with some success, to establish Glover, not Wilson, shot Valle.   Valle reported a tall black male hit him in the back of the head with a gun, and he did not know which black male actually shot him.   Glover, at 6'3¾", was the tallest male in the group that night.   (Doc. 10-2 at 107, 109, 129-30).

[34] On cross examination, trial counsel established Woods originally told the investigating officers he did not know who shot Valle.   (Doc. 10-3 at 7).

subdue Wilson.   (Doc. 10-3 at 46-47).   Nesmith testified that during the two years he

worked at the Claxton RYDC, Wilson was the only detainee who ever attacked him.

(Doc. 10-3 at 48-50).

 Daniel Rowe testified he attended school with Wilson.   (Doc. 10-3 at 37).   In

January 1993, Wilson and another boy attacked him at school as he was drinking from a

water fountain.   (Docs. 10-3 at 38-39).   Later the same day, the two again attacked him.

(Doc. 10-3 at 39).

 Corporal Craig Brown of the Glynn County Police Department testified that on

June 9, 1993 Wilson shot and killed a small dog for no apparent reason.   (Doc. 10-2 at

46-48).   Juvenile Court Administrator Phillip Corbitt testified Wilson was charged with

cruelty to animals and, at a June 25, 1993 arraignment, admitted shooting the dog.

(Doc. 10-2 at 90, 92-93).

 On June 10, 1993, the day after he was charged with shooting the dog, Wilson was

charged with possession of crack cocaine with intent to distribute.   (Doc. 10-2 at 62-66,

83-84).

 A little more than one month later, Wilson shot Robert Loy Underwood.   (Doc.

10-5 at 135-36).   Underwood testified that on July 26, 1993 he drove into a neighborhood

to look for day labor.   (Docs. 10-1 at 106-07; 10-2 at 41).   While there, he purchased

crack cocaine from two boys.[35]   (Doc. 10-1 at 107).   As he drove away, something

struck him in the head.   (Doc. 10-1 at 108, 113-14).   When he turned to see what had hit

him, he saw Wilson, who was pointing a pistol at him.   Wilson then shot five times into the

cab of Underwood's truck.   (Doc. 10-1 at 108-09, 115).   One bullet struck Underwood in

---

[35] On cross examination, trial counsel established Underwood was high on cocaine and over the legal limit
of intoxication at the time he was shot. (Doc. 10-2 at 1-2).

the head; another traveled through his arm and lung before lodging in his spine.   (Doc. 10-1 at 108, 115).   Underwood said Wilson then "turned around and just casually walked off."   (Docs. 10-1 at 110).   Underwood was hospitalized for six days.   (Doc. 10-1 at 111, 114, 116).   Wilson was charged with the shooting, and Underwood identified Wilson as the shooter during the juvenile proceedings.   (Doc. 10-1 at 119).

Detective Ted McDonald with the Glynn County Police Department testified Wilson gave a statement in which he claimed he acted in self-defense when he shot Underwood. (Doc. 10-2 at 36, 38).   However, according to McDonald, Underwood's wounds were not consistent with Wilson's claims of self-defense.   (Doc. 10-2 at 40-42).   Juvenile Court Administrator Corbitt testified Wilson admitted shooting Underwood during a juvenile court hearing.   (Doc. 10-2 at 90).

Sergeant Brandon Lee, an officer with the Georgia College Department of Public Safety in Milledgeville, testified that on May 25, 1995, not quite two months after Wilson's release from the Milledgeville YDC,[36] he found Wilson and five others in a Georgia College parking lot shouting at college students.   (Docs. 10-3 at 55-56; 10-6 at 9). When Lee asked them to leave the campus, Wilson, whom Lee described as the obvious leader of the group, became belligerent.   (Doc. 10-3 at 55-56).   The group then moved to another parking lot two blocks away where they got involved in another verbal confrontation with students.   (Doc. 10-3 at 56).   When campus police arrived and again asked the group to leave the campus, Wilson began shouting "gang language" in Lee's

---

[36] At trial, the State did not proffer Wilson's juvenile records into evidence.   They were submitted as exhibits to the state habeas proceedings.   (Docs. 12-17 at 33-70; 12-18 1-96; 12-19 at 1-54).   However, these records show that on October 20, 1993 Wilson was sentenced to DJJ custody for five years for the cruelty to animals, possession of crack cocaine, possession of marijuana, and aggravated assault charges. (Doc. 8-7 at 44-45).   He was to be in restrictive custody for an initial period of eighteen months.   (Doc. 8-7 at 45).   He received an early release from custody and, on March 29, 1995, was allowed to live in an apartment in Milledgeville to attend classes at GMC.   (Doc. 8-7 at 46).

face and refused to leave.   (Doc. 10-3 at 57, 62).   As Lee tried to place Wilson under arrest, Wilson charged another officer and attempted to grab the officer's handgun. (Doc. 10-3 at 58-59, 63).   A struggle ensued, and Wilson ultimately had to be pepper sprayed.   (Doc. 10-3 at 59-60).   After the confrontation, Wilson was arrested and charged with failure to leave campus as directed by an officer and felony obstruction of an officer.   (Doc. 10-3 at 59-62).   Wilson pled guilty to the charges and was banned from the campus.   (Doc. 10-7 at 56-59).

Steven Roberts, formerly a law enforcement officer with the Georgia College Department of Public Safety, testified that on August 1, 1995, Wilson was charged with driving the wrong way on a one-way street and, because he ran when officers approached his car, obstruction of an officer.   (Doc. 10-4 at 9-11).   Roberts also testified he saw Wilson on the Georgia College campus on September 28, 1995.   Knowing he had been banned from the campus, Roberts approached Wilson to arrest him for trespassing.   When instructed to place his hands on the car, Wilson ran.   (Doc. 10-4 at 3-5).

Maxine Blackwell, Solicitor of Baldwin County State Court, testified Wilson had been charged with approximately ten misdemeanor offenses during an eleven week period in 1995 and was sentenced to serve 60 to 120 days in a detention center.   (Docs. 10-4 at 20-21; 10-7 at 56-78).[37]

Blackwell testified that on April 2, 1996, just a few days after Parks's murder, Wilson appeared at her office.   (Doc. 10-4 at 19-23).   Aware there was an outstanding warrant for Wilson's arrest for Parks's murder, Blackwell had her secretary call law

---

[37]  Records tendered into evidence at the state habeas court hearing show Wilson was released from the detention center on February 28, 1996.   (Doc. 12-15 at 17).

enforcement.   (Doc. 10-4 at 23-24).   Chief Deputy Sills and Deputy Blenk arrived moments later and arrested Wilson.   (Doc. 10-4 at 27).

Blenk testified that when he arrested Wilson, he had 22 small zip-lock bags of marijuana in his front pocket.[38]   (Doc. 10-4 at 34).   Blenk stated that in a subsequent search of Wilson's residence, officers searching Wilson's bedroom found two shotguns (one of which was sawed-off), a photograph of a gang member displaying gang hand signs, a loaded Smith and Wesson .32 caliber revolver, a .36 caliber handgun, notebooks and folders of FOLKS gang information, zip-lock bags inside a larger zip-lock bag, ammunition, and a black ski mask with two cut-out eye holes.   (Doc 10-4 at 36, 41-42).

During the guilt phase of Wilson's trial, gang references had been redacted from Wilson's recorded statements.   In the sentencing phase, the State played the redacted portions.   The jury heard Wilson confess he joined the Milledgeville FOLKS gang during his incarceration (Doc. 10-4 at 73, 77); he was as high as he could be in the gang, although not the leader (Doc. 10-4 at 73); he had one person under him in the gang but could have as many members as he wanted under him (Doc. 10-4 at 77); there was no reason for him to kill Parks to move up in the gang ranks because he was already as high as he could be (Doc. 10-4 at 77); and Butts was a member of the other FOLKS gang located in Milledgeville (Doc. 10-4 at 74).   Wilson said his position in FOLKS was "the God damn chief enforcer," a designation he earned by "fighting and stuff like that" when he was incarcerated in the YDC.[39]   (Doc. 10-4 at 77-78).

---

[38] Shawn Davis, a forensic chemist with the Georgia Bureau of Investigations, confirmed the substance taken from Wilson's right front pocket was marijuana.   (Doc. 10-4 at 63).

[39] After the jury heard Wilson's statement regarding his membership and status in the FOLKS gang, Sills and Deputy Ricky Horn provided testimony regarding gangs in general and the FOLKS gang located in Baldwin County, Georgia in particular.   (Docs. 10-4 at 99-142; 10-5 at 1-7).   Wilson maintains trial counsel were ineffective for failing to object to or rebut Sills's and Blenk's testimony.   (Doc. 43 at 130-98).   The

Trial counsel called six witnesses in the sentencing phase.   The testimony of three witnesses, Sills, Blenk, and Sheriff Massee, supported trial counsel's theory that Butts shot Parks.   (Doc. 10-5 at 14-16, 34, 38, 61, 77-78, 81-86, 89).   Trial counsel called Butts, and he invoked his Fifth Amendment right to remain silent when asked if he remembered confessing to three cellmates[40] he shot Parks.   (Doc. 10-5 at 69).

Kohanski testified trial counsel employed her to determine Wilson's competency to stand trial and to "look at [Wilson's] background to see if [she] could come up with some sort of understanding for all of us as to how the circumstances came to be."   (Doc. 10-5 at 99).   She then testified at length about Wilson's background, primarily based on her review of the records trial counsel had obtained.

Kohanski testified Wilson began displaying aggressive and inappropriate behavior as early as the first grade, which led school officials to request a psychological assessment.   (Doc. 10-5 at 100).   Wilson had difficulty staying on task, suffered from a poor self-image, and displayed "excessive maternal dependence."   (Doc. 10-5 at 101).   School officials requested a medical evaluation, which was never done, to determine the cause of his problems.   (Doc. 10-5 at 101-02).   Based on his behavior, school officials suspected he suffered from an attention deficit disorder but he was never diagnosed with the disorder because his mother did not follow the recommendation he be tested.   (Doc. 10-5 at 103-04).

Wilson's home life was "extraordinarily chaotic."   (Doc. 10-5 at 102).   Wilson's mother provided little supervision, and there was no male supervision.   He lived on the

_____

Court discusses that ineffectiveness claim below.

[40]  The cellmates' names were Horace May, Shawn Holcomb, and Randall Gary Garza (also shown as Gary Randall Garza).   (Doc. 10-5 at 70, 81).

street and began fending for himself at age nine or ten.   (Doc. 10-5 at 103-04).   This lack of family guidance led him to associate with a gang.   (Doc. 10-5 at 104).

Cox's boyfriends "came and went" during Wilson's childhood, and drug use in the home was commonplace.   (Doc. 10-5 at 103).   The one boyfriend who was a father figure to Wilson "behaved in extremely dangerous ways."   (Doc. 10-5 at 104).   When Wilson was six or seven, he saw this man put a gun to his mother's head, which "apparently was not an uncommon event in th[e] household."   (Doc. 10-5 at 104).

Because he was biracial, Wilson experienced "considerable conflict" in the neighborhood in which he grew up where "identity was extremely important."   (Doc. 10-5 at 102-03).   Although he identified himself as African-American, he "had a white mother whom he loved dearly."   (Doc. 10-5 at 103).

On cross examination, Kohanski testified Wilson knew right from wrong at the time of the murder and that he was not acting under any delusional compulsion.   (Doc. 10-5 at 109-10).   She admitted there was no history of organic brain damage.   (Doc. 10-5 at 112, 120).   However, she noted Wilson had been in two car wrecks when he was younger, and she "would have been interested to see if there had been a MRI or CAT scan done at the time, but [they didn't] have those records."   (Doc. 10-5 at 112, 121).   Kohanski acknowledged early I.Q. tests revealed Wilson had an average I.Q. and conceded many biracial children lead successful lives.   (Doc. 10-5 at 114-16, 118).

Cox then testified Kohanski's testimony accurately reflected Wilson's life, and Wilson had a difficult time with his identity.   (Doc. 10-5 at 127-28).   She said she worked menial jobs most of her life and made very little money.   (Doc. 10-5 at 128-29).   She explained Wilson had no male guidance, and his father refused to have anything to do

with him.   (Doc. 10-5 at 128).   Cox testified that other than Wilson, her father was her

only family, and he would not associate with her because Wilson's father was

African-American.   (Doc. 10-5 at 129).   Cox testified Wilson had an eighteen-month-old

daughter.   She asked the jury to "spare his life and give him the chance to be with his

daughter."   (Doc. 10-5 at 131).

On cross examination, Cox admitted she had a difficult time controlling Wilson and

had to call authorities on several occasions.   (Doc. 10-5 at 132).   She also confirmed

most of the testimony from the State's witnesses about Wilson's criminal history.   (Doc.

10-5 at 135).   Finally, Cox testified Wilson was arrested for Parks's murder 24 days

before his daughter was born and had been incarcerated ever since.   (Doc. 10-5 at

137-38).

In closing, O'Donnell said he was "not [t]here to submit that … Wilson led any kind

of life but a bad one[,]" and he acknowledged Wilson's "juvenile days were not his best

days."   (Doc. 10-6 at 21, 26).   O'Donnell argued Butts was the shooter and that Butts

lied during his statement to law enforcement and later bragged to fellow inmates he was

the person who shot Parks.   (Doc. 10-6 at 24, 40).   O'Donnell asked the jury to "think

about what happened in [Wilson's] life."   (Doc. 10-6 at 27-28).   He joined a gang

because he never had a family and had been living on the streets since he was eleven

years old.   His mother's family would not accept him because he was biracial, and his

father simply did not want him.   (Doc. 10-6 at 27-28).   O'Donnell pointed out that, except

for Wilson's mother, all of the people who testified and knew Wilson during his youth were

in prison, illustrating the violent environment in which Wilson grew up.   (Doc. 10-6 at

29-30).   O'Donnell argued a sentence less than death was appropriate because Wilson

did not shoot Parks, and Wilson told authorities the truth about what happened the night of the murder.   (Doc. 10-6 at 40-41).

The jury returned a death sentence in less than two hours.   (Doc. 10-6 at 51-52).

ii)   The mitigation evidence in the state habeas court proceedings

The state habeas court's evidentiary hearing was "primarily devoted to … Wilson's claims of ineffective assistance with respect to trial counsel's penalty phase preparation and presentation."   (Doc. 43 at 18).   State habeas counsel presented nine witnesses, five of whom provided mitigation testimony.[41]   They also submitted 127 exhibits, including affidavits and depositions from several of Wilson's family members, friends, teachers, social services worker, and mental health experts.

Georgia Bell Hightower, Wilson's first grade school teacher, described Wilson as talkative and disruptive and felt he was starving for love and attention because he was neglected by his unkempt mother.   (Doc. 12-7 at 11, 13, 15, 17).   She testified Wilson lived in a rough, drug-infested neighborhood, where he roamed the streets with no parental supervision.   (Doc. 12-7 at 20).   She opined Wilson had much potential, and his life would have turned out differently had he received love and support.   (Doc. 12-7 at 22, 24).

Helen McCloud Watkins, a friend of Wilson's family, testified she considered Wilson to be her nephew because her brother was like a father to Wilson throughout his life.   (Doc. 12-7 at 34).   She stated that when Wilson was a baby, his mother lived with a man named Pat Kimp in a dilapidated rental home lacking electricity or running water. (Doc. 12-7 at 35-36).   The house reeked because they urinated into plastic milk jugs and

---

[41] Wilson's remaining witnesses were O'Donnell and three witnesses who testified regarding gangs in general and the FOLKS gang in Baldwin County in particular.   (Doc. 12-5 to Doc. 12-8).

two liter soda bottles they kept in the house.   (Doc. 12-7 at 36-37).   Watkins stated that

when Wilson was a toddler, she took him to her home because Cox and Kimp were

involved in an altercation.[42]   (Doc. 12-7 at 36).   She testified Wilson lived with her for

three to six months, during which time his mother only visited him once or twice.   (Doc.

12-7 at 41).   Cox retrieved Wilson only after Kimp learned Cox's public assistance might

be discontinued because she no longer had physical custody of the boy.   (Doc. 12-7 at

41).

Watkins said that after leaving Kimp, Cox moved in with McCloud.   (Doc. 12-7 at

54).   Both Cox and McCloud had jobs, but when not at work, McCloud abused drugs and

alcohol while Cox played Nintendo and worked puzzles instead of caring for her child or

cleaning her filthy house.   (Doc. 12-7 at 44-48, 54).   According to Watkins, Cox had no

rules for Wilson and did not supervise him at all.   (Doc. 12-7 at 46).

Watkins testified Cox later moved in with another alcoholic, Sullivan, who was

physically abusive to Wilson by either "spanking him or hurting him."   (Doc. 12-7 at 50).

On cross examination, Watkins acknowledged she had never seen any of this physical

abuse, and she did not report the alleged abuse to authorities.   (Doc. 12-7 at 54-55).

Vivian Amason, a former social service specialist with McIntosh County DFCS,

testified that on November 19, 1991, Marie Aldridge with the DJJ[43] notified McIntosh

County DFCS that Cox was not providing Wilson with adequate supervision, clothing, or

food.   (Docs. 12-7 at 65-67; 12-16 at 9-58).   At the time, Cox was living with Sullivan,

---

[42]  According to Cox, the altercation was actually between her and some unknown person who broke into
their home and attempted to rape her.   (Doc. 12-10 at 61).

[43]  The DJJ became involved with fifteen year old Wilson in November 1991 because he had been charged
with "unruly-runaway," loitering and prowling.   (Doc. 12-9 at 48).

who abused alcohol and drugs.   (Doc. 12-7 at 68, 71).   She testified Sullivan may have

been abusive to Wilson,[44] but DFCS never confirmed any physical abuse.   (Doc. 12-7 at

91).   She testified Cox was neglecting Wilson, who was running away from home,

skipping school, and having a difficult time socially because he was biracial.[45]   (Doc.

12-7 at 68, 71).   Amason described Wilson as a polite, respectful, and intelligent child

who accepted responsibility for his actions, wanted to do better, and wanted to live in a

stable environment with his mother.   (Doc. 12-7 at 69, 79-80).   Amason testified that

DFCS confirmed the neglect allegations and found Cox was not providing Wilson with

"nurturing, care, guidance, and … food."   (Docs. 12-7 at 69; 12-16 at 35).   She stated

Wilson was at risk while he was in the home, but DFCS could not continue services

because he was incarcerated in the juvenile court system.[46]   (Doc. 12-7 at 70, 88).

Amason further testified the McIntosh County Juvenile Court ordered DFCS to

contact Cox again in October 1992, and she found the home situation had improved

considerably.   Cox's mental functioning had also improved, and she was willing to

assume responsibility for Wilson, who wanted to live with his mother.   (Docs. 12-7 at 73,

89-90; 12-16 at 41).   In an October 29, 1992 letter to the McIntosh County Juvenile

Court, Amason recommended Wilson remain in Cox's custody.[47]   (Docs. 12-7 at 74;

---

[44] DFCS records show Wilson reported Sullivan drinks and "had hit him."   (Doc. 12-16 at 12).

[45] Amason's records from December 1991 show Amason contacted Cox who told her Wilson was hanging around the wrong crowd, getting into trouble, cutting school, leaving home without telling her, and that Cox did not know what to do with him.   (Doc. 12-16 at 36).   The records also show Cox told Amason that Wilson can be lovable when he gets what he wants but "can be nasty when things do not go his way." (Doc. 12-16 at 36).

[46] Wilson had been incarcerated for charges stemming from his December 16, 1991 shooting of Valle. (Doc. 12-16 at 17).

[47] Actually, the record shows Wilson was not in Cox's custody on October 29, 1992.   He was incarcerated, having been charged with simple battery after his unprovoked attack on a boy at a ballgame.   (Docs. 12-9 at 43; 12-16 at 41).   Cox stated she wanted custody of Wilson following his release from confinement, and

12-16 at 41).   However, the court disagreed and wanted to place Wilson in foster care.

(Doc. 12-7 at 74-75).   According to Amason, no foster homes or other facilities for

troubled teenage boys were available.   (Doc. 12-7 at 75).   Amason testified that shortly

after Wilson returned home in October 1992, he again got into trouble because he had no

structure, guidance, or stability at home.   (Doc. 12-7 at 78, 93-94).

On cross examination, Amason admitted Wilson knew he was behaving badly and

knew he could do better.   (Doc. 12-7 at 84).   She also admitted DFCS would not put a

child back into an unstable or dangerous home.   (Doc. 12-7 at 88-89).   Amason

confirmed Wilson, in October 1992, stated his mother tried to take care of him but he

"usually gets himself into trouble" and his mother "never abused him."   (Doc. 12-16 at 24,

41).   Amason also acknowledged that, in her October 29, 1992 letter, she told the

McIntosh County Juvenile Court Wilson did not "appear to be in danger of maltreatment in

his mother's home[,]" and Wilson was sixteen years old and needed to be held

accountable for his actions.[48]   (Docs. 12-7 at 90; 12-16 at 41).

Adam Poppell, an attorney, testified he was appointed to represent Wilson in

McIntosh County Juvenile Court in 1992.[49]   (Docs. 12-7 at 107-09; 12-9 at 43-50).   He

_____

Amason agreed she should have custody.   (Doc. 12-16 at 41).

[48]  In this letter, Amason also reported: "Ms. Cox says that Marion is very sensitive and tends to fight at the slightest insult."   (Doc. 12-16 at 41).

[49]  It is unclear exactly what charges were pending against Wilson when Poppell was appointed to represent him.   A January 3, 1992 "case-worker's report" from Marie Aldridge with the DJJ shows Wilson was charged with three separate unruly-runaway offenses because he ran away from home once in September 1991 and twice in November 1991; three counts of loitering and prowling; and one criminal attempt to commit armed robbery and aggravated assault, which stemmed from Valle's shooting.   (Doc. 12-9 at 43, 48).   An update, dated October 30, 1992, shows Wilson received probation for the unruly-runaway and loitering and prowling charges on March 20, 1992.   (Doc. 12-9 at 47).   The update shows he was charged with, and received probation for, one count of simple battery, and the criminal attempt to commit armed robbery and aggravated assault charges were dead docketed because Valle could not be located.   (Doc. 12-9 at 47).   Finally, the update shows Wilson was currently "charged with simple battery for an incident that occurred October 16, 1992, when he hit the victim, Ryan Mauldin, in the head causing a severe cut over

described Wilson's mother as an unkempt woman who could barely function and who never kept appointments.   (Doc. 12-7 at 107-09).   He said Cox, Sullivan, and Wilson lived in a dilapidated home in a poor neighborhood, and Cox failed to supervise or adequately care for Wilson.   (Doc. 12-7 at 110-11).   He stated that Wilson, who was a quiet child, did not like living with Sullivan, who was known in the community as a violent drug dealer.   (Doc. 12-7 at 115-16, 126).   Consequently, Wilson ran away from home frequently and essentially lived in the streets.   (Doc. 12-7 at 115-16).   According to Poppell, Wilson had potential and "was one of the more unusual kids in that he was relatively intelligent."   (Doc. 12-7 at 122).

Lorr Elias, a DJJ regional administrator who had worked at the DJJ for 21 years, reviewed Wilson's school records, DFCS records, court documents, affidavits, and hospital records.   (Doc. 12-7 at 132, 138).   Elias testified that every risk factor for becoming a serious juvenile offender was present in Wilson's life – poor home support; absence of a stable positive role model; long term neglect or abuse; family mobility; exposure to violence, drugs, and sex; poverty; and constant turmoil.   (Doc. 12-7 at 142). Elias was not surprised DFCS did not remove Wilson from his mother's home because DFCS had failed on many occasions to remove deprived children from their homes, and in any event, there was no place to put teenagers when they did remove them.   (Doc. 12-7 at 145).   She opined Wilson wanted to do better and responded well to structure, which is why the DJJ took the unusual step of releasing him early from the Milledgeville YDC to allow him to attend classes at GMC.   (Doc. 12-8 at 6, 8-9).   She explained that the DJJ was required by law to intensively supervise Wilson, as a high risk offender or a

---

the left eye.   Evidence indicates the incident was unpro[vo]ked.   No weap[o]n was found."   (Doc. 12-9 at 43).

designated felon, after his early release until he reached age 21.   (Doc. 12-8 at 8, 21, 25).   However, Wilson never received this supervision because his case was not transferred from McIntosh County to Baldwin County.   (Doc. 12-8 at 7, 9-11, 25-26).[50] Thus, Wilson was not supervised after his November 15, 1995 release to March 28, 1996. (Doc. 12-8 at 9-10, 25).   Elias explained that, without supervision, Wilson slipped back into the only lifestyle he knew -- hanging around with the wrong people, roaming the streets, and getting into trouble.   (Doc. 12-8 at 5-6).   She testified that had he been properly supervised, Wilson's community placement would have been revoked before he became involved in Parks's murder because of his many offenses.   (Doc. 12-8 at 13). Elias opined this "early intervention" may have been effective because, although he was a chronic offender, Wilson showed hope and promise not usually seen in similar offenders. (Doc. 12-8 at 13).

On cross examination, Elias admitted she had given this "expert opinion sort of testimony" in only one other case.   (Doc. 12-8 at 14, 21-22).   In that case, she was very familiar with the child because she had supervised him, whereas she had no personal knowledge of Wilson, his mother, or any of his family members.   (Doc. 12-8 at 15-16).

In addition to this testimony, state habeas counsel submitted affidavits from Wilson's family members, friends, acquaintances, teachers, and social workers.   These affiants confirmed and provided additional details about Wilson's troubled childhood and adolescence.   (Docs. 12-10 at 57-58, 84, 87, 100; 12-11 at 3-4; 12-9 at 9-10, 28; 12-10 at 96-98).   They provided more details of the filthy and dangerous conditions in which Cox and Wilson lived and described Wilson as a sickly, fragile child who was often forced to go

---

[50] In an affidavit submitted at the state habeas hearing, Nancy Rogers explained she worked as a case manager at the DJJ, and in April 1996, she received a written reprimand for failing to adequately and properly supervise Wilson from November 15, 1995 until late March 1996.   (Doc. 12-13 at 5-6).

without clothes or food.   (Docs. 12-10 at 60, 71-72, 85, 94, 96-97; 12-11 at 7).   They provided additional details about the numerous abusive relationships Cox had with multiple alcoholic, drug-abusing men.   (Docs. 12-10 at 60, 63, 71-72, 75, 77, 91, 94, 96; 12-11 at 5-7).

From Cox's affidavit, there is some evidence Wilson may have suffered physical abuse.   Cox claimed that when she and Wilson lived with her father in Oklahoma for several months in 1985 or 1986, her father beat Wilson with a belt.   (Doc. 12-10 at 65).   She stated one of her boyfriends threatened Wilson, hit Wilson, and once pulled a knife on Wilson.   (Doc. 12-10 at 65-66).   She also alleged Sullivan "sometimes would hit [Wilson]."   (Doc 12-10 at 66).   Ray Charles Ellis claimed Cox told him "her boyfriend [Sullivan] did a lot of drugs, drank a lot and he would often beat her and [Wilson]."   (Doc. 12-11 at 5).   Kimp stated that when Wilson "acted up, [he] would sometimes have to take [his] hand or belt to him."   (Doc. 12-10 at 91).   Another affiant, Belinda Wilson, claimed that when Kimp "got in one of his moods, he used to beat … [Wilson] really bad" by slapping or punching him.   (Doc. 12-11 at 7-8).

Affidavits provided evidence that when Wilson was about fifteen years old, he and his mother moved into a stable home environment with his aunt, Evelyn Gibbs.   (Doc. 12-10 at 67, 81-82).   While in this environment, Wilson did well in school and stayed out of trouble.   (Doc. 12-10 at 68).   In her affidavit, Kohanski explained Wilson's success at Gibbs's home showed a structured environment would "significantly ameliorate the kinds of behavior problems seen in … Wilson."   (Doc. 12-9 at 69-70).

Four former teachers submitted affidavits.[51]   (Doc. 12-9 at 7-42).   They testified Wilson was easily led, always anxious, hyperactive, energetic, incapable of focusing, likeable, and suffered from identity issues.   They stated Wilson had potential, was creative and intelligent, and his life would have turned out differently if he had the support, love, and attention all children need.   (Doc. 12-9 at 7-12, 25-27, 38-40).   Bazzle explained the school psychologist recommended placing Wilson in the behavior disorders program and that he have a medical checkup to see if he could receive medication for ADD.   (Doc. 12-9 at 40).   However, Cox and McCloud would not allow him to be placed in the behavior disorders program and did not take Wilson for a medical checkup.   (Doc. 12-9 at 40).   Melanie Moye, a GMC teacher, testified Wilson stood out in her college English class because of his intelligence and "strong effort to do well."   (Doc. 12-9 at 18). She opined Wilson wanted to "change his life and use his abilities to better himself." (Doc. 12-9 at 18).   She described him as personable and pleasant and stated he had a "warm and tender side."   (Doc. 12-9 at 19).

Wilson also presented affidavits from Dr. Jorge A. Herrera, a forensic neuropsychology expert.[52]   (Doc. 12-9 at 91).   In his February 25, 2002 affidavit, Herrera said he reviewed records, interviewed Wilson, and administered neuropsychological tests.   (Doc. 12-9 at 91-92).   Herrera diagnosed Wilson as having frontal lobe brain damage and ADHD.   (Doc. 12-9 at 97-99).   According to Herrera:

> The neuropsychological testing ... revealed mild to severe impairments in brain functioning, with severe impairment localized in the frontal lobes of Mr.

---

[51]  These teachers were Hightower, Wilson's first grade teacher who also testified at the state habeas evidentiary hearing; Joan Bazzle, another elementary school teacher; Barbara Smith, Wilson's eighth grade teacher; and Moye, an English teacher at GMC.   (Doc. 12-9 at 7-42).

[52]  In several places in the record, Herrera's name is shown as Dr. Jorge Alfredo Herrera-Pino.   (Doc. 12-10 at 2).

Wilson's brain.   This is an area of the brain which governs executive
functions such as judgment, decision-making, abstract reasoning and
planning skills, as well as impulse-control.   It is my professional opinion
that Mr. Wilson's impairments are developmental in nature, possibly
stemming from toxic exposure during the mother's pregnancy or other pre
or perinatal trauma and/or malnutrition and chronic illness/high fevers
associated with the poor conditions of Mr. Wilson's childhood home
environment.   Early life closed head trauma could also have contributed to
these impairments.   Mr. Wilson's impairments are consistent with the
symptoms of attention-deficit/hyperactivity disorder observed from Mr.
Wilson's early childhood.   Untreated, these impairments can adversely
affect an individual's ability to make proper life choices and to control
impulsive behavior.   Such individuals also tend to be more susceptible to
suggestion than normally functioning individuals.   In Mr. Wilson's case,
these impairments were exacerbated by Mr. Wilson's life history of
childhood poverty and deprivation, a total lack of parental nurturing,
guidance and supervision, and difficulties stemming from the struggles with
his lack of a father figure and his mixed-race identity.

(Doc. 12-9 at 92).

Herrera explained Wilson had adequate intelligence, but his "problems lie in the

area of social judgment and decision-making."   (Docs. 12-9 at 103; 16-2 at 16).   Herrera

theorized Wilson's association with Butts on the night of the murder and his failure to

intervene are consistent with the concrete thinking and judgment problems associated

with his severe frontal lobe impairment.   (Doc. 12-9 at 103).   Herrera found, "Wilson is a

damaged individual whose problems are directly related … both to his impaired brain

functioning and ADHD, and to his traumatic and disadvantaged life history."   (Doc. 12-9

at 103).

Wilson presented affidavits from Kohanski and Maish.   Kohanski agreed with

Herrera's findings that Wilson suffers from frontal lobe brain damage and ADHD.   (Doc.

12-9 at 60, 76-77).   Maish testified that after reviewing Wilson's records and Herrera's

neuropsychological testing results, he did not believe Wilson to be a psychopath or a

sociopath.   (Doc. 12-10 at 22).   He found Herrera's testing methods and results sound

and concurred in the diagnosis of ADHD and frontal lobe impairment.   (Doc. 12-10 at

20-21, 34, 38-39).   He stated Wilson's "troubled juvenile and criminal history was …

virtually guaranteed" by Wilson's ADHD and frontal lobe impairment paired with his highly

dysfunctional upbringing.   (Doc. 12-10 at 20).   Like Herrera, he opined Wilson's frontal

lobe impairment significantly impacted his ability to fully comprehend the consequences

of his actions, impeded his ability to make judgments, and hampered his ability to control

impulses.   (Doc. 12-10 at 22).

> iii) <u>The state habeas court's conclusion that Wilson was not prejudiced</u>
>     <u>by trial counsel's investigation and presentation of mitigation</u>
>     <u>evidence</u>

The state habeas court concluded Wilson's new mitigation evidence, both lay and

expert, would not have changed the outcome of his trial.   With regard to new lay

testimony, the court found:

> Petitioner claims that defense counsel failed to interview certain potential
> mitigation witnesses.   However, this Court finds that trial counsel were not
> deficient in not submitting this additional testimony and further finds that
> Petitioner has not established prejudice as the testimony proffered in
> support of this claim would have been inadmissible on evidentiary grounds,
> cumulative of other testimony, or otherwise would not have, in reasonable
> probability changed the outcome of the trial.
> > …
> As to the testimony of Petitioner's former teachers, this Court finds this
> evidence speculative and notes the limited contact these teachers had with
> Petitioner and/or the lapse in time between their contacts with Petitioner
> and the crimes.   Thus, while the testimony of Petitioner's former school
> teachers, including Ms. Gray's testimony, would have been largely
> cumulative of other evidence at trial, or otherwise inadmissible on
> evidentiary grounds, even assuming its admissibility, the Court finds that
> Petitioner has failed to show that trial counsel were deficient in not
> submitting this testimony or that the testimony would have a reasonable
> probability of changing the outcome of the case.
> > …
> This Court also finds that the remainder of Petitioner's lay affiants, like the
> aforementioned affiants, provide testimony that would not have been
> admissible at trial as the testimony is largely based on hearsay or

speculation or was cumulative of testimony elicited by defense counsel from Petitioner's mother and Dr. Kohanski at trial concerning Petitioner's childhood.   Further, given the defense theory that Butts was the triggerman, trial counsel were reasonable in declining to proffer the testimony that undermined that defense, and there is no reasonable probability that such additional testimony would have changed the outcome of the case….

(Doc. 18-4 at 23-26) (record citations omitted).[53]

With regard to new expert testimony, the court summarily found it would not have changed the outcome of the trial.   (Doc. 18-4 at 26).

Wilson generally complains the state habeas court failed to explain its prejudice determination.   "Instead of engaging in a 'probing' and 'careful' analysis, the state habeas court here simply relied on the bald recitations of the 'magic words' of the *Strickland* standard in concluding that Mr. Wilson was not prejudiced."   (Doc. 43 at 108). This argument is without merit.   A state court is not required to "show its work" or provide rationales and explanations for its decisions.   *Richter*, 131 S. Ct. at 784; *Evans*, 703 F.3d at 1329-30.   This Court focuses on the ultimate legal conclusion reached by the state court, "not on whether the state court considered and discussed every angle of the evidence."   *Lee*, 726 F.3d at 1211.   If there is no conspicuous misapplication of federal law, this Court must assume the state court knows and follows the law.   *Evans*, 703 F.3d at 1329-30.

Moreover, at least with regard to Wilson's new lay testimony, the state habeas court did somewhat explain its reasoning.   For example, it found the teachers' testimony speculative, noting "the limited contact these teachers had with [Wilson] and/or the lapse

---

[53] In its prejudice analysis, the state habeas court discussed the affidavit testimony of Eric Veal, who said Parks's murder was not gang-related.   Wilson makes no allegations regarding Veal in his briefs and thus does not contend the state habeas court erred when it concluded Veal's testimony was inadmissible and, in the alternative, would not have, with any reasonable probability, changed the outcome of Wilson's trial.

in time between their contacts with [Wilson] and the crimes."   (Doc. 18-4 at 24).   Wilson, who was 19 when Parks was murdered and 21 at the time of his trial, had not seen his elementary school teachers in years.   (Doc. 12-7 at 28).   Additionally, he spent no more than one school year with each of the elementary or middle school teachers and only one semester in Moye's college class.   (Doc. 12-9 at 7-42).   Moye, his college level teacher, acknowledged she was unable to spend much time with Wilson.   (Doc. 12-9 at 20).

Wilson argues that by ruling the teachers' testimony speculative, the state habeas court effectively found childhood or adolescent evidence is never "persuasive."   (Doc. 43 at 111).   Similarly, Wilson argues the state habeas court's broad and sweeping conclusion that all of the new lay testimony was inadmissible was unreasonable.[54] While, much of the lay testimony was speculative, much was not, and Wilson's argument would have some merit if the state habeas court had simply rejected all the lay testimony as speculative.   But that is not what the court did.[55]   The court examined the testimony and found it largely cumulative of Kohanski and Cox's trial testimony.   (Doc. 18-4 at 25,

---

[54] Wilson cites *Green v. Georgia,* 442 U.S. 95, 97 (1979) and *Sears v. Upton,* 130 S. Ct. 3259, 3263 n.6 (2010) to support his argument that hearsay evidence is admissible for penalty phase purposes.   In *Green*, the Court held it violated due process to exclude as hearsay a codefendant's confession that he alone committed the murder for which the defendant was charged.   *Id.* at 97.   In *Sears,* the Court did not hold it was always legal error to exclude hearsay testimony during the penalty phase of a capital trial.   To the contrary, it specifically stated it took "no view on whether the evidence at issue would satisfy the considerations … in *Green*."   *Id.* at 3263 n.6.   The hearsay testimony at issue in Wilson is not the "highly relevant" and "sufficiently reliable" statement exonerating a defendant.   *Green*, 442 U.S. at 97.   Instead, it is the type of self-serving affidavit testimony that normally proves of little significance.   *Putman*, 268 F.3d at 1245 n.19 (quoting *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995)).   Thus, there are no due process issues present here.

[55] Some of the more glaring examples of speculative testimony from the teachers are: Wilson would not have turned to destructive behavior if he had love and support; Wilson might not have ended up in these circumstances if he had good parents or a good home; with guidance and support Wilson could have accomplished great things; an authority figure or strong father figure could have made a big difference in Wilson's life and prevented his criminal activity; and with sustained intervention Wilson might have modified his behavior and flourished.   (Doc. 12-9 at 10-11, 20-21, 41).

31).   Kohanski, based primarily on her review of the records counsel obtained, and Cox testified about Wilson's background.[56]   (Doc. 43 at 117).

Citing *Cooper v. Sec'y, Dep't of Corrs.,* 646 F.3d 1328 (11th Cir. 2011), Wilson argues the state habeas court unreasonably applied *Strickland* when it found the new evidence cumulative.   Close examination of *Cooper* is instructive.

In Cooper's trial, his mother, Kokx, described the physical abuse, much of which Cooper witnessed, she suffered at the hands of Cooper's father, Phillip.   *Cooper*, 646 F.3d at 1337.   She testified Phillip neglected Cooper, was not very affectionate to Cooper, used profanity when speaking to Cooper, and was "very hard" on Cooper, disciplining him with a belt that left marks.   *Id.* at 1337-38.   The jury recommended the death penalty.

At the state postconviction hearing, Cooper's brother and sisters testified at length and in detail about the daily abuse Phillip inflicted upon his children.   Phillip, who was an alcoholic, beat them nearly every day with boards, fists, belts, switches, or horsewhips, began punching Cooper when he was barely out of diapers, picked them up and slammed them against walls, banged their heads together, threw rocks at them, and threatened to shoot them when they tried to run away.   *Id.* at 1342-44.   Cooper's older brother testified both he and Cooper attempted suicide to escape their father's abuse.   *Id.* at 1343.   His sister testified that because Phillip often made Cooper go without food, he would sneak to a barn to eat dog food and drink milk from a nursing mare.   *Id.* at 1344.   Witnesses also

---

[56] Wilson argues Kohanski and Cox presented only a "hollow shell" of his tragic life history, while the new lay testimony provides a graphic and detailed description of that history.   On a practical level, this is a reasonable point.   The live testimony of those who knew Wilson might have been more persuasive than Kohanski's regurgitation of facts she culled from records.

testified that after Phillip's death, Cooper's older brother began physically abusing Cooper on a daily basis.   *Id.* at 1345.

The state postconviction court denied relief, finding that trial counsel's performance was reasonable and that Cooper failed to show prejudice because the additional evidence regarding Cooper's background was cumulative of the evidence presented at trial by Cooper's mother, and the Florida Supreme Court affirmed.   *Id.* at 1348-49.   The Eleventh Circuit disagreed: "Although Kokx's testimony revealed that Cooper's home life was volatile; to characterize her testimony as revealing a 'substantial part' of Cooper's 'disadvantaged childhood' is a great exaggeration."   *Id.*   First, Kokx's testimony at trial explained how she, not Cooper, was physically abused by Phillip.   *Id.* Second, she could not have testified about much of the abuse suffered by Cooper because she was not living with Phillip and Cooper much of the time.   *Id.*   Finally, she failed to reveal Cooper was physically abused by his older brother as well.   *Id.*   Thus, the Eleventh Circuit held the Florida Supreme Court's determination that the evidence presented postconviction was cumulative to that presented at the sentencing hearing was an unreasonable determination of the facts.   *Id.* at 1353.   The Eleventh Circuit then reviewed *Strickland's* prejudice prong de novo and granted relief.   *Id.* at 1353-56.

But in this case, even by *Cooper's* standards,[57]  the state habeas court's determination that the lay witness testimony was cumulative was reasonable. "[E]vidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version

---

[57]  The Eleventh Circuit has since characterized *Cooper* as an "outlier," questioning its treatment of the state court's cumulative determination as factfinding for purposes of 28 U.S.C. § 2254(d)(2).   *Holsey*, 694 F.3d at 1259.

of the same story told at trial or provides more or better examples or amplifies the themes." *Holsey v. Warden,* 694 F.3d 1230,1260-61 (11th Cir. 2012) (quoting *Cullen*, 131 S. Ct. at 1409-10).   While Wilson's new lay witnesses provided the state habeas court with more details regarding his troubled background, their testimony "concerned the same 'subject matter' [as] the evidence presented at sentencing."   *Id.* at 1263 (quoting *Paul v. United States*, 534 F.3d 832, 842-43 (8th Cir. 2008)).   The jury heard Wilson was a sickly child who, starting in the first grade, had numerous problems in school; he may have had ADHD but his mother failed to have him tested to confirm this disorder; and as a biracial child, he suffered from identity and self-image problems.   Because he was biracial, he and his mother were shunned by her family; his father had no relationship with him at all; his father never provided any financial support, and his mother worked at menial jobs making very little money; his home life was chaotic and difficult; his mother's many boyfriends used drugs in the home and were frequently violent; his mother provided no supervision; he had no male role models; and he was living on the streets by age nine or ten.   (Doc. 10-5 at 102-04; 127-30).

In short, the new lay witness testimony did not tell a different story,[58]  just a more detailed one.   Thus, fairminded jurists could find their testimony cumulative.   Even if this

---

[58]  The lay affiants provided some general testimony of physical abuse, i.e., Cox's father hit him with a belt and various boyfriends hit or beat him.   (Docs.12-10 at 65-66, 91; 12-11 at 5-8).   They failed to provide more than "generalities" about such abuse.   *See Lee*, 726 F.3d at 1196 (explaining the petitioner could not show prejudice by stating only "generalities that his parents would frequently verbally abuse and berate him and sometimes whip him").   Certainly, there was no "powerful" mitigating evidence of severe physical torment or abuse.   *Wiggins*, 539 U.S. at 534-38.   Moreover, DFCS never confirmed any abuse (Doc. 12-7 at 91).   Wilson himself repeatedly denied any physical abuse: He told Kohanski that he was never physically abused (Doc. 13-12 at 79); Central State Hospital records show that Wilson denied any physical abuse (Doc. 15-3 at 57); School records show Kimp "never abused" Wilson (Doc. 12-6 at 60); and Department of Corrections' records show Wilson denied any physical abuse.   (Doc. 15-5 at 50).   Some of the affiants also claimed Wilson went without adequate food and clothing.   (Docs. 12-10 at 84; 12-11 at 7).   However, this testimony was rebutted by his elementary school records, which show Wilson was "a handsome racially mixed child of average height and weight" who was "clean and well dressed" and later by Georgia Regional Hospital records, dated January 1992, which show Wilson was "well developed, well

Court "might reach a different conclusion in the first instance," it cannot find the state court's cumulative determination was so clearly erroneous that no fairminded jurist would ever agree with it.   *Id.* at 1260; *see also Pinholster*, 131 S. Ct. at 1409-10 (if evidence presented postconviction "largely duplicate[s]" that heard by the sentencing jury, there is no prejudice); *Sochor v. Sec'y Dep't of Corr.*, 685 F.3d 1016, (11th Cir. 2012 ) (holding that a habeas petitioner does not establish prejudice when most of the mitigating evidence produced postconviction was cumulative of evidence produced during the trial).[59]

Moreover, the teachers' testimony would have opened the door to the admission of Wilson's school records, which contained evidence that would likely have been more harmful than helpful.   (Doc. 43 at 113).   For example, these records revealed Wilson was disruptive, physically and verbally aggressive to teachers and students, lacked self-control, and blamed others for his misconduct.   (Docs. 12-16 at 61-62, 67, 70; 12-17 at 4-5).   When evidence is not clearly mitigating or would open the door to harmful evidence, prejudice has not been established.   Thus, "it is reasonable to conclude that [Wilson] was not prejudiced [because] his mitigation evidence 'was a two-edged sword or would have opened the door to damaging evidence.'"   *Evans*, 703 F.3d at 1327 (quoting *Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1294 (11th Cir. 2012)).

---

nourished, [and] healthy appearing."   (Docs. 12-14 at 23; 12-16 at 62).

[59] Wilson also cites *Williams v. Allen,* 542 F.3d 1326 (11th Cir. 2008) to support his argument that the state habeas court's conclusion that lay witness testimony was cumulative of trial testimony was unreasonable. *Williams* is easily distinguishable.   First, the trial court in *Williams* rejected a jury's recommendation and imposed a death sentence.   In this situation, "'[p]rejudice is more easily shown … because of the deference shown to the jury recommendation.'"   *Id.* at 1343 (quoting *Harich v. Wainwright*, 813 F.2d 1082, 1093 n.8 (11th Cir. 1987)).   Also, Williams's new mitigation evidence "paint[ed] a vastly different picture" of Williams's background than the one portrayed at his sentencing.   *Id.* at 1335.   Finally, the state postconviction court greatly discounted the value of the new mitigation evidence because it had no "causal relationship" with the underlying murder.   *Id.* at 1343-44.   The Eleventh Circuit held the state court's emphasis on the absence of a causal relationship between the new mitigation evidence and the murder was an unreasonable application of *Strickland*.   *Id.*   *Williams* is both factually and legally distinguishable.

With regard to Wilson's new expert evidence, the state habeas court said nothing about Herrera and little about the results of his neuropsychological testing.   In a single sentence, the state habeas court simply found Wilson's "current diagnoses of impaired frontal lobe functioning, which allegedly affects Petitioner's impulsivity and reasoning, and ADHD," would not have changed the outcome of Wilson's trial.   (Doc. 18-4 at 26). Wilson takes issue with the court's summary rejection of his "extensive new evidence of organic brain impairment."   (Doc. 43 at 26).   But Wilson does not say much about the significance of his alleged brain damage or ADHD either.   He essentially says only that the jury did not know he had brain damage.   (Doc. 43 at 123).   In the factual background section of his brief, Wilson said an expert such as Herrera would have "explained to the jury that the problems Mr. Wilson has with social judgment and decision making are attributable to and consistent with the organic brain impairments that the testing revealed."   (Doc. 43 at 65-66).   "Discussion of those impairments could have shed light on [his] behavior on the night of the crime for which he was convicted, including why he may have been hanging out with the co-defendant."   (Doc. 43 at 66)   In yet another section of his brief, Wilson argues evidence of his "significant organic brain impairments … would have buttressed a 'mere presence' theory of the case, because it would have helped the jury understand why [he] may have been at the murder yet not had the maturity or reasoning skills to go to the police."   (Doc. 43 at 26).

But helped how?   What about Wilson's maturity and decision-making and reasoning skills would "shed light" on what he did, or did not do, the night of Parks's murder?   In other words, what were the consequences and manifestations, according to Wilson's experts, of his alleged brain damage?   One answer is found not in Wilson's

briefs but in Kohanski's affidavit testimony.   The neuropsychological testing, she says,

"indicates that Marion suffers from frontal lobe deficits and is a highly suggestible

individual, easily led by others in certain situations."   (Doc. 12-9 at 76).   After reviewing

all the new information, she concluded "Marion's profile is more consistent with an

individual who is led rather than someone who actively leads."   (Doc. 12-9 at 76).

Wilson, she said, is a "passive, distant, even dissociative adolescent."   (Doc. 12-9 at

76).[60]

The suggestion that Wilson was a passive, highly suggestible, and easily led by

others is in stark conflict with the facts.   In elementary school, he disrupted class by

hitting and picking on other children and talking back to teachers.   (Docs. 10-2 at 96-99,

115; 12-17 at 4-9).   By age twelve, he was threatening elderly neighbors.   (Docs. 10-2 at

96-99, 115; 12-17 at 4-9).   During his teen years, he assaulted his peers for no apparent

reason, shot a small dog (again for no apparent reason), distributed drugs, and shot both

Underwood and Valle.   (Docs. 8-8 at 77; 10-2 at 24-26, 60-65, 90; 10-3 at 21-23; 38-39,

46-51; 12-9 at 47).   When incarcerated in the Claxton RYDC, he attacked a youth

development worker.   (Doc. 10-3 at 46-47).   During a later incarceration at the YDC, he

joined a gang, where his willingness to fight helped him move up "as high as [he] can be"

and earned him the title "God damn chief enforcer."   (Doc. 10-4 at 77-78).   He was the

"obvious leader" of a group of young men who refused to leave a college campus, and he

alone among the group attacked an officer.   (Doc. 10-3 at 55-60).   Wilson's January 12,

1996 letter to a fellow gang member, written while Wilson was in prison, perhaps best

illustrates the problems with Kohanski's new opinion:

---

[60] Similarly, Herrera opined Wilson was "easily led," "suggestible," and just fell in with the wrong crowd.
(Doc. 12-9 at 101-02).

[I]f you see that fool Andre Simons in jail tear his ass up, because when I got up here, he was here and he paid some nigga to sneak me, because of that shit, I did to his cousin Rico Simmons.   So, if you see him get in his shit … I can't wait to get out because I got so much shit to take care of.   I got to make sure that our Folk Family is proper, I got to tend to my ho's, and I got to get fucced up.   Yea, you know how we do it!   I know you heard about that shoot-out with the South Side and them Boddie project nigga's.   I guess you know that Manice and Jarmaine Reanes got shot.   I'm telling you folk, when I get out it ain't go be none of that hoe shit, them nigga's will die before they try the Manor, Folks, and the whole South Side again!   You know that I ain't with that shit, and they know it.

Folk, it's 1996, and it our year to come up and make our nation stronger. We got to wise up and look at the future of our nation.   You know it's all about that Money, Mackin, Murder, and that should be our main priority; We should be making more money, macking more ho's to make more Queens, and murdering all that oppose our nation, but only when necessary.   We can't rise if we can't stay out of jail and prisons, and shoot outs and shit. None of that will help our nation.   You see what I'm saying.   We're supposed to be organized crime, not crime.   This is true knowledge from a real G's head….   When I get out, I'm going to pull things together.   I already know the ropes of this game….   I'm going to make it happen, and when I get through, Milledgeville is going to have a set of folks that's strictly legit and untouchable.   You'll see!   However, I can't do it by myself, although I know the proper procedures, I still need help from the other G's, so that we can bring this nation together quickly and properly.   You know what I'm saying.   I'm just letting you know that is fixing to blow-up like world trade center.   It's on!   It's all about Folks, and that 6 pointed nation in "1996", and this shit is real, so be prepared to help bring your nation to the top.   Be prepared to rise with your nation or die with your nation….

(Doc. 15-14 at 32-33).[61]   Given this evidence, this Court finds it difficult to believe opinion

testimony that Wilson was passive and easily led as the result of brain damage would

have gained much traction with the jury.

In any event, Herrera's findings were questionable, which in turn rendered

Kohanski's and Maish's testimony questionable as well.[62]   Herrera acknowledged

---

[61] Although the State did not introduce this letter at trial, it certainly would at any retrial.   *See Wong*, 558 U.S. at 20 (when determining prejudice it is necessary to consider all the relevant evidence that would be introduced to the jury, both mitigating and aggravating).

[62] Neither Kohanski nor Maish had any additional contact with Wilson following the trial.   (Docs. 16-6 at 89;

Wilson's scores for attention, ability to focus, distractibility, and impulsiveness would be considered within normal range by many psychologists and that no previous psychologist or psychiatrist had diagnosed Wilson with ADHD or found any brain damage.   (Doc. 16-2 at 16-47, 58, 67 75).   He also acknowledged Wilson's scores on most of the tests would be considered within the normal range if judged by published authoritative neuropsychological guidelines.   (Doc. 16-2 at 16, 18, 22, 24, 26-27, 29-32, 35-38, 44-47).   But Herrera used norms of his own making, which he based on "hundreds of articles."   (Doc. 16-2 at 31-33, 35).

Herrera's finding that Wilson's alleged ADHD continued into adulthood was questionable.   He discounted the neurological tests that revealed no impairment in attention and concentration because, in his opinion, Wilson does not suffer from attention problems.   (Doc. 16-2 at 72-73).   Rather, he suffers from an inability to regulate impulsivity and hyperactivity.   (Doc. 16-2 at 72-73).   According to Herrera, adults with ADHD "have often been shown to have a frontal lobe defect that significantly limits their ability to learn from experience, to engage sound judgment, to utilize abstract reasoning skills and to control impulsive behavior."   (Doc. 12-9 at 99).   Yet, he admitted the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") criteria for ADHD does not mention frontal lobe defects.   (Doc. 16-2 at 71).

Also problematic was the absence of neurological imaging.   As discussed, Kohanski initially told trial counsel Wilson needed to undergo neurological imaging (MRIs or CT scans), a physical evaluation, and psychological testing in order to verify the brain damage and ADHD she suspected.   (Docs. 12-9 at 59; 16-6 at 83).   Maish testified he

16-10 at 83, 93).   They based their opinions in large part on the clinical findings of Herrera.   (Docs. 16-6 at 85; 12-10 at 18, 20).

always requested neurological imaging when neuropsychological tests indicated a patient may have brain damage.   (Doc. 16-10 at 96).   However, Herrera recommended against any neurological imaging, and no physical examination was performed.   (Docs. 16-2 at 59-60, 90; 16-6 at 85).   Even without these, and without examining Wilson again, Kohanski agreed with Herrera that Wilson has ADHD and frontal lobe brain damage. (Doc. 12-9 at 60).

Further, some of Herrera's findings hurt more than helped.   The Minnesota Multiphasic Personality Inventory 2 ("MMPI-2") administered by Herrera indicated individuals such as Wilson "typically receive a psychotic diagnosis" and that Wilson projects blame onto others and uses denial as a defense mechanism.   (Doc. 16-2 at 62, 81-82).   This finding would have bolstered the State's argument that Wilson was seeking to avoid punishment by projecting blame for the murder onto Butts, just as Wilson had denied responsibility and tried to blame others for many of his previous crimes.

Herrera agreed Wilson's MMPI-2 results matched the MMPI profile results administered by the Georgia Regional Hospital in January 1992:

> Most adolescents with this profile are hostile, sullen, resentful, irritable, and angry ….   They can be notably argumentative, self-centered[], obnoxious, irresponsible, rebellious, adventurous and unreliable….
>
> The potential for occasional acting-out and antisocial behavior and conflicts with authority figures is a likely possibility.   This is further reinforced by his reported history.   He tends to disregard the consequences of his actions and may not profit from experience.
>
> Projection and denial are prominent defense mechanisms.   Control over impulses seems inadequate.   On the whole his judgment tends to be poor.

(Docs. 16-2 at 64-65; 13-14 at 10).   Herrera acknowledged the psychologist at Georgia Regional Hospital was concerned that "[d]iagnostically [Wilson] is felt to be showing the

picture of a Conduct Disorder," which is the juvenile precursor to antisocial personality disorder.   (Docs. 16-2 at 66-68; 13-14 at 10).[63]   Herrera confirmed that Wilson did, in fact, meet some of the criteria for a conduct disorder.   (Doc 14-1 at 4).   Thus, much of Wilson's mental health evidence could be characterized as a "double-edged sword," with some of the evidence being more harmful than mitigating.   *Evans*, 703 F.3d at 1328-29 (cataloging cases in which the Eleventh Circuit has held evidence of antisocial personality disorder, psychopathy, substance abuse, and brain damage can often hurt the defense more than it helps).

Wilson, citing *Porter*, claims the state habeas court unreasonably discounted the effect his mental health experts' testimony would have had on the jury.   (Doc. 47 at 35). *Porter* is distinguishable.   Both Porter's postconviction counsel and the State presented psychological testimony at the postconviction evidentiary hearing.   *Porter v. State*, 788 So. 2d 917, 922 (Fla. 2001).   The postconviction court flatly rejected the testimony of Porter's expert and accepted the testimony from the State's psychologist.   *Id.* at 923. On appeal, the Florida Supreme Court accepted that finding.   Thus, the Florida Supreme Court failed to give any consideration at all to Porter's mental health evidence for the purpose of nonstatutory mitigation.   *Porter*, 558 U.S. at 42-43.   The Supreme Court held that it was unreasonable for the state court to "discount entirely the effect that [the expert's] testimony might have had on a jury" simply because there were "problems with the tests used … and the conclusions" drawn.   *Id.* at 43.   In Wilson's case, nothing in the state habeas court's opinion indicates it failed to consider or "discount[ed] entirely the effect that" Wilson's evidence of ADHD and frontal lobe brain impairment would have had

---

[63] According to records from Wilson's September 1997 stay at Central Georgia Hospital, Wilson was diagnosed with antisocial personality disorder as an adult.   (Doc. 14-1 at 4).   Herrera did not mention this diagnosis.

on the jury.   Instead, the court simply determined that even if his sentencing jury had heard the mental health evidence, there is no reasonable probability they would have given Wilson a different sentence.   (Doc. 18-4 at 26).   This was not an unreasonable application of *Strickland*.

On the ultimate question of whether Wilson had been prejudiced by trial counsel's investigation and presentation of mitigation evidence, the state habeas court concluded:

> [W]ith regard to the affidavit and witness evidence Petitioner presented to this Court as additional potential mitigating evidence, this Court finds that, even if the evidence had been admissible at trial, there is no reasonable probability that the outcome of the trial would have been different given: (1) the limited nature of the additional, admissible, non-cumulative portions of Petitioner's potentially mitigating testimony; (2) the overwhelming evidence of Petitioner's guilt,[64] including: his statements to law enforcement officers; evidence that Petitioner and Co-Defendant Butts had taken the victim's car after shooting the victim and stopped to purchase gasoline, where Petitioner was observed by witnesses and videotaped by a security camera inside the service station; evidence that Petitioner and Co-Defendant Butts then drove to Atlanta where they contacted Petitioner's cousin in an unsuccessful effort to locate a "chop shop" for disposal of the victim's automobile; evidence that Petitioner and Co-Defendant Butts purchased two gasoline cans at a convenience store in Atlanta and drove to Macon where the victim's automobile was set on fire; and evidence that a sawed-off shotgun was found at Petitioner's residence that was loaded with the type of ammunition used to kill the victim; and (3) the evidence in aggravation that was presented to the jury including: testimony that Petitioner had robbed and shot Jose Valle in 1991, because Petitioner wanted to know what it felt like to shoot somebody; testimony that Petitioner had previously shot Robert Underwood in 1993; testimony regarding Petitioner's arrest for possession of drugs; testimony that Petitioner had previously shot a neighbor's dog for no reason; evidence regarding Petitioner's juvenile convictions for arson and criminal trespass; evidence of Petitioner making a death threat; and evidence of Petitioner fighting in school and assaulting a correction officer at the Regional Youth Development Center.

---

[64] Wilson alleges the state habeas court appears to have conflated the two phases of trial when it stated that in light of "the overwhelming evidence of Petitioner's guilt," there was no reasonable probability the outcome of the trial would have been different.   (Doc. 43 at 109).   However, the jury was specifically instructed "to consider all the evidence received here in court in both stages of this proceeding" when arriving at their verdict as to sentencing.   (Doc. 10-6 at 44).   Thus, the jurors could consider the evidence of Wilson's guilt during their sentencing deliberations.

(Doc. 18-4 at 31-32) (record citations omitted).

For the reasons discussed in detail above, the Court cannot find the state habeas court's prejudice determination was based on unreasonable findings of fact or that it constitutes an unreasonable application of *Strickland*.   Thus, even if trial counsel were deficient in their development of mitigation evidence, Wilson has not established that he was prejudiced.

d.   Trial counsel's allegedly ineffective assistance regarding gang related testimony from Chief Deputy Howard Sills and Deputy Ricky Horn

Wilson claims trial counsel were deficient because they failed "to protect Mr. Wilson from irrelevant, unreliable, false, and misleading evidence regarding gangs." (Doc. 43 at 4) (capitalization removed).   The evidence Wilson attacks is the sentencing phase testimony of Chief Deputy Sills and Deputy Horn.   Wilson claims his lawyers in the state habeas action, armed with nothing more than "basic cross-examination skills and the Baldwin County Sheriff Department's own documents," showed that Sills's and Horn's gang testimony was based on "pure speculation, conjecture, and unverifiable hearsay, and in every instance were misleading exaggerations at best."   (Doc. 43 at 130-31).

At the outset, the Court notes that Wilson does not claim trial counsel were deficient for allowing the admission of Wilson's gang reference-laden confession and notebooks.[65]   Putting aside Sills's and Horn's testimony, the jury still heard Wilson boast that he joined the FOLKS gang while he was incarcerated and that by "fighting and stuff like that," he rose to the rank of "God damn chief enforcer."   (Doc. 10-4 at 77-78).   The jury heard Wilson confess that he had advanced as high as he could in the gang hierarchy

---

[65]   At times in their brief, Wilson's lawyers suggest effective counsel could have precluded the admission of gang evidence, but they never argue that Wilson's own statements about FOLKS were not admissible.

and that he could have as many gang members under him as he wanted.   (Doc. 10-4 at

77).   In his notebooks, the jury read that FOLKS gangsters should "kill anybody [they]

feel has disrespected [them] or threatened [them] in any way" and should kill, or be killed,

for their fellow gangsters.   (Doc. 10-8 at 27-28).   Further, the Respondent introduced at

the state habeas hearing letters written by Wilson that were even more explicit in their

discussion of gang evidence.[66]

Given the evidence from Wilson's own hand and mouth, his lawyers put their

credibility in jeopardy when they attack Sills's and Horn's testimony by arguing that "there

is no remotely credible or reliable evidence that the FOLKS gang in Baldwin County was

violent."   (Doc. 47 at 47).   Considering Wilson's confession, his notebooks and letters,

his extensive criminal history, and the brutality of Parks's murder, the state habeas court

reasonably concluded that Wilson was not prejudiced by trial counsel's failure to exclude,

limit, or rebut Sills's and Horn's testimony.[67]   This is likely more than sufficient to address

---

[66] In these letters, Wilson instructed fellow gang members that "it's all about that Money, Mackin, Murder, and that should be our main priority; We should be making more money, macking more ho's to make more G Queens, and murdering all that oppose our nation, but only when necessary."   (Doc. 15-14 at 33).   He explained that he had "big plans" to help the gang "rise up" and carry on "organized crime" to make "legit money, as well as illegal money."   (Doc. 15-14 at 32-33, 38).   He bragged that he was "talking about straight keys (cocaine) and G's (grands) big money."   (Doc. 15-14 at 38).   Referencing violence among various gangs, Wilson wrote,

> I know that you heard about that shoot-out with the South Side and them Boddie project
> niggas.   I guess you know that Manice and Jermaine Reanes got shot.   I'm telling you
> folk, when I get out it ain't go be none of that hoe shit, them niggas will die before they try
> the Manor, Folks, and the whole South Side again.

(Doc. 15-14 at 32).

[67] Wilson argues that *Alexander v. State*, 270 Ga. 346, 509 S.E.2d 56 (1998), which features the same prosecutor, trial judge, and gang, is "direct evidence of *Strickland* prejudice in that it represents a finding by the Georgia Supreme Court that such evidence is exceptionally prejudicial."   (Doc. 47 at 54) (emphasis omitted).   The Court does not doubt that such evidence can be prejudicial.   However, in Wilson's particular case, he has not shown *Strickland* prejudice—he has not shown that there was a reasonable probability that, absent trial counsel's alleged errors, "the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."   *Rose v. McNeil*, 634 F.3d 1224, 1242 (11th Cir 2011) (internal quotation marks and citation omitted).   More importantly, he certainly has not shown what is required under AEDPA—that the state habeas court's lack of prejudice determination was unreasonable.   Furthermore, except for the fact that it involved the same judge and prosecutor, *Alexander*

Wilson's complaints about that testimony, but the Court will address them nonetheless.

Wilson argues that *Dawson v. Delaware*, 503 U.S. 159 (1992), and "a plethora of Georgia case law" could have been used by trial counsel to prevent Sills and Horn from testifying.   (Doc. 43 at 133-144).   Both contentions are without merit.

> i)   The relevancy of gang evidence

In *Dawson,* the Supreme Court held that the introduction of evidence of a defendant's abstract beliefs during a sentencing hearing can violate the defendant's First Amendment rights when the evidence has no relevance to legitimate issues.   503 U.S. at 167.   But the Court made clear that if the evidence is relevant, for example to prove an aggravating circumstance, then the Constitution does not bar admission of the evidence. *Id.* at 166.   For this reason, the Georgia Supreme Court, in Wilson's direct appeal, rejected the argument that the introduction of gang evidence violated Wilson's First Amendment rights.   Acknowledging *Dawson*, the Georgia Supreme Court held that evidence of Wilson's FOLKS membership and the gang's violent nature were relevant to issues in the sentencing phase of his trial.   *Wilson*, 271 Ga. at 813-14, 525 S.E.2d at 344. Based on this holding, the state habeas court found that trial counsel were not deficient for failing to raise a *Dawson* objection and, in any event, Wilson could not establish he

---

bears little similarity to Wilson's case.   In *Alexander*, the prosecutor informed the jury in his guilt/innocence opening statement that he would show the defendant, a FOLKS gang member, was in an argument with a Blood gang member at a "Stop the Violence" rally, and, in retaliation for the argument, committed a drive-by shooting to terrorize a neighborhood of the Blood gang.   *Id.* at 348-49, 509 S.E.2d at 59.   However, the prosecutor failed to offer any evidence that Alexander was a member of FOLKS, that the person with whom he argued was in the Blood gang, or that the area of the drive-by shooting was a Blood neighborhood.   He provided no "evidence of the significant connection to gangs that he detailed in his opening statement" and he offered no explanation regarding why he failed to do so.   *Id.* at 349, 509 S.E.2d at 59-60.   The trial court gave a general instruction that opening statements are not evidence but failed to specifically instruct the jury not to consider the prosecutor's opening statement.   The Georgia Supreme Court found that the prosecutor's opening statement was in bad faith, was prejudicial, and the trial court's general instruction did not render the statement harmless.   *Id.* at 350-51, 509 S.E.2d at 60-61.   In *Wilson's* case, opening statements are not at issue, evidence undeniably established that Wilson was the chief enforcer of the local FOLKS gang, and evidence from Sills, Horn, and Wilson himself established the violent nature of the gang. Such evidence was relevant to issues to be decided during Wilson's sentencing.

was prejudiced by their failure.   (Doc. 18-4 at 30-31).

In his brief, Wilson's attack on this conclusion by the state habeas court is a little difficult to follow.   (Doc. 143 at 192-93).   Wilson acknowledges that the Georgia Supreme Court found gang evidence relevant to issues in the sentencing phase, but claims the court "in the end declined to rule on the *Dawson* claim because counsel failed to object to the evidence at trial."   (Doc. 43 at 192).   Wilson misreads the Georgia Supreme Court's opinion; the court clearly ruled gang evidence was relevant to a legitimate issue.   But Wilson does not seem to challenge this relevancy determination. Rather, he argues the Georgia Supreme Court's *Dawson* ruling "does not foreclose in any way a showing that due to counsel's ineffectiveness, the inaccuracy and unreliability of the gang testimony was not revealed to the trial court, jury or to this Court."   (Doc. 43 at 192)   Thus, Wilson does not question the relevancy of gang evidence generally but rather the evidentiary sufficiency of Sills's and Horn's testimony.   He can make this argument, and does make this argument, but that does not call into question the finding that trial counsel were not deficient for failing to challenge the general relevancy of gang evidence on constitutional grounds.   In short, Wilson has not established that the state habeas court unreasonably applied *Strickland* when it rejected his claim that trial counsel were deficient for failing to raise a *Dawson* objection to the relevancy of gang evidence generally.

ii)   <u>Evidentiary sufficiency of Sills's and Horn's testimony</u>

Wilson contends that effective trial counsel would have used a "plethora of case law" to exclude, limit, or rebut Sills's and Horn's testimony because: (a) Horn was not qualified to testify as an expert; (b) much of Horn's testimony was based on hearsay; (c)

Sills, who did not testify as an expert, gave hearsay testimony, most notably in his account of the murder of a Fayette County, Georgia sixteen-year- old girl by a gang member seeking to elevate his status; (d) both Sills and Horn improperly testified that Wilson was a leader of the FOLKS gang in Baldwin County; and (e) both Sills and Horn improperly testified about the number of FOLKS gang members in Baldwin County and various FOLKS practices, such as committing crimes to elevate status.[68]   These arguments require only brief discussion.

a)  <u>Horn's expert qualifications</u>

Horn, who had 20 years of law enforcement experience, testified that he had been investigating gangs in Baldwin County for seven years.   (Doc. 12-5 at 67, 69).   He attended the Southeastern Gang Conference sponsored by the Law Enforcement Coordinating Committee of the United States Attorney and other seminars.   (Doc. 13-9 at 26).   He acknowledged, however, there was little formal education regarding gangs available to law enforcement officers at the time.   (Doc. 12-5 at 71).   He had not reviewed "academic works" because his approach "to gangs was from a law enforcement aspect."   (Doc. 12-5 at 39-40).   Rather, he conducted his own investigations by speaking with gang members, parents of gang members, and other law enforcement officers.   He read law enforcement publications and followed media articles and programs.   (Doc. 12-5 at 38-39).   In short, his claimed expertise was based primarily on his experience.   The state habeas court, agreeing with the Georgia Supreme Court,

---

[68] Wilson also complains about Horn's testimony that FOLKS stands for Followers of Lord King Satan. (Doc. 10-4 at 114).   The state habeas court reasonably found that Wilson did not establish that Horn's testimony was inaccurate.   Horn testified that he garnered this information from gang members and from seminars.   (Docs. 12-5 at 47, 75-76; 15-14 at 13).   While Wilson's expert testified that he had never heard this interpretation of FOLKS, this Court cannot say that the state habeas court's finding was incorrect, much less unreasonable.

found that Horn "easily qualified as an expert on Baldwin County gangs."[69]   (Doc. 18-4 at 33).

Georgia courts, like federal courts, permit law enforcement officers with sufficient experience to testify as gang experts.   *Burgess v. State*, 292 Ga. 821, 822, 742 S.E.2d 464, 466 (2013) (citing *Thomas v. State*, 290 Ga. 653, 658, 723 S.E.2d 885, 890 (2012)); *see also Williams v. State*, 279 Ga. 731, 732, 620 S.E.2d 816, 818 (2005) (special knowledge in a field may be derived from experience as well as study, and formal education is not a prerequisite); *see United States v. Augustin,* 661 F.3d 1105 (11th Cir. 2011).

But Wilson claims the state habeas court found Horn to be an expert solely because of the Georgia Supreme Court's decision in his codefendant's case.   According to Wilson, "by making this conclusory finding the basis of the rejection of the ineffectiveness claims," the state habeas court failed to consider the jury impact that testimony such as that presented at the state habeas evidentiary hearing would have had.   (Doc. 43 at 174).   The state habeas court did not base its finding solely on the Georgia Supreme Court's decision in *Butts*.   Rather, it examined Horn's trial and state habeas testimony regarding his experience.   (Doc. 18-4 at 33-34).   There is no indication the state habeas court failed to consider the impact that cross examination of Horn, such as that done at the state habeas hearing, would have had.   By finding Wilson had not established prejudice as to trial counsel's questioning of Horn's experience, the

---

[69] The state habeas court was referring to the Georgia Supreme Court's finding in Wilson's codefendant's appeal that Horn could have qualified as an expert: "Butts argues that an investigator gave testimony during the sentencing phase of Butts's trial about gangs that would have been improperly perceived by the jury as being expert testimony.   This issue is waived because Butts raised no objection at trial.   Furthermore, we find nothing improper in the testimony, as it appears from the transcript that the witness would have qualified easily as an expert on gangs."   *Butts*, 273 Ga. at 769, 546 S.E.2d at 483.

state habeas court necessarily determined that further cross-examination of Horn would not have, in reasonable probability, changed the outcome of Wilson's sentencing.[70]

The state habeas court's finding that Horn was an expert on gangs in Baldwin County was not unreasonable, and the court's determinations that trial counsel were not deficient and Wilson was not prejudiced when they failed to object to Horn's qualifications did not involve an unreasonable application of *Strickland*.

### b)  Horn's hearsay testimony

Because Horn was an expert, he could properly rely on hearsay in reaching his opinions.   It is true, as Wilson argues, that an expert cannot "'give an opinion based [entirely] upon reports which have been prepared by others and which are not in evidence.'"  *Leonard v. State*, 269 Ga. 867, 871, 506 S.E.2d 853, 857 (1998) (quoting *Loper v. Drury*, 211 Ga. App. 478, 481, 440 S.E.2d 32, 35 (1995)).   Nor may an expert merely repeat the opinions of others.   *Moore v. State*, 221 Ga. 636, 643, 146 S.E.2d 895, 901 (1966); *Brown v. State*, 206 Ga. App. 800, 801-02, 427 S.E.2d 9, 10 (1992); *Jordan v. Georgia Power Co.*, 219 Ga. App. 690, 693, 466 S.E.2d 601, 605 (1995).   It is also true that Georgia courts have struggled with defining the extent to which experts may rely on experts.   But while an expert may not simply parrot the opinions of others, he can rely on hearsay, including the reports of others, in reaching his conclusions.   *Fulmore v. CSX Transp., Inc.,* 252 Ga. App. 884, 557 S.E.2d 64 (2001), rev'd on other grounds, *Norfolk &*

---

[70] Wilson also argues that the state habeas court's finding that Horn was an expert was unreasonable because Horn admitted he was not that knowledgeable about the FOLKS gang.   (Doc. 43 at 152).   Horn's statement that he was not that knowledgeable about FOLKS was in response to a question regarding whether Wilson was a member of the Black Gangster Disciples subsection or the Insane Gangster Disciples subsection.   (Doc. 12-5 at 64-65).   Horn stated that, "[t]he difference between a Black Gangster Disciple and an Insane Gangster Disciple, I am not that knowledgeable."   (Doc. 12-5 at 65).   This lack of knowledge regarding subsections of the FOLKS gangs would not prevent him from being considered an expert on local Baldwin County gangs.

*Western Ry. Co. v. Ayers*, 538 U.S. 135 (2003).

Thus, Horn's testimony regarding the Baldwin County FOLKS gang's history, origin, behavior, ties to other cities, number of members, behavior, and presence in prisons, schools, or the YDCs was not inadmissible simply because it was based on hearsay.   Based on his experience and expertise, Horn could rely on information gathered during his investigations to reach his conclusions.   (Doc. 12-5 at 37-39).   Thus, the state habeas court's determinations that trial counsel were not deficient for failing to challenge his testimony as hearsay and that Wilson was not prejudiced were reasonable.

### c)   Sills's inappropriate testimony

Sills is another matter.   He was not qualified as an expert on gangs.   Yet he testified about some matters as to which he had no personal knowledge.   Most notably, he said a Fayette County law enforcement officer told him that a gang member killed a sixteen year old girl in order to elevate his status in a gang.   (Docs. 10-4 at 101-02; 43 at 171-72).[71]

The state habeas court found that Wilson "failed to establish deficiency or prejudice as Petitioner was not tied to [this] incident by the testimony of Sheriff Sills or Ricky Horn at Petitioner's trial."   (Doc. 18-4 at 36).   Wilson states that this was "an unreasonable fact determination."   (Doc. 43 at 171).   Given the deference this Court

---

[71] The balance of Sills' hearsay testimony was cumulative of Horn's testimony.   The state habeas court found that "trial counsel were not deficient or Petitioner prejudiced by trial counsel not objecting to the small portion of Sheriff Sills'[s] testimony that Petitioner argues was inadmissible as it was merely cumulative of Ricky Horn[]'s admissible testimony."   (Doc. 18-4 at 34) (record citations omitted).   Wilson maintains "[t]o find that Sills's testimony was not prejudicial because it was cumulative of Det. Horn's testimony is directly contradicted by the record and therefore constitutes an unreasonable finding of fact."   (Doc. 43 at 174).   This argument is without merit.   The record reveals that, with the exception of Sills's testimony about the Fayette County murder, the sentencing jury heard all of the testimony about which Wilson complains from both Sills and Horn.   (Doc. 10-4 at 114, 122-23).

must accord factual findings made by state courts, the Court finds the state habeas

court's finding of no prejudice was reasonable.   No testimony connected Wilson to the

Fayette County murder.   According to Sills, this murder occurred before 1992 or 1993.

(Doc. 10-4 at 99, 101).   The jury knew that Wilson lived in Glynn and McIntosh Counties

at that time.   There was no evidence he was then a FOLKS member (although there was

considerable evidence of his violent criminal activities).[72]   There is no reason to believe

the jury thought Wilson had any connection to a murder in Fayette County during this

time.[73]   Even if the Court determined that the state habeas court's performance

determination was unreasonable, there is no reasonable probability that had trial counsel

objected and successfully excluded Sills's hearsay testimony, the result of Wilson's

sentencing proceedings would have been different.

d)  Wilson's leadership role in FOLKS

Both Sills and Horn testified that Wilson was reportedly the leader of FOLKS in

Baldwin County.   (Doc. 10-4 at 100, 123).   Wilson claims trial counsel could have used

his profile from the Baldwin County Sheriff's Office to discredit this testimony.   (Doc. 43

at 153-54).   The state habeas court found:

> At trial, Sheriff Sills and Detective Horn testified that Petitioner was
> reportedly the leader of the FOLKS Gang in Baldwin County, which they
> learned from collective law enforcement in the community and informants.
> Detective Horn also testified that there were other sets of FOLKS in Baldwin
> County under a different leader.   Further, the record before this Court
> establishes that in an April 15, 1996 statement to his defense team,

---

[72] Previous witnesses had already told the jury that during this time period, Wilson lived in Glynn and
McIntosh Counties where he was busy shooting Valle, shooting a small dog, attacking a youth development
worker, assaulting a classmate, selling crack cocaine, and, finally, shooting Underwood, for which he was
incarcerated from July 29, 1993 until 1995.   (Docs. 8-7 at 46; 10-2 at 24-26, 46-48, 62-66, 90-93; 10-3 at
37-39, 46-47; 10-5 at 135-36; 10-6 at 8-9).

[73] For the same reason, the state habeas court did not unreasonably reject the claim that Sills's testimony
about a gang assault on a jogger in Baldwin County in 1992 or 1993 suggested that Wilson was involved in
that incident.   (Docs. 10-4 at 99, 101; 18-4 at 36).

Petitioner stated that he was a "G," the "leader of a set" and the "highest ranking 'G' in Milledgeville."   Petitioner also stated in his statement to law enforcement that he was as high as he could be and could not get any higher within the gang, and most damaging to his own case is Petitioner's emphatic declaration to law enforcement that he was the "Goddamn chief enforcer" of the FOLKS Gang in Baldwin County.   Further, during the course of the defense investigation, the defense team learned that Petitioner was the highest ranking "G" in the FOLKS Gang in Milledgeville. This Court finds that counsel were not deficient and Petitioner was not prejudiced by trial counsel not attempting to discredit Ricky Horn's testimony that Petitioner was a leader of the FOLKS Gang in Baldwin County as Petitioner failed to establish that Detective Horn's testimony was inaccurate and/or misleading in any manner.

(Doc. 18-4 at 35) (record citations omitted).

Wilson's Baldwin County Sheriff's Department's profile stated he headed the "Black Gangster Disciples" in Baldwin County.   (Docs. 16-5 at 50-52; 16-6 at 9; 43 at 153).   The Black Gangster Disciples was a subsection of FOLKS.   (Doc. 16-5 at 51).

At the state habeas hearing, Horn testified he had simply failed to update Wilson's profile with information that Wilson "was the leader of the Folk."   (Doc. 16-5 at 52-53). Moreover, Wilson's profile was not necessarily inconsistent with Horn's and Sills's testimony at the sentencing hearing.   Both testified that there were, or had been, more than one "set" of FOLKS in Baldwin County and someone else was the leader of the other set.   (Doc. 10-4 at 109; 126).   Also, Wilson admitted he had a significant leadership role in FOLKS.   Looking at the entire record, and giving the state habeas court's decision "the benefit of the doubt," the Court cannot find that the state habeas court's determination regarding the accuracy of Horn's testimony was unreasonable.   *Holsey*, 694 F.3d at 1260.   Clearly, this Court cannot say Wilson was prejudiced by the testimony.

---

e)  Attributes of FOLKS

Horn testified that there were between 100 to 300 members in the local FOLKS gang, but it was "hard to put a concrete figure on it."   (Doc. 10-4 at 114, 124).   Wilson alleges that according to the Baldwin County Sheriff's Office roster of gang members in the Milledgeville area as of November 1996, the actual number was 80.   (Docs. 16-6 at 10; 43 at 154, 178).   Wilson claims trial counsel were ineffective when they failed to use the roster to cross examine Horn.   According to Wilson, a meaningful challenge to his testimony regarding the number of gang members could have persuaded the jury his testimony was inaccurate and pure speculation.

The state habeas court rejected this claim.

As to the accuracy of Detective Horn's testimony concerning how many individuals were in the FOLKS Gang in Baldwin County, this Court finds that Petitioner failed to show deficiency or prejudice, as Detective Horn repeatedly testified before both the trial court and this Court, that the Sheriff's Department's system identified suspected gang members, but did not identify all the gang members in the area.   He further testified that he and others in law enforcement still thought 300 was a conservative number.

(Doc. 18-4 at 35-36) (record citations omitted).

These were reasonable findings.   At the state habeas evidentiary hearing, Horn testified that the computer roster would not identify every local FOLKS gang member. (Doc. 12-5 at 41).   He explained there was no way to know the exact number of gang members and "for every one you know about, there are several you don't."   (Doc. 12-5 at 42-43).   Wilson's expert acknowledged that it is difficult to estimate the number of members in a gang.   (Docs. 12-5 at 134, 138; 12-6 at 38).   The state habeas court's application of *Strickland* and its determination of the facts regarding this issue were reasonable.

Sills testified that FOLKS caused problems with "violent crimes, drive by shootings, or just crime in general."   (Doc. 10-4 at 103).   Horn said that gang members committed every type of crime imaginable, "from simple battery to armed robbery, murder, [and] kidnapping….Sometimes as individuals; sometimes in furtherance of the gang itself." (Doc. 10-4 at 121).   He stated that he suspected there were "hundreds, probably thousands of crimes committed in Baldwin County over the last seven or eight years by gang members in furtherance of the gang.   To be able to prove that in court may be another story."   (Doc 10-4 at 142).

At the state habeas evidentiary hearing, Horn admitted he could not identify a single instance in which a battery, aggravated assault, murder, or kidnapping had been done to further of FOLKS interests.   He maintained, however, that his testimony was not an exaggeration, just "rhetorical."   (Doc. 12-5 at 58).

Wilson understandably argues this testimony was based on nothing but speculation and conjecture.   (Doc. 43 at 183).   The bases for the testimony about gang crimes generally appears thin, but, for reasons already discussed, the Court cannot find that the state habeas court's determination of no prejudice was unreasonable.   Even if trial counsel had managed to exclude or discredit this testimony, the jury would still have learned of Wilson's lengthy criminal history, his own gang activities, and FOLKS's advocacy of violent crime.   Given the State's evidence in aggravation, the state habeas court reasonably found there was no reasonable probability that, but for trial counsel's failure to keep this testimony out or discredit it, the result of Wilson's sentencing would have been different.

Both Sills and Horn testified that FOLKS members committed crimes to elevate their status in the gang.   (Doc. 10-4 at 101-02, 122-23, 126).   The state habeas court found that trial counsel were not deficient and Wilson was not prejudiced because he "not only failed to show that this testimony was inaccurate, but [Wilson], in his post-arrest statement, conceded this point as did Dr. Hagedorn."   (Doc. 18-4 at 36) (record citations omitted).[74]

Wilson asserts the state habeas court's findings were unreasonable.   First, he argues that his statement does not support the notion that gang members commit crimes to elevate their status.   (Doc. 43 at 187).   This is not true.   Wilson stated that the commission of a crime "would give [a gang member] some more range if that's what his G want [sic] to do for him."   (Doc. 10-4 at 76).   Hagedorn conceded that Wilson's statement was accurate—If "your G, if the leader asks you to do something and is going to reward you for it, then you do it."   (Doc. 12-6 at 40).   This is just what Horn and Sills told the jury.   Echoing Wilson, Sills stated that a gang member can obtain a higher rank in the gang by committing crimes, but it is up to his "G, meaning his gangster."   (Doc. 10-4 at 102).   Horn explained that gang members increase their rank by committing crimes, but they are forbidden from committing crimes "without the permission of [their] G, [their] boss."   (Doc. 10-4 at 122-23).   Accordingly, the state habeas court's decision was not based on unreasonable factual findings and did not involve an unreasonable application of *Strickland*.

### e.   Trial counsel's failure to hire a gang expert

Wilson maintains that trial counsel were ineffective for failing to retain a gang expert.   The state habeas court found:

---

[74] Dr. John Martin Hagedorn was Wilson's gang expert at the state habeas hearing.

Petitioner has failed to establish that trial counsel's decision to rely on their psychiatrist, Dr. Renee Kohanski, to rebut the State's gang evidence was deficient or that Petitioner was prejudiced by trial counsel not hiring a gang expert to testify at trial.   Mr. Carr testified that they did not consider getting their own gang expert, but chose to have Dr. Kohanski testify that the gang was the only family structure Petitioner had and why this was his family structure based on his background.   He further testified that he did not feel there was anything to gain by hiring a gang expert other than Dr. Kohanski. In fact a review and comparison of the testimony of Petitioner's newly hired gang expert with the testimony presented at trial shows that trial counsel were not deficient or Petitioner prejudiced by trial counsel making the strategic decision not to hire a gang expert, but to rely on Dr. Kohanski, as Dr. Hagedorn's testimony was, in large part, cumulative of the testimony of Dr. Kohanski and the State's Witness, Ricky Horn.   This Court finds that the limited additional testimony that Petitioner presented to this Court would not have, in any reasonable probability, changed the outcome of Petitioner's trial.

Also supporting the denial of Petitioner's ineffective assistance claim with regard to hiring a gang expert is the fact that Dr. Hagedorn only spoke to Petitioner once over the telephone, conceded he could not testify "with any certainly about the gang situation in Milledgeville," that he had not "done the research here," did not contest that Petitioner said he was the chief enforcer of the gang, and, although testifying that "chief enforcer" is not a particularly high rank, he conceded that a term in Chicago could "likely" mean something different in Milledgeville.

This Court finds that trial counsel were not deficient nor Petitioner prejudiced by trial counsel making a reasonable strategic decision not to hire a defense expert on gangs in addition to the testimony offered by Dr. Kohanski.

(Doc. 18-4 at 37-38).

Citing *Wiggins,* 539 U.S. 510 (2003), Wilson argues that the state habeas "court's non-deficient performance finding unreasonably applies *Strickland* in that the trial attorneys had access to separate court funds to retain [a gang expert] yet failed to consult with any, rendering their decision uninformed and therefore nonstrategic."   (Doc. 43 at 195).   But *Wiggins* did not hold that trial counsel are *per se* ineffective if they fail to hire

an expert when funds are available.[75]   The standard practice in capital litigation at the time of Wiggins's trial was to prepare a social history report and the public defender's office made funds available for trial counsel to hire a forensic social worker for this purpose.   *Id.* at 524.   Despite numerous "red flags" of abuse and neglect in Wiggins's records, trial counsel chose not to retain a social worker to prepare a social history report. *Id.* at 523-24.   The Supreme Court held that trial counsel's performance was deficient because their decision to cease investigating when they did was unreasonable.

Retaining a gang expert, as opposed to using a forensic social worker to develop a social history report, is not standard practice.   Trial counsel testified that they knew what Horn would say about gangs, that he had been saying the same thing for years, and they thought "that it wouldn't come across that well" with the jury.   (Doc. 12-8 at 109). Consistent with their mitigation theory, trial counsel hired Kohanski to testify that Wilson joined a gang because it provided him the family, guidance, and structure he never had. Given this record and the required AEDPA deference, the Court cannot say the state habeas court's performance determination involved an unreasonable application of *Strickland*.

Wilson argues the state habeas court's finding that "Hagedorn's testimony was cumulative of that presented by Dr. Kohanski at sentencing" was an unreasonable factual determination.[76]   (Doc. 43 at 195).   Wilson mischaracterizes the state habeas court's

---

[75]   Wilson's assertion that the trial court offered funds so that trial counsel could hire a "gang expert (a sociologist specializing in gangs)" is not entirely accurate.   (Doc. 43 at 195).   Trial counsel requested funds to retain a sociologist to investigate Wilsons "checkered past," not a "sociologist specializing in gang." (Docs. 8-1 at 39; 43 at 195).   The trial court denied the funds but told them that if they were "going to have to go to trial, … bring this back up."   (Doc. 8-11 at 9).   There was never any discussion of funds for a "gang expert."

[76]   As explained previously, there is some doubt about treating a "cumulative" conclusion as factfinding to be reviewed under 28 U.S.C. § 2254(d)(2).   However, Respondent does not contend the Court should not

finding.   It did not find Hagedorn's testimony cumulative of Kohanski's.   Rather, it found "Hagedorn's testimony was, in large part, cumulative, of the testimony of Dr. Kohanski and the State's Witness, Ricky Horn."   (Doc. 18-4 at 38).   There is a difference between "cumulative" and "in large part cumulative."   "'Cumulative' may mean 'completely cumulative' or it may not, but [in large part cumulative] does not mean 'cumulative.' Instead, [it] means 'chiefly cumulative,' 'mostly cumulative,' or 'more cumulative than not.'"   *Holsey*, 694 F.3d at 1259.   Thus, the question is whether it was reasonable for the state habeas court to find Hagedorn's testimony "in large part cumulative" of both Kohanski and Horn's testimony.   (Doc. 18-4 at 38).   It was.

Like Horn, Hagedorn testified: If a gang leader approves, a gang member can advance in rank by committing crimes; it is hard to determine how many members a gang has because gang members often do not admit membership; gang members can be violent and dangerous; small town gang activity can present serious problems; gang members commit crimes or violent acts for personal reasons at times and to help the gang at other times; and Wilson was the chief enforcer of the local FOLKS gang. (Doc.12-6 at 8, 18-19, 37-40).   Like Kohanski, Hagedorn testified: The Baldwin County FOLKS gang was more of a "peer group" for Wilson; troubled youths and children from broken homes, like Wilson, are attracted to gangs because they are looking for acceptance, structure, and protection; Wilson joined a gang, in part, because he was searching for his identity; and Wilson could have had a productive life if he just had the right guidance and mentoring.   (Doc. 12-6 at 9, 13-15, 51-52).

---

treat the state habeas court's determination as factfinding, and doing so does not affect the result reached by the Court.   *See Holsey*, 694 F.3d at 1259-60.

Also, the state habeas court reasonably found that the value of Hagedorn's additional, noncumulative testimony was undercut by the fact that his research was conducted in Chicago and Milwaukee, not Georgia or Baldwin County.   (Docs. 12-5 at 138; 12-6 at 1, 39).   He acknowledged that gangs vary from location to location, and to know how the gang operates in an area, one must conduct research by speaking with law enforcement, gang members, and local schools.   (Doc. 12-6 at 42-43).   His admission that he could not testify "with any certainty the gang situation in Milledgeville" certainly supports the state habeas court's finding that Wilson was not prejudiced by trial counsel's failure to hire a gang expert.   (Doc. 12-6 at 26).

Citing *Porter*, Wilson argues the state habeas court failed to consider or unreasonably discounted Hagedorn's testimony.   (Doc. 43 at 196).   Not so.   The state habeas court considered Hagedorn's testimony, found it largely cumulative of that presented at trial, and determined the "limited additional testimony that Petitioner presented to [the] Court would not have, in reasonable probability, changed the outcome of Petitioner's trial."   (Doc. 18-4 at 38).   This analysis did not involve an unreasonable application of *Strickland*, nor was it based on unreasonable findings of fact.

### f.   Ineffective assistance during the guilt/innocence phase

Wilson maintains that trial counsel performed deficiently and prejudiced him during the guilt/innocence phase of his trial by failing to offer testimony from three inmates to whom Butts confessed that he was the triggerman; by failing to prepare and present testimony from Rafael Baker, Felicia Ray, Sills, and Johnson; and by failing to object to the trial judge's decision not to accompany the jury to view the crime scene and subsequently failing to alert the trial and appellate courts that jurors violated the trial

judge's order by leaving the bus and walking around the crime scene.   (Doc. 43 at 198-214).

> i)   <u>Failure to offer testimony from inmates</u>

Butts allegedly told three fellow inmates, May, Garza, and Holcomb, that he shot Parks.   (Doc. 12-11 at 27-28).   May and Garza testified at Butts's trial that Butts confessed to being the triggerman.   (Doc. 43-1 at 9-10, 20); *Butts*, 273 Ga. at 762, 546 S.E.2d at 478.   Holcomb testified he could not remember what Butts told him.   (Doc. 43-1 at 10 to 18).

During Wilson's trial, trial counsel attempted to call two[77] of the inmates to testify about Butts's confession.   (Doc. 9-19 at 22).   Trial counsel countered the State's hearsay objection by arguing Butts was a co-conspirator, thus his statement was admissible under Georgia's co-conspirator hearsay exception, O.C.G.A. § 24-3-5.   (Doc. 9-19 at 22-29).   The trial court ruled the co-conspirator exception did not apply because the conspiracy had ended.   (Doc. 9-19 at 35).   Trial counsel unsuccessfully made the same co-conspirator exception argument in their motion for new trial.   (Doc. 14-13 at 55).

On appeal, the Georgia Supreme Court also rejected this argument:

> Wilson claims that self-inculpatory statements allegedly made by Robert Earl Butts to three of Butts's fellow inmates were made "during the pendency of the criminal project" (O.C.G.A. § 24-3-5) in which Wilson and Butts had been engaged as co-conspirators and, therefore, that those alleged statements should have been admitted during the guilt/innocence phase of Wilson's trial.   The trial court excluded the evidence on the basis that any conspiracy between Wilson and Butts ended when Wilson gave statements to law enforcement officers revealing certain details of the crime and seeking to place blame for the murder on Butts.   While we agree with the trial court that any conspiracy between Butts and Wilson ended upon Wilson's statements to authorities, we further add that the statutory exception to the hearsay rule upon which Wilson relies makes declarations of conspirators admissible only *against* other conspirators.   It is the long-

---

[77] It is unclear which of the two inmates trial counsel wanted to present.

standing rule in this state that declarations to third persons to the effect that the declarant and not the accused was the actual perpetrator are, as a rule, inadmissible.

Furthermore, although this type of hearsay evidence is generally inadmissible, under the principles set forth by this Court in *Drane v. State*, 265 Ga. 255 (455 S.E.2d 27) (1995), and by the U.S. Supreme Court in *Chambers v. Mississippi*, 410 U.S. 284, 302 (93 S. Ct. 1038, 35 L. Ed. 2d 297) (1973) (failure to admit evidence of another's confession offered during guilt/innocence phase of trial constituted a violation of due process right), and *Green v. Georgia*, 442 U.S. 95 (99 S. Ct. 2150, 60 L. Ed. 2d 738) (1979) (failure to admit evidence of co-indictee's confession offered at punishment phase of trial violated due process right because testimony was highly relevant to a critical issue in punishment phase and substantial reasons existed to assume its reliability), there may be exceptional circumstances that make the hearsay evidence sufficiently reliable and necessary to require its admission. However, as stated in *Turner v. State*, 267 Ga. 149, 155 (476 S.E.2d 252) (1996), whenever defense counsel seeks to admit this type of hearsay evidence to support a claim that someone other than the defendant is responsible for the crimes being tried, counsel:

> must make a proffer in which the reliability and necessity of the hearsay evidence are thoroughly set out, and the trial court's ruling must reflect consideration of the proffered evidence and a determination that the evidence does or does not show "persuasive assurances of trustworthiness," or was made under circumstances providing considerable assurance of its reliability.

Despite being tried approximately one year after the *Turner* ruling was issued, Wilson, the hearsay proponent at trial, did not utilize the procedures set forth in *Turner* and did not obtain a ruling from the trial court evidencing its consideration of the proffered hearsay evidence under *Turner*. Accordingly, the trial court did not err in failing to address whether, under the standards set forth in *Green*, *Chambers*, and *Drane*, the hearsay evidence in question was sufficiently reliable, relevant, and necessary to require its admission in the guilt/innocence phase of Wilson's trial.

*Wilson*, 271 Ga. at 814-15, 525 S.E.2d at 344-45.

Before the state habeas court, Wilson argued that trial counsel performed

deficiently because they did not know O.C.G.A. § 24-3-5 applied only to inculpatory

statements made by a co-conspirator before the end of the conspiracy, and that the

admission of exculpatory hearsay was governed by *Turner.*   (Doc. 17-10 at 23-25 n.70).

The state habeas court found:

> The Court notes that the majority of the testimony on which Petitioner relies
> to support his actual innocence claim before this Court was presented at
> Petitioner's trial.   However, even after hearing this same evidence, the jury
> recommended a sentence of death.   This Court finds that trial counsel
> were not deficient or Petitioner prejudiced by the counsel not submitting the
> additional evidence that Petitioner alleges trial counsel should have
> presented at the guilt phase of his trial.
>
> Specifically, with regard to the testimony of Gary Garza, Horace Mays and
> Shawn Holcomb, which was ruled inadmissible by the trial court, this Court
> finds that Petitioner failed to establish that counsel were deficient or that
> Petitioner was prejudiced by counsel not requesting a ruling as to the
> admissibility of their testimony based on <u>Turner v. State</u>, 267 Ga. 149, 476
> S.E.2d 252 (1996).   The defense team interviewed these three inmates,
> believed the inmate witnesses had "credibility issues" and felt the witnesses
> would be hard to control on the stand.   This Court finds that based on these
> factors that trial counsel would not have been able to meet the exception
> circumstances of <u>Turner</u> required for the admission of such testimony.
>
> Further, even pretermitting the lack of deficiency, this Court finds that
> Petitioner failed to establish ineffective assistance of counsel as he failed to
> establish the requisite prejudice.   The record establishes that these
> witnesses would have undermined Petitioner's mere presence defense as
> Mr. Mays would have also testified that Co-Defendant Butts had stated that
> Petitioner was in control of the events the night of the murder, including
> ordering the victim out of the car, and as Mr. Garza would have testified that
> Petitioner stood outside Wal-Mart to detain the victim and was the person
> who ordered the victim to stop the car, clearly showing Petitioner as a party
> to the crime.   Also, the Court notes that trial counsel were able to submit
> this same testimony through their investigator during the sentencing phase
> of trial.   Thus, this Court finds that counsel were not deficient or Petitioner
> prejudiced.

(Doc. 18-4 at 14-15) (record citations omitted).

Wilson argues that the state habeas court's findings are unreasonable.   He

maintains that trial counsel were not worried about credibility or control issues with the

three inmates.   They just did not know Georgia law.   According to Wilson, the state

habeas court's finding "'resembles more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to [trial].'"   (Doc. 43 at 205) (quoting *Wiggins*, 539 U.S. 510, 526-27).

At the state habeas hearing, trial counsel testified that the inmates had control and credibility issues and thus they made the strategic choice to get Butts's confession into evidence during the sentencing phase of the trial through Thrasher.   (Doc. 12-8 at 90-94).   But for the guilt/innocence phase of the trial, the record clearly shows that trial counsel did not make a strategic decision to not call the inmates because of credibility and control problems.   Instead, relying only on the patently inapplicable co-conspirator hearsay exception, they attempted to call two of the inmates to testify about Butts's confession.   (Doc. 9-19 at 22-35).   At the state habeas hearing, Carr acknowledged that neither he nor O'Donnell was aware of *Turner* and this lack of knowledge, not any concern over credibility or control, was why they did not make a *Turner* proffer.   (Docs. 12-11 at 33; 12-6 at 106-09).

But even if the state habeas court's finding about trial counsel's performance was based on unreasonable findings of fact or involved an unreasonable application of *Strickland*,[78] its finding regarding prejudice was reasonable.   The jury was well aware Butts may have been the triggerman.   The prosecutor told them so in his opening statement and told them again in his closing argument.   (Docs. 9-14 at 36; 10-1 at 5-6, 20-26).   Also, some of Mays's and Garza's testimony would have severely undermined Wilson's mere presence defense theory.   Mays would have testified that Wilson ordered Parks to pull his car over and stop and that Wilson, not Butts, ordered Parks to get out of

---

[78] A likely conclusion given the Georgia Supreme Court's opinion of trial counsel's performance on this issue.   *Wilson*, 271 Ga. at 814-15, 525 S.E.2d at 344-45.

the car.  (Doc. 16-11 at 115-16).  Garza would have testified that Wilson waited outside

Wal-Mart to detain Parks and that Wilson ordered Parks to stop the car.  (Doc. 16-11 at

121).[79]  Therefore, the state habeas court's finding that Wilson failed to show prejudice

was reasonable.[80]

> ii)  <u>Trial counsel's failure to call four additional witnesses</u>

> a)  <u>Rafael Baker</u>

Wilson argues that Rafael Baker, whom Wilson and Butts visited the night of the

murder, could have testified that Butts admitted he shot Parks.  (Docs. 43 at 2-6; 12-11 at

19).  In an affidavit tendered to the state habeas court, Baker stated that he tried, on

several occasions, to tell trial counsel about Butts's confession, but they "wouldn't give

[him] the time of day."  (Doc. 12-11 at 19).  Thus, according to Wilson, trial counsel were

ineffective for failing to prepare and present Baker's testimony.  (Doc. 43 at 206).  The

state habeas court held:

> As to Rafael Baker, trial counsel spoke to Mr. Baker prior to trial and Mr.
> Baker told trial counsel that neither Petitioner nor Co-Defendant Butts
> mentioned a murder or shooting someone on the night of the murder.
> Accordingly, trial counsel were not deficient for not calling Mr. Baker to
> testify to evidence he expressly denied to trial counsel prior to trial.   As to
> Mr. Baker's claim that he attempted to talk to defense counsel, but they
> would not talk to him, Mr. Baker's testimony is belied by Mr. Carr's
> testimony in which Mr. Carr testified, live before this Court with undeniable
> certainty, that neither Mr. Baker nor anyone else approached trial counsel
> with information in the days leading up to the trial.   Further establishing that
> Petitioner failed to show deficiency or any resulting prejudice with regard to
> trial counsel's decision not to attempt to elicit testimony from Mr. Baker that
> Co-Defendant Butts was the triggerman, is the fact that Mr. Baker's

---

[79]  There is no indication that Holcomb would have provided any helpful testimony.   He refused to testify
when called to the stand in Butts's trial.  (Doc. 43-1 at 11-18)

[80]  The jury learned of Butts's confession to these inmates during the sentencing phase of Wilson's trial from
three credible witnesses: Thrasher, Blenk, and Sills.  (Docs. 10-4 at 104, 106; 10-5 at 73-78, 83-89).
They still voted to impose the death penalty.   This certainly does not support a finding that but for trial
counsel's failure to have the inmates testify about Butts's confession during the guilt/innocence phase,
there is a reasonable probability Wilson would have been found not guilty.

roommate, who could have been called by the State in rebuttal, had previously stated that Mr. Baker made statements to him that implicated Petitioner in the murder and as the leader of the crimes.   In view of these facts and the above findings concerning Mr. Baker and as Mr. Baker's current affidavit is merely cumulative of other testimony proffered at trial, or is otherwise contradicted by trial counsel, Petitioner has failed to show that counsel were deficient or that he was prejudiced.

(Doc. 18-4 at 16) (record citations omitted).

These findings were reasonable.   When questioned by police, Baker denied that Wilson or Butts told him anything about the murder.   (Docs. 9-16 at 50; 12-11 at 19; 13-12 at 65-66).   Notes from trial counsel's file show that Baker told them he "[d]idn't hear anybody say anything about a murder" and that neither Butts nor Wilson "mentioned a shooting or who shot whom."[81]   (Doc. 14-9 at 54).   In his testimony during the guilt/innocence phase of Wilson's trial, Baker again denied that Wilson or Butts said they had killed anyone.   (Doc. 9-16 at 49).

Given this record, the state habeas court's finding that trial counsel were not ineffective for failing to present testimony from Baker was not based on any unreasonable findings of fact and did not involve an unreasonable application of federal law.

b) <u>Felicia Ray</u>

Wilson argues that trial counsel were ineffective because they failed to call Felicia Ray, who would have testified that Wilson was talking to her while Butts was in Wal-Mart and Wilson "seemed very relaxed," was "not anxious or nervous about anything," and, based on the way he was moving and standing, could not have been concealing a shotgun in his clothes.   (Docs. 12-11 at 13; 43 at 207).   The state habeas court found:

---

[81] Wilson argues that it was unreasonable for the state habeas court to find Baker had not tried to tell trial counsel what he knew about Butts being the shooter because O'Donnell corroborated Baker's story.   (Doc. 43 at 210).   Actually, O'Donnell testified at the state habeas hearing that he could not remember if Baker told him Butts said he was the shooter.   (Doc. 12-8 at 84).   Looking at trial counsel's typed notes, it appears that Baker told them neither Wilson nor Butts mentioned the murder at all.   (Doc. 14-9 at 54).

> Trial counsel also spoke to Felecia Ray prior to trial, discussed whether to call her at trial and made a strategic decision not to utilize her testimony. Although Petitioner claims that Ms. Ray could have described Petitioner as "relaxed" while Co-Defendant Butts was inside Wal-Mart, this Court finds that counsel were not deficient in not presenting this evidence and that this evidence would not have, in reasonable probability changed the outcome of trial, particularly in light of the fact that the jury also witnessed Petitioner on videotape at the gas station immediately after the murder of Mr. Parks, behaving in the same "relaxed" manner.

(Doc. 18-4 at 16-17) (record citations omitted).

Wilson argues the state habeas court's factual findings were unreasonable because O'Donnell had no recollection of speaking with Ray prior to trial and gave no strategic reason for not calling her.   (Doc. 43 at 210).   Thus, according to Wilson, the state habeas court's factual determinations that trial counsel spoke with Ray and made a strategic decision not to call her were unreasonable.   (Doc. 43 at 210).   The record shows that trial counsel interviewed Ray and she signed an affidavit stating that Wilson spoke with her outside Wal-Mart for ten to fifteen minutes on the night of the murder and he was not "nervous or anxious."   (Doc. 14-9 at 68).   When deposed by post-conviction counsel almost five years after Wilson's trial, O'Donnell testified that there must have been a reason they did not call her to testify, but he could not specifically recall Ray or the reason she was not called.   (Doc. 16-11 at 23-24).   There is a strong presumption that trial counsel rendered effective assistance and where trial counsel, many years after the trial, is unable to recall why he did, or did not, take certain actions, the court presumes he exercised reasonable professional judgment.   *Reaves v. Sec'y, Fla. Dep't of Corr.*, 717 F.3d 886, 900 n.9 (11th Cir. 2013) (explaining the court should not take counsel's lack of memory about what he may have been thinking at the time of retrial, which occurred many years before the post-conviction hearing, for the absence of a reasoned basis for his

actions); *Harvey v. Warden*, 629 F.3d 1228, 1245 (11th Cir. 2011) (explaining that the courts must presume counsel exercised reasonable judgment instead of giving a habeas petitioner the benefit of trial counsel's short memory).   Given the record, the strong presumption that trial counsel acted reasonably, and the deference that must be given to the state habeas court, this Court finds that the state habeas court's determination that O'Donnell made the strategic decision not to call Ray was reasonable.   Clearly, the state habeas court's prejudice finding was reasonable as well.

c) Angela Johnson

Wilson argues that trial counsel were ineffective for failing to call Angela Johnson to testify that she witnessed Butts giving Wilson the shotgun the day after the murder and ordering him to keep it.   (Doc. 43 at 208).   The state habeas court held:

> Trial counsel also spoke to Angela Johnson prior to trial, and made a reasonable strategic decision not to call her as a witness because they felt she could not help Petitioner's case, as she would have testified that Petitioner had stated that he "owned the gang" and would have undermined Petitioner's mere presence defense, she had a credibility problem, and they recognized that she would not have made a good witness since she had her own pending charges.   The record establishes that although Ms. Johnson stated that Co-Defendant Butts brought the shotgun over to her home, her statement also established that Petitioner **and** Co-Defendant Butts chose Donovan Parks as their victim.   Trial counsel's decision not to call Ms. Johnson as a witness in either phase of the trial was reasonable and Petitioner was not prejudiced.

(Doc. 18-4 at 17) (record citations omitted).

Wilson has presented no evidence tending to establish that these findings were unreasonable.   Trial counsel spoke with Johnson on numerous occasions.   (Docs. 12-6 at 79; 12-8 at 94).   Johnson originally told them Butts brought the shotgun into her home, but she later changed her story and claimed the police planted the gun.   (Docs. 12-6 at 79-80; 16-11 at 40).   She also said Wilson told her he "owned" the local gang and he and

Butts picked Parks as the victim that night because he had a "nice ride."   (Doc. 16-11 at

39-40, 124).   In light of this record, Petitioner has not shown that the state habeas court's

factual findings were unreasonable or that its decision on this issue involved an

unreasonable application of *Strickland.*

### d)  Chief Deputy Sills

Wilson argues that trial counsel were ineffective because they did not call Sills to

testify that Butts had the gun in his jacket while they were in Wal-Mart.   (Doc. 43 at

207-08).   Respondent maintains that the state habeas court did not address this as a

separate ineffective assistance claim, but ruled, "As to the remainder of Petitioner's

ineffective assistance of counsel claims, … this Court finds that Petitioner has failed to

establish the requisite deficiency or prejudice with regard to any of Petitioner's ineffective

assistance of counsel claims."[82]   (Doc. 18-4 at 41-42).

The State presented evidence that Butts concealed the shotgun while he and

Wilson were in Wal-Mart.   In the opening statement, the prosecutor said, "laying all the

cards on the table, in the Wal-Mart, it was [Wilson's] partner in crime, his co-defendant

Butts, that you'll her evidence of that was wearing the starter jacket," in which the shotgun

was concealed.   (Doc. 9-14 at 38).   Kenya Mosley, a witness for the State, testified that

Butts was wearing a coat inside Wal-Mart, while Wilson was not.   (Doc. 9-15 at 108-09).

Chico Mosley, another witness for the State, testified that Butts was wearing a big starter

jacket while he stood outside Wal-Mart on the night of Parks's murder.   (Doc. 9-15 at

139-40; 153-54).   Thus, Sills's testimony confirming that Butts concealed the shotgun in

---

[82] Wilson does not maintain that the state habeas court failed to adjudicate this particular claim on the
merits.   Even though this is a summary rejection, it is still due deference.   *Richter*, 131 S. Ct. at 784.

his jacket while in Wal-Mart, adds very little, if anything.   The state habeas court's findings were reasonable and did not involve an unreasonable application of *Strickland*.[83]

### iii)  Trial counsel's failure to object to the jury view of the crime scene

Wilson alleges that trial counsel should have objected when the trial judge failed to attend the jury view of the crime scene and should have notified the trial judge that the jurors got off the bus to look at the scene.

After the State called its final witness in the guilt/innocence phase of the trial, it requested that the jury view the scene where Parks's body was found.   (Doc. 9-19 at 9-12).   Trial counsel did not object to the viewing, but did object to the judge accompanying the jury on the bus to the scene.   (Doc. 9-19 at 12).   The judge instructed the jury:

> [Y]ou will be taken to the scene where the body was allegedly discovered. This is simply to enable you to better interpret and understand the evidence. It is—you are not to discuss this at this time among yourselves or point out things or have any comment in any way.   You've all heard the street name where the scene is so you'll, I'm sure, will realize when you are there.   The bus will simply pause momentarily and then the bus will return you to your quarters.

(Doc. 9-19 at 14).

---

[83]  Although he provides little detail, Wilson mentions in one paragraph of his opening brief that trial counsel were ineffective for failing to find a witness who could testify that Butts worked with and knew the victim. He alleges that trial counsel "failed to develop through pretrial investigation the factual bases for showing that only Mr. Wilson's co-defendant, Mr. Butts, had previously worked with and knew the murder victim." (Doc. 43 at 207-08).   According to Wilson, this would have buttressed his "mere presence" defense by showing that Butts alone had reason to worry about being identified by the victim, thereby motivating Butts to kill Parks.   Wilson, but contrast, had no connection to the victim and would not have been concerned about identification.   (Doc. 43 at 208).   Respondent argues, and Wilson does not contest, that the state habeas court rejected this claim in its "catch all" denial of any remaining ineffective assistance claims. (Doc. 18-4 at 41-42).   This claim is completely without merit.   There was testimony at Wilson's trial that Butts worked with Parks.   (Doc. 9-15 at 89).   Also, it is ridiculous to think that Parks would not have been able to identify Wilson because he had never worked with him.   Wilson had never worked with or met Underwood, the man he shot three times in 1993, but Underwood had no problem identifying him as the shooter.   (Doc. 10-1 at 106-07, 119).

Wilson, trial counsel, and the prosecutor attended the jury view.   (Doc. 16-11 at 66-68, 75).   At least some of the jurors got off the bus.   (Docs. 16-1 at 102; 16-11 at 68).   O'Donnell stated that he saw nothing irregular and observed no conduct to which he should have objected.   (Doc. 16-11 at 69).

On direct appeal, appellate counsel raised the issue that the trial judge was not present when the jury viewed the crime scene.   The Georgia Supreme Court held that while the trial judge should have attended the jury view, Wilson failed to demonstrate any harm and thus his absence was not reversible error.   *Wilson*, 271 Ga. at 817, 525 S.E.2d at 346.

In the state habeas court, Wilson argued that trial counsel were ineffective for failing to object to the trial judge's absence from the viewing and for not objecting to the jurors getting off the bus.   The state habeas court rejected this contention:

> The Court finds that Petitioner failed to establish deficiency or prejudice in counsel not objecting to the trial judge being absent from the jury view of the crime scene as trial counsel and the State consulted and agreed upon the procedure to be employed, trial counsel and Petitioner attended the jury view by following the bus in separate vehicles, trial counsel interviewed the jurors following the conclusion of Petitioner's trial and asked a number of them about the jury view, and there was no indications from the answers of the jurors who attended the view that anything improper occurred.

(Doc. 18-4 at 18) (record citations omitted).

These findings were reasonable and supported by the record.   Wilson alleges trial counsel failed to tell the trial judge the "jury had … violated the court's order to stay on the bus."   (Doc. 43 at 214).   But the judge did not order the jury to "stay on the bus," he told them the bus would pause momentarily and they were not to point out anything or discuss

anything.[84]   (Doc. 9-19 at 11).   He did not tell them to stay on the bus while it was paused momentarily.[85]

Citing *United States v. Cronic*, 466 U.S. 648 (1984), Wilson alleges trial counsel were *per se* ineffective for failing to object to the judge's absence and failing to tell the judge the jury "violated the court's order to stay on the bus."   (Doc. 43 at 213-14).   In *Cronic*, the Supreme Court held that a showing of prejudice is unnecessary if there are circumstances "that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."   *Id.* at 658.   No specific showing of prejudice is required in only very limited situations: When there is a complete denial of counsel at a critical stage of the trial; when counsel entirely fails to subject the State's case to meaningful adversarial testing; or when counsel is called upon to render assistance under circumstances where competent counsel very likely could not.   *Id.* at 659-60.   "Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt."   *Id.* at 659 n.26 (citing *Strickland*, 466 U.S. at 693-96).   No "circumstances of that magnitude" exist in this case.   The *Strickland* prejudice standard[86] governs and the state habeas court's decision did not

---

[84] At least one juror explained that, "There was (sic) no instructions other than no talking.   They gave the jurors the option to get out of the bus."   (Doc. 14-11 at 78-79).

[85] Wilson argues that the Georgia Supreme Court unreasonably found the jurors did not leave the bus. (Doc. 43 at 212-13 n.97).   However, the jurors' actions were not at issue on direct appeal.   Instead, the issue there was the absence of the trial judge.   The Georgia Supreme Court's decision that the absence of the trial judge was harmless did not rest on its notation that the jury did not get off the bus.

[86] The Court notes that Wilson cites a February 16, 2002 Affidavit of Juror Brian Spivey to support his allegation that the jury failed to heed the trial judge's instructions, exited the bus, and wandered around together pointing out various parts of the scene. (Doc. 43 at 212).   Notes from trial counsel's post-trial interview with Spivey dated July 23, 1998 show that Spivey informed them as follows about the viewing the scene: "They just stood around.   He thought it was useless.   He doesn't remember anyone asking any questions."   Trial counsel noted that Spivey "thought some things were irrelevant (seeing the scene….)."

involve an unreasonable application of *Strickland* and it was not based on any

unreasonable factual findings.   Thus, relief must be denied.

### 1.  Proportionality of the Death Sentence

Wilson states he was not the person who actually shot Parks and, therefore, the

imposition of the death penalty is contrary to clearly established Supreme Court

precedent, namely *Enmund v. Florida*, 458 U.S. 782 (1982) and its progeny.   In *Enmund*,

the Supreme Court held that the death penalty may not be imposed on one who "aids and

abets a felony in the course of which a murder is committed by others but who does not

himself kill, attempt to kill, or intend that a killing will take place or that lethal force will be

employed."   *Id.* at 797.   In *Tison v. Arizona*, 481 U.S. 137 (1987), the Supreme Court

limited *Enmund*, holding that "major participation in the felony committed, combined with

reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability

requirement."   *Tison*, 481 U.S. at 158.   A finding of the requisite culpability may be made

by a jury, the trial judge, or an appellate court.   *Cabana v. Bullock*, 474 U.S. 376, 392

(1986).   The factual findings as to culpability must be presumed correct under 28 U.S.C.

§ 2254(d) and, unless the petitioner overcomes the presumption, this Court must hold

that the Eighth Amendment is not offended by the death sentence.   *Id.* at 388.

In Wilson's case, it took the jury less than two hours to find him guilty of malice

murder, which the trial court defined, in part, as unlawfully and intentionally killing without

justification.   (Doc. 10-1 at 78; 95, 97).   It took the jury less than two hours to find that the

murder was committed while Wilson was engaged in the commission of an armed

robbery.   (Doc. 10-6 at 51-53).   On direct appeal, the Georgia Supreme Court reviewed

the facts and determined they supported the verdict and sentence:

(Doc. 14-12 at 4-5).   This certainly does not support a finding of prejudice.

> Viewed in the light most favorable to the verdict, we find that the evidence introduced at trial was sufficient to enable a rational trier of fact to find beyond a reasonable doubt that Wilson was guilty of the crimes of which he was convicted and to find beyond a reasonable doubt the existence of a statutory aggravating circumstance.   The State was not required to prove that Wilson was "the triggerman" in order to prove him guilty of malice murder.   Even assuming that Wilson did not shoot the victim, there is sufficient evidence that he intentionally aided or abetted the commission of the murder or that he intentionally advised, encouraged, or procured another to commit the murder to support a finding of guilt.

*Wilson*, 271 Ga. at 813, 525 S.E.2d at 343-44 (internal citations omitted).

Wilson has not presented evidence to overcome these factual findings.   Contrary to Wilson's contention, neither *Atkins v. Virginia*, 536 U.S. 304 (2002), *Robert v. Simmons*, 543 U.S. 551 (2005) or *Kennedy v. Louisiana*, 554 U.S. 407 (2008) altered the holding in *Tison*.   It is only when a habeas petitioner shows the state court's ruling is contrary to, or involved an unreasonable application of, the holding of a United States Supreme Court decision, that this Court may grant relief.   *Newland v. Hall*, 527 F.3d 1162, 1183 (11th Cir. 2008) (quoting *Williams,* 529 U.S. at 412-13).   Wilson has not made such a showing.

In denying Wilson's claim that his sentence was disproportionate, the Georgia Supreme Court held:

> We also find, considering both the crime and the defendant, that the sentence of death was neither excessive nor disproportionate to the penalties imposed in similar cases.   The similar cases listed in the Appendix support the imposition of the death penalty in this case, as all are cases of intentional killing committed during the commission of an armed robbery or a motor vehicle hijacking.

*Wilson*, 271 Ga. at 823-24, 525 S.E.2d at 351 (internal citations omitted).

To any extent that Wilson is claiming the proportionality review conducted by the Georgia Supreme Court is constitutionally infirm in general and as applied because the

court failed to consider capital cases in which life sentences were imposed when determining the proportionality of his sentence, this Court may not conduct a case-by-case comparison of the review undertaken by the Georgia Supreme Court.[87] *Mills v. Singletary*, 161 F.3d 1273, 1282 (11th Cir. 1998) (Docs. 1 at 23-26; 43 at 215 n.99).   In *Moore v. Balkcom*, 716 F.2d 1511, 1518 (11th Cir. 1983), the Eleventh Court held:

> A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, "get out the record" to see if the state court's findings of fact, their conclusion based on a review of similar cases, was supported by the "evidence" in the similar cases.   To do so would thrust the federal judiciary into the substantive policy making area of the state.   It is the state's responsibility to determine the procedure to be used, if any, in sentencing a criminal to death.

### 2.  Actual Innocence

Wilson alleges that he is actually innocent and his execution would violate the Fifth, Eighth, and Fourteenth Amendments.   (Doc. 43 at 254-64).   As discussed, the Georgia Supreme Court found there was sufficient evidence to enable the jury to find him guilty and to find the existence of a statutory aggravating circumstance.   *Wilson*, 271 Ga. at 813, 525 S.E.2d at 343.   Wilson raised a claim of actual innocence before the state habeas court and that court held:

> Even if this Court were to determine that Petitioner's bare claim of actual innocence was not barred by res judicata, the claim would be noncognizable in this habeas proceeding.   Petitioner's proper avenue to assert his bare allegation of actual innocence would be in the trial court by properly filing an extraordinary motion for new trial.

(Doc. 18-4 at 8).

---

[87]  In its answer-response to Wilson's habeas petition, Respondent maintained that this particular claim is procedurally defaulted.   (Doc. 7 at 11).   Petitioner argues that ineffective assistance of appellate counsel provides cause to excuse any default.   This Court need not address these issues because even if the claim is not defaulted, the Court is prohibited from second-guessing the state court and conducting a proportionality review.

These are reasonable findings.   "Federal courts are not forums in which to relitigate state trials."   *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983).   Thus, a freestanding allegation of actual innocence is not cognizable in federal habeas corpus proceedings.   Claims of actual innocence must be coupled with an allegation of constitutional error.   *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Herrera v. Collins*, 506 U.S. 390, 400 (1993).

Wilson argues that "the majority of the Supreme Court in *Herrera* at least implicitly recognized the constitutional right of an innocent person not to be executed."   (Doc. 47 at 88-89).   In *Herrera*, the Court explained that "'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."   *Herrera*, 506 U.S. at 404.   However, the Court

> assume[d], for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim.   But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.

*Id*. at 417.

Wilson has not made such a showing.   He has not presented any newly discovered evidence or made a "truly persuasive demonstration of actual innocence."   *Id*.   Moreover, there are state avenues open to process his claim of actual innocence.   He can, as instructed by the state habeas court, file an extraordinary motion for new trial.   O.C.G.A. § 5-5-41.   Additionally, he may file a

request for clemency with the Georgia State Board of Pardons and Paroles. O.C.G.A. § 42-9-20.

Wilson also claims that his actual innocence should serve as a gateway to consideration of constitutional claims procedurally defaulted in state court.   "The actual innocence exception to the procedural bar is not meant to remedy ordinary errors in criminal judgments but is narrowly reserved for only 'fundamental miscarriage[s] of justice.'"   *Rozelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1011 (11th Cir. 2013) (quoting *Schlup*, 513 U.S. at 315).   "In the usual case the presumed guilt of a prisoner convicted in state court counsels against federal review of defaulted claims."   *House v. Bell*, 547 U.S. 518, 537 (2006).   To the extent Wilson asserts actual innocence of the underlying crime, he would have to show "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."   *Schlup*, 523 U.S. at 327.   To the extent he "challenges his death sentence in particular, he must show 'by clear and convincing evidence' that no reasonable juror would have found him eligible for the death penalty in light of the new evidence."   *Calderon v. Thompson*, 523 U.S. 538, 559-60 (1998) (quoting *Sawyer*, 505 U.S. at 348).   Wilson has not come close to making either of these showings.   Thus, the Court does not find this an "extraordinary case" where procedurally defaulted claims may be considered due to Wilson's actual innocence.   *Schlup*, 513 U.S. at 324.

## IV.   CONCLUSION

For the reasons explained above, Wilson's petition for writ of habeas corpus is **DENIED**.

### CERTIFICATE OF APPEALABILITY

A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a Certificate of Appealability ("COA").   28 U.S.C. § 2253(c)(1)(A).   As amended effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a [COA] when it enters a final order adverse to the applicant," and if a COA is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."

The Court can issue a COA only if the petitioner "has made a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   To merit a COA, the Court must determine "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"   *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations omitted).   If a procedural ruling is involved, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Under this standard, the Court issues a COA on the following issue: Whether trial counsel was ineffective during the penalty phase by failing to conduct a reasonable

investigation into mitigation evidence and by failing to make a reasonable presentation of mitigation evidence.[88]

In relation to all other claims, grounds, and issues raised in Wilson's Petition for Writ of Habeas Corpus (Doc. 1), the Court finds the standard shown above for the grant of a COA has not been met.

**SO ORDERED**, this 19th day of December, 2013.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

[88] This issue is part of Claim Two in Wilson's Petition for Writ of Habeas Corpus and is addressed in pages 17-73 of this Order.   (Doc. 1 at 11-22).